1    PRYOR CASHMAN LLP
       Ilene S. Farkas (*pro hac vice*)
2      ifarkas@pryorcashman.com
       M. Mona Simonian (*pro hac vice*)
3      msimonian@pryorcashman.com
       Marion R. Harris (*pro hac vice*)
4      mharris@pryorcashman.com
       Brian M. Maida (*pro hac vice*)
5      bmaida@pryorcashman.com
     7 Times Square
6    New York, New York 10036
     Phone: (212) 421-4100
7    Fax: (212) 326-0806

8    BRAUNHAGEY & BORDEN LLP
       Adam S. Cashman (State Bar No. 255063)
9      cashman@braunhagey.com
     747 Front Street, 4th Floor
10   San Francisco, California 94111
     Phone: (415) 599-0210
11   Fax: (415) 599-0210

12   Attorneys for Plaintiff *Epidemic Sound, A.B.*

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

17   EPIDEMIC SOUND, AB,                    CASE NO. 3:22-cv-04223-JSC

18              Plaintiff,                   **EPIDEMIC SOUND, AB'S MOTION
                                             FOR SUMMARY JUDGMENT ON
19      vs.                                  LIABILITY**

20   META PLATFORMS, INC., f/k/a FACEBOOK,   The Honorable Jacqueline Scott Corley
     INC.,
21                                           Hearing Date: February 26, 2026
                Defendant.                   Hearing Time: 10:00 a.m.
22                                           Place: Courtroom 8

23

24

25

26

27

28

1    **<u>NOTICE OF MOTION AND MOTION</u>**

2    **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR RESPECTIVE**

3    **COUNSEL OF RECORD:**

4        **PLEASE TAKE NOTICE** that, on February 26, 2026 at 10:00 am, or as soon thereafter

5    as may be ordered and heard by the Honorable Jacqueline Scott Corley in Courtroom 8 of the

6    United States District Court for the Northern District of California, located at 450 Golden Gate

7    Avenue, San Francisco, California 94102, Plaintiff Epidemic Sound, AB ("Epidemic") will and

8    hereby does move this court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for

9    summary judgment that Defendant Meta Platforms, Inc. ("Meta") is liable (directly or, in the

10   alternative, secondarily) for mass infringement of Epidemic's copyrighted sound recordings and

11   musical compositions at issue in this action, that Meta's copyright infringement was willful, that

12   Meta's affirmative defenses fail as a matter of law, and for such other relief the Court deems

13   appropriate (the "Motion").

14        Epidemic's Motion is based on this Notice, the supporting Memorandum of Points and

15   Authorities below, the accompanying declarations of Tom Höglund, Caroline Ekström, Lina

16   Melander, expert Paul Geluso, and M. Mona Simonian and the exhibits thereto, the complete files

17   and records in this action, and any additional material and arguments as may be considered in

18   connection with the hearing on this Motion.

19

20    Dated:  November 19, 2025                    Respectfully submitted,
                                                   PRYOR CASHMAN LLP
21                                                 *Ilene S. Farkas*
22                                                 Ilene S. Farkas (*pro hac vice*)
                                                     *ifarkas@pryorcashman.com*
23                                                 M. Mona Simonian (*pro hac vice*)
                                                     *msimonian@pryorcashman.com*
24                                                 Marion R. Harris (*pro hac vice*)
                                                     *m.harris@pryorcashman.com*
25                                                 Brian M. Maida (*pro hac vice*)
                                                     *bmaida@pryorcashman.com*
26                                                 7 Times Square
                                                   New York, New York 10036
27                                                 Telephone: +1.212.421.4100

28                                                 *Attorneys for Plaintiff Epidemic Sound, AB*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................ iv

MEMORANDUM OF POINTS AND AUTHORITIES.....................................................1

INTRODUCTION ..............................................................................................................1

MATERIAL, UNDISPUTED FACTS ................................................................................3

I.     The Parties ...............................................................................................................3

II.    Epidemic's Music Catalog, Licenses, And Ownership of Works At Issue .........4

    A.  Epidemic's Music Catalog ............................................................................4

    B.  Epidemic's Exploitation and Licensing Of Its Catalog................................4

    C.  Epidemic's Ownership of the Epidemic Tracks At Issue..............................6

    D.  Meta Conceded Epidemic's Ownership In Its Own Agreements with Epidemic ..........7

III.    Meta's Infringement of the Epidemic Tracks........................................................8

    A.  Meta's Interrogatory Responses Identifying Infringing Works ...................8

    B.  It is Undisputed the AL Infringing Tracks and the OA/RR Infringing Audio At Issue Reproduce and/or Embody the Epidemic Tracks........................9

    C.  Meta Has (Finally) Stipulated That the AL Infringing Tracks and OA/RR Infringing Audio are Substantially Similar to the Epidemic Tracks..............................11

    D.  Meta Has Infringed Epidemic's Works Via Its Audio Library....................11

       1.  Meta's Seeding and Control of the Audio Library..................................11

       2.  Meta Included the Epidemic Tracks in the Audio Library Without a License.......13

    E.  Meta Has Infringed the Epidemic Tracks Via Its OA/RR Features ............15

       1.  Meta's OA/RR Features .........................................................................15

       2.  Meta's Unauthorized Use of The Epidemic Tracks via the OA/RR Features........15

IV.    Meta Has Demonstrated A Brazen Disregard for Epidemic's Rights ...............16

    A.  Meta Knowingly Provides Epidemic the Wrong Version of the Rights Manager Tool ....................................................16

    B.  Epidemic Repeatedly Informed Meta That It Needed RM4M, As RM Pro Was Hindering Epidemic's Ability to Protect Its Music and Discover Meta's Infringements .....................................................19

C.  Epidemic Discovers in 2020 That Its Tracks Are Being Offered In Meta's Audio Library.................................................................................................................21

LEGAL STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 56.......................22

ARGUMENT ..............................................................................................................................22

I.     META DIRECTLY INFRINGED EPIDEMIC'S COPYRIGHTS ....................................22

A.  Epidemic Owns Valid Copyrights in the Epidemic Tracks.............................23

B.  The Infringing Works Copied Epidemic's Tracks...........................................24

1.  Meta Has Admitted Substantial Similarity Exists Between the Epidemic Tracks and the Infringing Tracks At Issue .........................................................24

2.  The Stipulation Is Consistent with the Direct Evidence of Copying from Epidemic ...................................................................26

3.  Epidemic's Tracks Are Widely Disseminated and Were Copied ...........................28

C.  Meta Directly Infringed The Epidemic Tracks By Distributing, Reproducing, and Performing the Infringing Works ..................................................................28

1.  Meta Reproduced, Distributed and Performed the Infringing Works Through the Audio Library and OA/RR.........................................................................28

2.  Meta Reproduced the Infringing Works.....................................................29

D.  Meta's Conduct Was Plainly Volitional ...........................................................30

II.    ALTERNATIVELY, META IS SECONDARILY LIABLE FOR INFRINGEMENT BY ITS USERS VIA META'S OA/RR FEATURES ............................................................32

A.  Meta Had Knowledge of the Direct Copyright Infringement of its Users.................32

B.  Meta Induced its Users to Infringe Epidemic's Copyrights Through Its Development and Offering of the OA/RR Features ...............................................................33

C.  Meta's OA/RR Features Materially Contribute Users' Infringement .........................34

III.   META'S INFRINGEMENT WAS NOT INNOCENT BUT IS WILLFUL.......................34

IV.    EPIDEMIC IS ENTITLED TO JUDGEMENT DISMISSING META'S REMAINING AFFIRMATIVE DEFENSES .........................................................................................34

A.  Meta's DMCA Safe Harbor Defense Fails.......................................................37

B.  Epidemic Is Entitled to Judgment on Meta's Express/Implied License Defense ........40

1.  There Is No Express License ...........................................................40

2.  Meta Has No Implied License ...........................................................41

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

C.  Epidemic Is Entitled to Judgment on Meta's Statute of Limitations Defense ............42

    1.  Epidemic's Claims Are Timely ..................................................................42

D.  Epidemic Is Entitled to Summary Judgment on Meta's Copyright Misuse Defense...43

E.  Epidemic Is Entitled to Summary Judgment on Meta's Unclean Hands Defense.......45

F.  Epidemic Is Entitled to Summary Judgment on Meta's Fair Use Defense.................47

G.  Epidemic Is Entitled to Summary Judgment on Meta's De Minimis Defense ...........47

H.  Epidemic Is Entitled to Summary Judgment on Meta's Estoppel Defense ................48

I.  Epidemic Is Entitled to Summary Judgment on Meta's Waiver Defense ...................49

VI. CONCLUSION ...............................................................................................................50

1          **TABLE OF AUTHORITIES**

2   <u>**CASES**</u>                                                                                    <u>**PAGES(s)**</u>

3

4   *A&M Recs., Inc. v. Napster, Inc.*,
       239 F.3d 1004 (9th Cir. 2001) ..................................................................... *passim*

5   *ABC, Inc. v Aereo, Inc.*,
6      573 U.S. 431 (2014)..........................................................................................31

7   *ABS Ent., Inc. v. CBS Corp.*,
       908 F.3d 405 (9th Cir. 2018) ...........................................................................25
8
9   *Adobe Sys. Inc. v. Canus Prods, Inc.*,
       173 F. Supp. 2d 1044 (2001) ...........................................................................32

10  *Adobe Sys. Inc. v. NA Tech Direct Inc.*,
11     No. 17-CV-05226-YGR, 2019 WL 5579472 (N.D. Cal. Oct. 29, 2019)....................48, 49, 50

12  *Agee v. Paramount Commc'ns, Inc.*,
       59 F.3d 317 (2d Cir. 1995)...........................................................................25, 30
13
14  *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*,
       239 F.3d 619 (4th Cir. 2001) ...........................................................................38

15  *Apple Inc. v. Psystar Corp.*,
16     658 F.3d 1150 (9th Cir. 2011) .........................................................................44

17  *Arista Recs. LLC v. Usenet.com, Inc.*,
       633 F. Supp. 2d 124 (S.D.N.Y. 2009)...........................................................31, 32
18
19  *Asia Ent., Inc. v. Nguyen*,
       No. 94-cv-985 (GLT), 1996 WL 652767 (C.D. Cal. June 10, 1996) .....................26

20  *Associated Press v. Meltwater U.S. Holdings*,
21     Inc., 931 F. Supp. 2d 537 (S.D.N.Y. 2013) ..........................................................48

22  *Atari Interactive, Inc. v. Redbubble, Inc.*,
       515 F. Supp. 3d 1089 (N.D. Cal. 2021) ........................................................37, 38
23
24  *BackGrid USA, Inc. v. Haute Living Inc.*,
       No. 2:21-CV-06543-FWS-SK, 2023 WL 2347082 (C.D. Cal. Jan. 6, 2023) .........................49

25  *Bangkok Broad. & T.V. Co. v. IPTV Corp.*,
26     742 F. Supp. 2d 1101 (C.D. Cal. 2010) .........................................................49

27  *Bell v. Wilmott Storage Servs., LLC*,
       12 F.4th 1065 (9th Cir. 2021) .....................................................................30, 31

28

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995)....................................................................................40

*Bright Solutions for Dyslexia, Inc. v. Lee*,
  No. 15-cv-01618-JSC, 2017 WL 10398818 (N.D. Cal. Dec. 20, 2017)...............................32

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
  No. 10-cv-419 (GPC) (WVG), 2012 WL 6553403 (S.D. Cal. Dec. 13, 2012)......................23

*Cable/Home Comm. Corp. v. Network Prods.*,
  902 F.2d 829 (11th Cir. 1990) ..............................................................................32

*Capitol Records, LLC v. ReDigi Inc.*,
  934 F. Supp. 2d 640 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018) .....................29, 31

*Capitol Recs., LLC v. Bluebeat, Inc.*,
  No. 09-cv-8030 (JFW), 2009 WL 10681957 (C.D. Cal. Nov. 18, 2009) ...............................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................22

*Chi-Boy Music v. Charlie Club, Inc.*,
  930 F.2d 1224 (7th Cir.1991) ...............................................................................35

*Clayborn v. Indep. Online Distribution All., Inc.*,
  No. 12-cv-6022 (PSG) (JCx), 2013 WL 12114835 (C.D. Cal. July 31, 2013).....................27

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ..............................................................28, 29, 33, 40

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
  259 F.3d 1186 (9th Cir. 2001) .........................................................................35, 37

*Daybreak Game Co. LLC v. Takahashi*,
  No. 25-CV-01489-BAS-BLM, 2025 WL 2691161 (S.D. Cal. Sept. 19, 2025).....................48

*Disney Enters., Inc. v. VidAngel, Inc.*,
  371 F. Supp. 3d 708 (C.D. Cal. 2019) .....................................................................27

*Ets-Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000) ..............................................................................23

*Facebook, Inc. v. Power Ventures, Inc.*,
  No. 08-cv-05780 (JF) (RS), Dkt. 58, 2009 WL 6326764 (N.D. Cal.) ...............................44

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)............................................................................................22

*Filmvideo Releasing Corp. v. Hastings*,
  668 F.2d 91 (2d Cir. 1981)....................................................................................41

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ........................................................................48

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
    80 F. Supp. 3d 535 (S.D.N.Y. 2015)...........................................................49

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ........................................................................34

*GoPro, Inc. v. 360Heros, Inc.*,
    291 F. Supp. 3d 1060 (N.D. Cal. 2017), *on reconsideration*, No. 16-CV-
    01944-SI, 2018 WL 574930 (N.D. Cal. Jan. 26, 2018) .............................41

*Goodman v. Universal Beauty Prods. Inc.*,
    No. 17-CV-1716 (KBF), 2018 WL 1274855 (S.D.N.Y. Mar. 9, 2018)...................45

*Gray v. Perry*,
    No. 15-cv05642 (CAS), 2018 WL 3954008 (C.D. Cal. Aug. 13, 2018) ................28

*Joe Hand Promotions, Inc. v. Maupin*,
    No. 2:15-cv-06355-(ADS)(AKT), 2018 WL 2417840 (E.D.N.Y. May 25, 2018).................50

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*,
    71 F.3d 996 (2d Cir. 1995)...........................................................................35

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
    676 F.3d 841 (9th Cir. 2012), *as amended on denial of reh'g and reh'g en
    banc* (June 13, 2012)............................................................................23, 27

*Leadsinger, Inc. v. BMG Music Publ'g.*,
    512 F.3d 522 (9th Cir. 2008) .......................................................................47

*Leegin Creative Leather Prods., Inc. v. Belts by Nadim, Inc.*,
    316 F. App'x 573 (9th Cir. 2009) ................................................................36

*Lions Gate Films Inc. v. Saleh*,
    No. 14-cv-06033 (ODW) (AGR), 2016 WL 6822748 (C.D. Cal. Mar. 24, 2016) ................28

*MAI Sys. Corp. v. Peak Comput., Inc.*,
    991 F.2d 511 (9th Cir. 1993) .......................................................................29

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ..............................................................37, 39

*Menzel v. Scholastic, Inc.*,
    No. 17-cv-05499, 2019 WL 6896145 (N.D. Cal. Dec. 18, 2019)..................40

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006) .........................................................45

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
   345 F. Supp. 3d 482 (S.D.N.Y. 2018)......................................................................44

*Micro Star v. Formgen Inc.*,
   154 F.3d 1107 (9th Cir. 1998) ................................................................................49

*Monge v. Maya Mags., Inc.*,
   688 F.3d 1164 (9th Cir. 2012) ................................................................................47

*Munoz v. Albuquerque A.R.T. Co.*,
   829 F. Supp. 309 (D. Alaska 1993), *aff'd*, 38 F.3d 1218 (9th Cir. 1994) ...............50

*Nintendo of Am., Inc. v. Storman*,
   No. 19-cv-7818 (CBM), 2021 WL 4780329 (C.D. Cal. Aug. 5, 2021)............34, 36

*Omega S.A. v. Costco Wholesale Corp.*,
   776 F.3d 692 (9th Cir. 2015) (Wardlaw, J. concurring) .........................................44

*Oracle Am., Inc. v. Google Inc.*,
   No. 10-cv-03561, 2012 WL 1965778 (N.D. Cal. May 31, 2012)...........................41

*Oracle Am., Inc. v. Terix Comput. Co., Inc.*,
   No. 13-cv-03385-PSG, 2015 WL 2090191 (N.D. Cal. May 5, 2015) ...............40, 41

*Oracle America, Inc. v. Hewlett Packard Enter. Co.*,
   No. 16-cv-01393-(JST), 2017 WL 2311296 (N.D. Cal. May 26, 2017) ................47

*Oracle USA, Inc. v. Rimini St., Inc.*,
   879 F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873 (2019)........................44

*Peer Int'l Corp. v. Pausa Recs., Inc.*,
   909 F.2d 1332 (9th Cir. 1990) ................................................................................37

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ..................................................................................32

*Perfect 10, Inc. v. Visa Int'l Serv, Ass'n*,
   494 F. 3d 788 (9th Cir. 2007) ............................................................................32, 33

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663 (2014)............................................................................................43, 47

*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*,
   982 F. Supp. 503 (N.D. Ohio 1997).......................................................................32

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*,
   668 F.3d 1148 (9th Cir. 2012) ...........................................................................23, 27

*Religious Tech. Ctr. v. Netcom On-Line Comm. Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995).......................................................................32

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  923 F. Supp. 1231 (N.D. Cal. 1995) ...........................................................................23

*Roblox Corp. v. WowWee Grp. Ltd.*,
  No. 22-CV-04476-SI, 2024 WL 4057403 (N.D. Cal. Sept. 3, 2024) .....................................46

*Rosen v. Masterpiece Mktg. Grp., LLC*,
  No. 15-cv-06629 (SJO), 2016 WL 7444688 (C.D. Cal. Nov. 29, 2016) ...............................23

*Sanrio, Inc. v. Ronnie Home Textile, Inc.*,
  No. 14-cv-06369, 2016 WL 5956096 (C.D. Cal. Jan. 5, 2016) .............................................35

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
  642 F. Supp. 2d 167 (S.D.N.Y.), *modified on reconsideration*,
  642 F. Supp. 2d 206 (S.D.N.Y. 2009) ...........................................................................49

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ...................................................................................25

*Starz Ent. LLC. v. MGM Domestic TV Distrib., LLC.*,
  39 F.4th 1236 (9th Cir. 2022) ...................................................................................42

*Stewart v. Abend*,
  495 U.S. 207 (1990).................................................................................................44

*Taylor Holland LLC v. MVMT Watches, Inc.*,
  No. 2:15-CV-03578-SVW-JC, 2016 WL 6892097 (C.D. Cal. Aug. 11, 2016) ....45, 47, 49, 50

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000), *overruled on other grounds by Skidmore as Tr.*
  *for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ........................26

*Travelers Cas. & Sur. Co. of Am. v. Coyle/Reno Joint Venture*,
  No. 17-cv-03141 (JSC), 2018 WL 3344661 (N.D. Cal. July 9, 2018) .................................22

*Turtle v. Sanctuary Recs. Grp., Inc.*,
  No. 03-cv-3922 (MMC), 2005 WL 2290310 (N.D. Cal. Sept. 20, 2005) .............................35

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
  715 F.2d 1327 (9th Cir. 1983) ...................................................................................26

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
  No. 14-cv-3466 (GW), 2016 WL 3457179 (C.D. Cal. Apr. 20, 2016)...................................42

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000)...........................................................................29

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
  853 F.3d 980 (9th Cir. 2017) ...............................................................................34, 37

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ...................................................................................23

*VMG Salsoul, LLC v. Ciccone*,
   824 F.3d 871 (9th Cir. 2016) .....................................................................................24

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
   704 F.3d 668 (9th Cir. 2012) .....................................................................................35

*Watkins Fam. Tr. Dated 1/7/94 v. Wallace*,
   No. 24-cv-02785 (JSC), 2025 WL 2210012 (N.D. Cal. Aug. 4, 2025)...................22

*Webcaster All., Inc. v. Recording Indus. Ass'n of Am., Inc.*,
   No. 03-cv-3948 (WHA), 2004 WL 1465722 (N.D. Cal. Apr. 1, 2004).................45

*Werner v. Evolve Media, LLC*,
   No. 18-cv-7188 (VAP), 2020 WL 3213808 (C.D. Cal. Apr. 28, 2020) ..................38

**STATUTES**

17 U.S.C. § 106(1)......................................................................................................29

17 U.S.C. § 107...........................................................................................................47

17 U.S.C. § 114(b).................................................................................................25, 29

17 U.S.C. § 410(c).......................................................................................................23

17 U.S.C. § 512(c).......................................................................................................37

17 U.S.C. § 512(c)(1)..................................................................................................39

17 U.S.C. § 512(c)(1)(A)(i) & (ii)..............................................................................39

17 U.S.C. § 512(c)(1)(B).............................................................................................39

17 U.S.C. § 512(c)(1)(C).............................................................................................39

Copyright Act § 106....................................................................................................22

**COURT RULES**

Fed. R. Civ. P. 56.......................................................................................................22

Fed. R. Civ. P. 56(a)...................................................................................................22

U.S. Copyright Office, Circular 56(a) at 2...................................................................6

U.S. Copyright Office Compendium, § 802.8(A)..........................................................6

1

## OTHER AUTHORITIES

2 Nimmer on Copyright § 8.11[B][4][d] (2025)....................................................................28

4 Nimmer on Copyright § 13E.09 (2025).........................................................................31

92nd Cong., 1st Sess. at 106 (1971)...............................................................................25

H.R. Rep. No. 105–551 (1998).......................................................................................38

H.R.Rep. No. 487 (1971)................................................................................................25

## WEBSITE

https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-
    Reports-Fourth-Quarter-and-Full-Year-2024-Results.].............................................34

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION

3      Epidemic brought this action to stop the theft of its music, created by hundreds of

4  Epidemic's musicians, songwriters, producers and vocalists – theft occurring knowingly,

5  intentionally and brazenly by Meta on its Facebook and Instagram social media platforms on a

6  daily basis.  Defendant Meta is not merely aware of this infringement.  It has actively infringed,

7  as well as participated in, encouraged and enabled such infringement.  In fact, Meta has created

8  tools whose primary purpose is to increase infringing uses on Facebook and Instagram.  Meta

9  knows it does not have a license from Epidemic.  Meta knows it needs such a license.  Meta is

10  infringing Epidemic's works and refuses to stop, perhaps hoping fatigue will win over undisputed

11  intellectual property rights.

12      Epidemic now moves for summary judgment on 869 Epidemic works that have been

13  infringed by Meta in one of two separate ways.  First, Meta has created, curated and controls its

14  own audio music library, one it has seeded with music that it offers to its billions of users to create

15  audiovisual posts.  Meta has recognized that it requires a license in order to offer this music library

16  to its users, and pays ███████████████████ each year in license fees (to others) to do so,

17  in order to compete with other social media platforms such as YouTube and TikTok, while

18  financially benefitting enormously from such an offering.  Meta knows Epidemic's music is being

19  delivered by unauthorized third parties to Meta and yet, Meta is adding them to its library anyway.

20  Worse yet, Meta is paying those unauthorized third parties for Epidemic's music.

21      In addition to its music library, in late 2020 and 2021, Meta developed and launched two

22  new features—Original Audio and Reels Remix—which encourage and allow its users to steal

23  even more of Epidemic's unlicensed music, at Meta's hands.  "Original Audio" was designed to

24  enable and encourage Meta's users to copy or "rip" unlicensed audio from publicly posted videos

25  (Reels) and reuse that unlicensed music in an unlimited number of other posts.  "Reels Remix"

26  allows users to reuse public Reels – including the unlicensed music therein – in their own posts.

27  Epidemic's music has been made available, copied, distributed, performed and synchronized via

28  Meta's tools on a constant basis without Epidemic's permission and without compensation to

1  Epidemic.[1]

2      This case is not about Meta's users uploading infringing user-generated content ("UGC").

3  It is about Meta *itself* actively and directly infringing Epidemic's works by copying them into its

4  online music library and then offering, reproducing, distributing and performing them to its billions

5  of users across its platforms without a license.  This case is about Meta creating features to enable

6  and encourage its unlicensed users to reproduce, synchronize and perform Epidemic's music

7  without compensation to Epidemic.

8      For years, Meta has ignored Epidemic's notices of infringement and refused its requests

9  for access to Meta's available tools that could help stop the infringement.  While Meta offers music

10  rightsholders certain rights management tools designed to enable copyright owners to identify,

11  protect and derive value from their music on Meta's platforms, Meta has repeatedly denied

12  Epidemic access to these same rights management tools for music content, without a legitimate

13  explanation.  The rationale is clear:  Meta knows that if it is forced to recognize Epidemic's

14  undisputed ownership of its content, it will have to properly compensate Epidemic.

15      Discovery has confirmed the massive infringement of Epidemic's works at issue – even

16  without the significant swaths of information spoliated by Meta after this case was commenced.

17  Meta's own sworn interrogatory responses ███████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████.  Even with these matches – confirmed by Meta's own

20  systems – Meta refused to acknowledge or address its continued unlicensed, uncompensated, theft

21  of Epidemic's music.

22      Meta has now, on the eve of summary judgment, finally stipulated to the substantial

23  similarity between the 869 Epidemic tracks at issue and over 5,000 matching tracks on its platform.

24  And yet still, despite (a) Epidemic's undisputed ownership of the Epidemic tracks at issue, (b) the

25  admitted substantial similarity between the tracks, (c) Meta's acknowledgement that it requires a

26  license for the uses of Epidemic's tracks at issue, (d) the undisputed lack of a written license for

27

28  _____

[1] Reels are short form videos, often containing music, that users create, post and consume on Instagram and Facebook.

such uses, Meta refuses to stop fighting Epidemic or to address its infringement.

Epidemic thus moves for summary judgment for liability on its claims for direct and secondary copyright infringement and to dismiss Meta's baseless affirmative defenses.

## **MATERIAL, UNDISPUTED FACTS**

A recitation of the relevant undisputed facts is set forth herein and in the accompanying Declarations of (i) Tom Hoglünd ("Höglund Decl."); (ii) Caroline Ekström ("Ekström Decl."); (iii) Lina Melander ("Melander Decl."); (iv) Paul Geluso ("Geluso Decl."); and (v) M. Mona Simonian ("Simonian Decl.") and the exhibits annexed thereto.

### I. **The Parties**

Plaintiff Epidemic is a global leader in the music industry headquartered in Sweden, with offices in the United States and around the world. Epidemic is the owner, producer, and distributor of over 51,000 world-class music tracks. (Höglund Decl., ¶ 3.) For each of those 51,000+ tracks, Epidemic is the owner of both the sound recording (*i.e.*, the master recording) and the musical composition (*i.e.,* the underlying music and lyrics) embodied therein. (Ekström Decl. ¶ 3.) Epidemic partners with its songwriters, artists and producers, collaborates in their creative process, and has the exclusive rights to market and distribute their original works for use in video content, podcasts, television and film production, on music streaming platforms, and other media so that they can share their music, increase their visibility, and be compensated for their work. (*Id*. ¶¶ 3, 12, 17; Hoglund Decl., ¶¶ 3-6.)

Defendant Meta (f/k/a Facebook, Inc.) is one of the most well-known and largest social media and technology companies in the world, with its headquarters in Menlo Park, California. Meta owns and operates, among other things, the widely used social media platforms Facebook, Instagram and WhatsApp. As discussed below, Meta actively and increasingly promotes the use of music on its platforms in order to remain competitive and profitable.

To encourage the use of music on its platforms, Meta offers certain music features or tools relevant to this action. *First*, in the second half of 2018, Meta created and began to curate its own audio library of purportedly licensed music that it makes available to its billions of users (the

"Audio Library")[2], allowing users to, among other things, synchronize music to content posted on its platforms. (Simonian Decl., Ex. 7 at RFAs 1-2; 4-8.) *Second*, in 2020, Meta developed and launched its "Original Audio" feature, which allows and encourages Meta's users to copy or "rip" out any music for which Meta does *not* have a license that appears in a public Reel on Meta's platforms, and reuse or incorporate it, in the user's own Reel or post (the "OA Feature"). (Simonian Decl., Ex. 13 at 22:2-23:4, 29:13-31:6, 32:4-7, 37:16-39:9; Ex. 31; Ex. 48 at META-EPDMS_00285405.) Meta developed and implemented a similar tool entitled "Reels Remix," which allows users to reuse public Reels (including the unlicensed audio therein), in their own Reels (the "RR Feature" and together with the OA Feature, the "OA/RR Features"). (*Id.* Ex. 16 at 15:25-16:24, 109:3-17; Ex. 19 at 16:8-17:6.) These features are described more fully below.

## II. <u>Epidemic's Music Catalog, Licenses, And Ownership of Works At Issue</u>

### A. *Epidemic's Music Catalog*

Epidemic's growing music catalog (currently including over 51,000 tracks) spans across many genres – including pop, rock, country, classical, alternative and hip hop. It includes tracks by Grammy award-winning artists such as Jordin Sparks, Lukas Nathanson, Ebo Krdum, and other well-known and producers Arc de Soleil and Honey Dijon. (Höglund Decl. ¶¶ 3-4.) Epidemic does not acquire existing catalogs; rather, Epidemic specifically commissions its music. Epidemic's Artists & Repertoire Team ("A&R") scouts and identifies both up-and-coming and established artists and creators from various countries, who then partner with Epidemic for the purposes of creating tracks *for and with Epidemic*. Epidemic's A&R remains intimately involved throughout the creation process, typically reviewing every demo and version of the tracks, up through their final mixes. (Ekström Decl. ¶12.) This process is intended to curate a well-rounded, valuable musical library, the rights to which Epidemic fully controls.

### B. *Epidemic's Exploitation and Licensing Of Its Catalog*

Epidemic owns 100 percent of the rights, including copyright, in both the sound recording and underlying musical composition for all music in its catalog. (Ekström Decl., ¶ 3.) It exploits

---

[2] The Audio Library is sometimes referred to as the "Music Picker." (Simonian Decl., Ex. 15 at 126:17-127:5.)

its catalog of music through various means, including on streaming services such as Spotify for audio-only listening, and for use in audiovisual productions (known as synchronization or "synch" licenses). (Höglund Decl. ¶ 5.)  And because Epidemic's music has been extremely popular among online content creators and social media influencers, Epidemic has found success through subscription-based offerings as well. (*Id.* ¶ 9.)  Epidemic offers individuals and corporate entities the ability to obtain a subscription, for a monthly or yearly fee, that provides a license to synchronize any track in its catalog with their audiovisual productions, including in social media posts, subject to the terms and conditions of the licenses. (*Id.* ¶ 9.)

Specifically, Epidemic offers a "Personal Plan" that is designed for individual creators and casual users, and a "Commercial Plan" that is designed for a single business user creating customer productions for most commercial uses. (*Id.* ¶ 10.)  Both the Personal and Commercial subscription licenses have express limitations on how Epidemic's music may be used – the idea being the licensees can use the music for their social media posts and online content and nothing else. (*Id.* ¶¶ 13-17.)  Licensees are prohibited from using Epidemic's music on a standalone, or audio-only, basis or in samples (*i.e.*, incorporated into another sound recording), audio libraries, with still images or limited animations, or from using Epidemic's tracks outside the licensee's own production. (*Id.*, Ex. 1, § 3.3; Ex. 2, § 3.4.3(b).)  Licensees are also expressly prohibited from using Epidemic's music in any way that would allow *others* to download, access, or use Epidemic's music on a standalone basis or in synchronizations. (*Id.*, Ex. 1, § 3.3; Ex. 2, § 3.4.3(c).) Epidemic precludes licensees from altering Epidemic's tracks, except to shorten or loop a track to fit a particular production. (*See, e.g.*, *id.*, Ex. 2, § 3.6.)  The rights granted to licensees are "non-transferable, and non-assignable and may not be sublicensed. . .".[3] (*Id.*, Exs. 1-2, § 3.5.)

Beyond subscription licenses, Epidemic also enters into bespoke, negotiated licenses with certain commercial users.  These are known as "Enterprise" licenses, with negotiated fees and terms.  Generally, each of these Enterprise licenses identify the number of "seats" (*i.e.*, permitted users within the licensee's organization) who may use Epidemic's music, the number of

---

[3] The Commercial Plan does allow limited sublicensing of certain rights to outside production companies for a user's production, though such right is not relevant here. (*Id.*, Ex. 2, § 3.2.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

productions – *i.e.,* synchronizations – for which the licensee can use Epidemic's music, the license term, and the territories in which Epidemic's music, as incorporated into the production, can be used, the license fee, among other material terms. (Höglund Decl. ¶¶ 18-20 & Ex. 3.)

The Enterprise licenses also explicitly bar the licensee from, *inter alia*, making Epidemic's music available on a standalone basis, in audio libraries, or in any way that allows others to download or access Epidemic's music on a standalone basis or in subsequent productions. (*Id.*, Ex. 3, § 2.7.) And just as with the subscription licenses, the Enterprise licenses also bar the right to distribute or exploit Epidemic's music outside of the licensee's production and bar the right to transfer, assign or generally sublicense the rights granted therein. (*Id.*, Ex. 3, § 2.8.)

The licenses contain an express acknowledgement that Epidemic holds all copyrights in and to the music in its catalog, that the licensee does not acquire any proprietary rights with respect to Epidemic's music, and that the music is "the sole property of" Epidemic. (*Id.*, Ex. 3, § 4; *see also* Exs. 1-2, § 7.)

C. *Epidemic's Ownership of the Epidemic Tracks At Issue*

At issue on this motion are 869 Epidemic tracks (including the sound recording and underlying musical composition for each track, totaling 1,737 copyrighted works) (the "Epidemic Tracks") which have been infringed by Meta, and represent a small sample of the rampant infringement that has been and continues to occur on Meta's platforms.[4] (*See* Ekström Decl., Ex. 1; Simonian Decl., Exs. 1-2.) For each of these 869 Epidemic Tracks, Epidemic has registered both the sound recording and musical composition incorporated therein with the U.S. Copyright Office. (Ekström Decl. at Exs. 1, 1A.)[5] Each of these registrations identifies Epidemic as the

---

[4] At the start of this litigation, Epidemic identified over 900 of its tracks which it suspected had been infringed and alleged that these tracks were a representative sample of Meta's widespread infringement of Epidemic's tracks. The Court later ruled that the identified 900 tracks would be the only tracks at issue in this particular litigation. Epidemic now moves on 869 of those tracks.

[5] While they are two separate copyrightable works, a sound recording and musical composition can be registered through a single sound recording application when "(1) the musical composition and sound recording are embodied in the same phonorecord and (2) the claimant for both the musical composition and sound recording are the same." U.S. Copyright Office, Circular 56(a) at 2; U.S. Copyright Office Compendium, §802.8(A). Here, several of the copyright registrations for the Epidemic Tracks are registered through the single registration (as indicated by the Registration identifying both the "sound recording' and the "music" or "music and lyrics," or similar inclusive notation).

1  claimant, or owner, of the sound recording and/or musical composition. (*Id.*) A list of the 869
2  Epidemic Tracks at issue on this motion and their corresponding U.S. Copyright Registration
3  numbers (and other relevant information) are annexed as Exhibit 1 to the Ekström Declaration.

4      In addition to the copyright registrations, Epidemic also has written agreements confirming
5  its ownership of the Epidemic Tracks (the "Transfer Agreements"). Epidemic enters into Transfer
6  Agreements with the performing artists, composers, and producers, which include full transfers of
7  all right, title, and interest in the creator's particular tracks and/or compositions to Epidemic,
8  including the copyright in and to the works. (*See e.g.*, Ekström Decl., Ex. 3 at 2, § 4.1 & 9.) The
9  Transfer Agreements also expressly provide that Epidemic is the sole and exclusive
10  owner/proprietor of the track being transferred. (*Id.*, Ex. 3 at 4, §4.3.) Epidemic has produced
11  such chain-of-title evidence for all of the Epidemic Tracks at issue. (Ekström Decl., Ex. 1C.)

12      Meta has failed to produce any evidence in this action which rebuts Epidemic's ownership
13  of the Epidemic Tracks. Epidemic's ownership of the works at issue is undisputed.

14      D. *Meta Conceded Epidemic's Ownership* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15      In fact, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



19                                                      (Ekström
20  Decl. ¶ 25, Exs. 13-14 at §5.2, 15-18 at § 7.2, 19-20 § 5.2; *see also* Simonian Decl. Ex. 12 at
21  171:12-173:6, 177:15-178:17; *see also* Simonian Decl., Ex. 37 at META-EPDMS_00262905
22  (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).)
23      Indeed, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  (Ekström Decl. ¶¶24-28, Exs. 13-38 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.)

28  ▓▓▓▓▓▓▓▓ (*Id.*)

1

**III. Meta's Infringement of the Epidemic Tracks**

2        Discovery has confirmed Meta's infringement of the Epidemic Tracks.  Each of these

3  Epidemic Tracks were either (i) reproduced, distributed, or performed by Meta through its Audio

4  Library, described below, and/or (ii) reproduced and distributed by Meta and/or its users without

5  authorization through Meta's OA/RR Features.

6        A.  *Meta's Interrogatory Responses Identifying Infringing Works*

7        During discovery, the Court ordered Meta to identify, for the relevant time period, each

8  work that matched an Epidemic Track that (i) appeared in Meta's Audio Library, and/or (ii) were

9  used in posts on its platforms created through the OA/RR Features.  (Simonian Decl., Exs. 8 at

10  77:1-78-17, 85:1-86:12; Ex. 9 at 3:18-4:19.) Meta thereafter provided: (i) a chart identifying audio

11  matches to the Epidemic Tracks that appeared in its Audio Library (the "AL Infringing Tracks")

12  as a response to Interrogatory No. 7 ("Rog 7 Response"), and (ii) a chart identifying audiovisual

13  posts on its platforms created using the OA/RR Features that included audio matching the

14  Epidemic Tracks (the "OA/RR Infringing Audio") as a response to Interrogatory No. 8 ("Rog 8

15  Response," together with the Rog 7 Response, the "Rog 7 & 8 Responses").  (*Id.*, Exs. 3-4.)[6]

16  Because the Rog 7 & 8 Responses over-designated matches to the Epidemic Tracks, as Meta

17  identified numerous "matches" containing minimal common audio, Epidemic seeks summary

18  judgment on a subset of these identified matches[7] – *i.e.*, the AL Infringing Tracks and OA/RR

19  Infringing Audio, which are identified in Exs. 1 and 2 to the Simonian Declaration.[8]

20

21

---

22  [6] Meta amended its Rog 7 & 8 Responses several times, ultimately altering and deleting columns
of information the Court ordered it to provide, and did not finally verify its responses until July
23  21, 2025.  (*See* Simonian Decl., Exs. 3-4.)  Further, as set forth in the Epidemic's Motion for
Spoliation Sanctions being filed concurrently with this motion (the "Spoliation Motion"), Meta
24  also conceded that it failed to preserve certain information and thus, its identification of matching
content and related information in its Rog 7 & 8 Responses is incomplete.
25  [7] Indeed, as also set forth in Epidemic's Spoliation Motion, this over-designation was avoidable
had Meta preserved the "percentage match" data its systems recorded showing the extent of
26  overlap between matching audio files.
[8] Because Meta's Rog 8 Response identifying instances of OA/RR Infringing Audio were
27  identified only by a video post identification number that could not be tied to the audiovisual files
it produced (thereby making it impossible to tie the evidence together), Meta's counsel eventually
28  provided Epidemic with a spreadsheet that provided the data necessary to connect the Rog 8
Response to its produced posts.  (*See* Simonian Decl., Ex. 5.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

B. *It is Undisputed the AL Infringing Tracks and the OA/RR Infringing Audio At Issue Reproduce and/or Embody the Epidemic Tracks*

Given the thousands of tracks and posts **that Meta identified** as sonically matching the Epidemic Tracks (with many songs having the same title and/or identifying "Epidemic" as the owner), Epidemic requested during discovery that Meta stipulate to the substantial similarity between the tracks at issue. (*See e.g. id*., Ex. 3 at Rows 75, 101, 300, 775, 805.) Indeed, the fact that Meta's audio fingerprinting systems matched the audio of the OA/RR Infringing Audio to the Epidemic Track indicates that the audio is "substantially very similar," as Meta's sworn witness confirmed. (*Id.*, Ex. 11 at 45:2-10.)

Meta only agreed to the stipulation long after the close of fact and expert discovery. As a result, because Meta failed to preserve its own data concerning the percentage of overlapping audio between the tracks at issue, Epidemic was forced to engage an audio expert, Prof. Paul Geluso,[9] to conduct a technological comparison of, *inter alia*, the Epidemic Tracks and thousands of potentially infringing works Meta had identified as matches in its Rog 7 & 8 Responses. (Geluso Decl., Exs. 1-2.) Prof. Geluso concluded that over 1,000 of the AL Infringing Tracks "reproduced or embodied the **entirety** of the [Epidemic sound recordings]," many of which were clear and obvious matches. (*Id.*, Ex. 1 ¶¶ 22, 57; Ex. 2 ¶ 7.)

For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, which was made available by Meta in its Audio Library. (Simonian Decl., Ex. 3 at Row 371.) The AL Infringing Track had an identical title to *City Night*, and the same duration: 3 minutes 58 seconds. (Geluso Decl., Ex. 1 ¶ 34.) Taking these indicators, together with his technological analysis, Prof. Geluso concluded that the AL Infringing Track was "identical – or extremely close to identical – to" *City Night*. (*Id.* ¶¶ 34-39; *compare* Ekström Decl., Ex. 1B at ES0000238 *with* Simonian Decl., Ex. 1A at META-EPDMS_00080764.)[10]

---

[9] Because Meta did not preserve percentage match data, Epidemic's expert was forced to examine over 4,600 "matches" identified by Meta's systems, including many matches that were ultimately deemed to be inconsequential or non-infringing (those matches are not part this motion).

[10] The sound recordings have been provided to the Court. The Court can hear this for itself. *See Capitol Recs., LLC v. Bluebeat, Inc.*, No. 09-cv-8030 (JFW) (JCx), 2009 WL 10681957, at *5 (C.D. Cal. Nov. 18, 2009) ("[T]he Court, albeit to its musically untrained ear, was unable to detect

1    Even when the AL Infringing Track matched to only a portion of the Epidemic Track, the

2    similarity between the two tracks was obvious.  For example, Meta identified the Epidemic Track,

3    *After A While / Smile* by artist Sum Wave ("*After A While*") as matching the AL Infringing Track

4    titled *Gimnasta* by artist Electronica ("*Gimnasta*").  (Simonian Decl., Ex. 3 at Row 30; ECF 350.)

5    Prof. Geluso concluded that the final 1 minute 37 seconds of *Gimnasta* is an identical reproduction

6    of a significant portion of the Epidemic Track *After A While*, with "no additional sounds or

7    perceptible alterations" and with "vocals from [*After A While* that] were seemingly identical in

8    [*Gimnasta*]."  (Geluso Decl., Ex. 1 ¶¶ 50-53; *compare* Ekström Decl., Ex. 1B at ES0000022 *with*

9    Simonian Decl., Ex. 1A at META-EPDMS_00042543.)

10    Prof. Geluso also analyzed the produced OA/RR Infringing Audio, concluding thousands

11    embody the same or a significant portion of the actual sounds in the corresponding Epidemic

12    Track.  (Geluso Decl., Ex. 1 ¶ 60.)  As an example, Meta identified a 58-second audiovisual post

13    with Post ID number 18338152759020139 that was posted to Meta's platforms on January 6, 2023

14    (almost six months into this litigation), remains live, and was created by ripping audio from another

15    post using the OA Feature.  (Simonian Decl., Ex. 4 at Row 72; ECF 350.)  Prof. Geluso concluded

16    that the 58-second post embodied the first 58 seconds of the Epidemic Track *Apollo* by artist

17    Dream Cave, in "extremely similar, if not identical form."  (Geluso Decl., Ex. 1 ¶¶ 54-56; *compare*

18    Ekström Decl., Ex. 1B at ES0000053 *with* Simonian Decl., Ex. 2A at META-EPDMS_00252967.)

19    Finally, Prof. Geluso concluded that where his "analysis determined that a significant

20    portion of the actual sounds are embodied in the two recordings," it necessarily "follow[s] that any

21    compositional elements that correspond to those sounds were also embodied in the tracks."

22    (Simonian Decl., Ex. 23 at 269:18-270:2.)  Put simply, because the infringing audio contains a

23    substantial portion of the actual sounds in Epidemic's sound recordings, it also necessarily contains

24    a substantial portion of Epidemic's musical compositions.[11]

25    Professor Geluso's findings are unrebutted.  Meta's sole expert musicologist purported to

26    _____

or discern any meaningful difference between [recordings at issue]").

27    [11] For one of the AL Infringing Tracks (*Feel The Energy* by artist Shay J), Prof. Geluso concluded
that it was only a compositional match to the Epidemic Track.  (Geluso Report, ¶ 59 & n.10;

28    *compare* Ekström Decl., Ex. 1B at ES000360 *with* Simonian Decl., Ex.1A at META-
EPDMS_00222401.)

"rebut" Prof. Geluso's findings, but that expert admitted that he did not perform a musicological analysis of the **sound recordings** at issue and was not even qualified to do so. (*Id.*, Ex. 24 at 40:14-42:4.) He further admitted that he took no issue with the findings of Prof. Geluso on the sound recording matches and did not even listen to the vast majority of the matches at issue. (*Id.*, Ex. 24 at 48:14-21, 53:17-57:4, 60:5-11.)

C.  <u>Meta Has (Finally) Stipulated That the AL Infringing Tracks and OA/RR Infringing Audio are Substantially Similar to the Epidemic Tracks</u>

After four years of litigation, and after forcing Epidemic to retain an expert to analyze over 4,600 "matching" tracks identified by Meta's systems (while Meta's "expert musicologist" reviewed less than 100), Meta finally agreed to stipulate to the substantial similarity between the Epidemic Tracks and the AL Infringing Tracks and OA/RR Infringing Audio at issue on this motion. The November 19, 2025 Stipulation provides, *inter alia*, that:

- There are 1,539 sound recordings that were in Meta's Audio Library (*i.e.*, AL Infringing Tracks), which contain a substantial portion of actual sounds contained in the corresponding Epidemic Track sound recording (identified in Exhibit 1 to the Stipulation);

- These 1,540 Accused Tracks that were in Meta's Audio Library contain musical compositions that are substantially similar to the musical compositions embodied in corresponding Epidemic Tracks;

- There are 3,482 OA/RR Posts identified in Exhibit 2 to the Stipulation (*i.e.*, OA/RR Infringing Audio) which contain a substantial portion of actual sounds contained in the corresponding Epidemic Track sound recording; and

- These 3,482 OA/RR posts contain musical compositions that are substantially similar to the musical compositions embodied in corresponding Epidemic Tracks.

(*See* ECF 350.) Meta finally stipulated to what its systems verified long ago.

D.  <u>Meta Has Infringed the Epidemic Works Via Its Audio Library</u>

1.  Meta's Seeding and Control of the Audio Library

Meta's Audio Library distributes a vast quantity of music to Meta's billions of Facebook and Instagram users for synchronization into user content posted to Meta's platforms. (Simonian Decl. Es. 7 at RFAs 1-2, 4-8, 10 at 41:5-14, 14 at 42:17-43:23, Ex. 52.) Meta also allows its users to search the Audio Library for music and to save copies of music from the Audio Library into their own personal libraries, and to perform or preview tracks so users can listen to them before

1  deciding to synchronize or save any particular track.  (*Id.*, Ex. 7 at RFAs 4-8.)

2        Meta controls the contents of its Audio library. ████████████████

3  ██████████████████████████████████████████████████.  (*Id.*, Ex. 17 at 167:1-5,

4  168:16-20, 170:2-171:18; Ex. 52.)  Meta organizes that music, allowing for search functions so its

5  users can "find" the music they want to synchronize with their visual content. ████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8       (*Id.*, Exs. 14 at 46:20-48:23, 51:10-56:10, 60:19-62:10; 25 at META-EPDMS_00282360-

9  65.) ████████████████████████████████████████████████████████████████

10  █████████████████████████  (*Id.*, Ex. 14 at 46:20-48:23, 49:25-50:9.)

11  ████████████████████████████████████████████████████████████  (*Id.* Ex.

12  14 at 48:8-23).  Critically, it is undisputed that, once Meta adds a track to the Audio Library, ███

13  ████████████████████████████████████████████████████████████████████

14         (*Id.*, Ex. 14 at 91:12-92:6, 92:15-93:12, 101:14-102:19, 103:17-104:21,

15  and Errata page; Ex. 17 at 126:21-127:6.)  And while Meta does permit takedowns of specifically

16  identified UGC posts that contain music from the Audio Library as required under the DMCA, ████

17  ████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████.  (*Id.*, Ex. 14 at Errata page.)

19  ████████████████████

20  ████████████████████████████████  (*Id.*, Ex. 17 at 58:9-59:15, 60:1-22; 211:21-

21  212:3, Ex. 12 at 30:9-18.)  Meta's own Head of Music Business Development and Partnerships,

22  Tamara Hrivnak, testified that ████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████  (*Id.*, Ex. 17 at 60:3-22; Ex. 16 at 43:11-15.)  As she admitted,

25  ████████████████████████████████  (*Id*, Ex. 17 at 211:21-212:3.)

26        Meta has agreed to pay ████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████

1  ████████████ (*See e.g.,* Simonian Decl., Exs. 26 at META-EPDMS_184976, 33 at META-

2  EPDMS_00133361, 34 at META-EPDMS_00133398, 57-58.) ████████████████████

3  ██████████████████████████████████████████ (*Id.*, Ex. 15 at 26:14-27:3; *see*

4  *also* Ex. 17 at 168:5-13.)[12]

5  ████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████ (*Id.*, Ex.

7  14 at 46:20-48:23.) █████████████████████████████████████████

8  ███████████ (*Id.*) ███████████████████████████████████████

9  ███████████████████████████████████████████████████████████

10  (*Id.*) ████████████████████████████████████████████████████

11  ███████████████████████████████████████████████

12  ████████████████████████ (*Id.*, Ex. 36.)

13      2.  <u>Meta Included the Epidemic Tracks in the Audio Library Without a License</u>

14      Meta's own records have revealed that ████████████████████

15  ████████████████████████████████ (Simonian Decl., Exs. 1-2.)  Meta

16  has offered and distributed these Epidemic Tracks to Meta's billions of users for free to use in

17  audiovisual posts, without permission from, or compensation to, Epidemic or its creators.  For

18  example, Meta's own records show that an exact copy of the Epidemic Track *I Will Wait for You*

19  by Yesable appeared in the Audio Library under the (very similar) title *I Will Wait* and under the

20  artist name "Ivichi."  (Simonian Decl. Ex. 1 at Row 601; ECF 350.)  This AL Infringing Track

21  was added to the Audio Library ███████████████████████████████████████

22  ████████████████████████████████. (Simonian Decl. Ex. 1 at Row

23  601.)  In that time, according to its own records, Meta reproduced and distributed this AL

24  Infringing Track from the Audio Library to its users for synchronization ████████ times.[13]

25  

---

26  [12] Meta employees confirmed that, as a rule, ████████████████████████████████

27  ████████████████████████████ (*Id.* Exs. 15 at 26:14-27:3, 17 at
   168:5-13.)

28  [13] This AL Infringing Track was also uploaded by users in UGC ████ times, and each time, Meta
   ████████████████████ (Simonian Decl., Ex. 3 at Row 805.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1  (Simonian Decl., Ex. 3 at Row 805.)  It is undisputed that the AL Infringing Track *I Will Wait* by

2  Ivichi is an identical copy of the Epidemic Track *I Will Wait For You* by Yesable, and it is

3  undisputed that the Epidemic Track had been released in 2014, ██████████████████

4  ████████████████████████ (Ekström Decl., Ex. 1 at Row 335; Geluso Decl. Ex. 1,

5  Visual Ex. A at AE000837.)  It is further undisputed that at no time did the party that delivered the

6  AL Infringing Track to Meta challenge Epidemic's ownership of that sound recording.  (Ekström

7  Decl. ¶ 33.)

8        Many supposed rightsholders that delivered AL Infringing Tracks to Meta ***admitted*** that

9  they copied the Epidemic Tracks delivered to Meta.  (*See, e.g.*, Ekström Decl. ¶¶29-32, Exs. 39-

10  41.)  And even where copying was not expressly admitted, many supposed rightsholders did little

11  to try to hide their copying.  112 of the AL Infringing Tracks delivered to Meta actually used the

12  same or an extremely similar title to the Epidemic Tracks.  (*See, e.g.*, Simonian Decl., Ex. 1 at

13  Rows 89-93, 97-98, 120, 201, 248-250, 258, 582-85, 593; ECF 350.)[14]  There are even seven

14  instances where an AL Infringing Track references "Epidemic" in the title or artist field.  (*Id.*, Ex.

15  1 at Rows 138, 140, 142-43, 146-48; ECF 350.)

16        Further, internal documentation shows Meta's awareness.  ████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████ (*Id.*, Ex. 35 at META-

19  EPDMS_00258450 (entries on pages 1-4, 11 of chart).)  Yet still, Meta took no steps to remove

20  these unauthorized tracks from the Audio Library.  Similarly, ████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████ (Simonian Decl., Ex. 30 at META-EPDMS_00187816 at

23  8:10:35 PST, 8:49:17 PST and 8:58:34 PST (████████████████████████████

24  ████████████████████); *id.*, Ex. 12 at 296:8-298:19.)  Despite this clear

25  knowledge, Meta simply continued to exploit Epidemic's music without a license and repeatedly

26  allowed the Epidemic Tracks to be synched to user content, saved to individual user libraries, and

27

28  ――――――――――――――――
[14] Several of these AL Infringing Tracks with similar or identical titles stem from the same
purported "artists" –repeat offenders delivering stolen works.

saved or previewed by users.

The list of the Epidemic Tracks infringed through Meta's Audio Library, together with their infringing counterpart AL Infringing Track are reflected in the Simonian Declaration, Ex. 1.

E. *Meta Has Infringed the Epidemic Tracks Via Its OA/RR Features*

1. Meta's OA/RR Features

In or around 2020, Meta introduced its "Reels" tool to its Instagram platform. (*Id.*, Ex. 13 at 22:23-23:4.)  In 2021, Meta launched Reels on the Facebook platform as well. (*Id.,* Ex. 16 at 32:9-11.) When Meta launched Reels, it also launched its "Original Audio" or "OA" feature to enable its users to take music for which Meta had not licensed – *i.e.*, what Meta has termed "Original Audio" – and use it in any subsequent post. (*Id.*, Ex. 16 at 30:25-31:4, 32:24-33:15, Ex. Ex. 61 at META-EPDMS_00285018.)  The OA Feature allows all of Meta's users to copy, or rip out the (unlicensed) Original Audio from a public Reel and synchronize that unlicensed music to content in their own Reels. (*Id.* Ex. 31; Ex. 48 at META-EPDMS_285405; Ex. 13 at 29:13-31:6, 32:4-7, 37:16-39:9.)  Meta deems unlicensed music as Original Audio, irrespective of whether the music is copyrighted, well known, or recognizable. (*Id.*, Ex. 13 at 83:5-84:1, 84:21-86:6; Ex. 14 at 96:16-98:3.)  Since the start of this litigation, Meta has begun offering "Original Audio" in its Audio Library. (*Id.* Ex. 13 at 17:18-24, 41:20-42:23, Ex. 10 at 42:11-23.)

Meta also offers a second, similar feature to its users, called "Reels Remix," or the RR Feature. (*Id.,* Ex. 16 at 15:25-16:24.)  The RR Feature allows a user to take all or part of another user's public Reel and incorporate it into their own content, such as by placing a portion of the Reel either side-by-side with or overlaid onto an existing Reel. (*Id.,* Ex. 16 at 109:3-17; Ex. 19 at 16:8-17:6.)  Remixed Reels copy the Reel (including unlicensed audio) from the original Reel, unless the user replaces the audio. (*Id.*).

2. Meta's Unauthorized Use of the Epidemic Tracks Via the OA/RR Features

Meta concedes that there are over 3,400 posts containing OA/RR Infringing Audio that were created using its OA/RR features. (Simonian Decl., Ex. 2; ECF 350.)  Meta has stipulated that the OA/RR Infringing Audio is (at least) substantially similar to the corresponding Epidemic Tracks (both the sound recording and musical composition), and its own systems confirmed this.

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1    (ECF 350.)  The undisputed record proves the OA/RR Infringing Audio is unauthorized.

2         Meta was fully aware it had no license for these uses of the Epidemic Tracks.  Indeed

3

4                                                                            (Simonian

5    Decl., Exs. 27-28, 12 at 201:15-202:21.)

6

7

8                                                      (Simonian Decl., Ex. 12 at 196:19-

9    199:15, 203-7:205:2.)                                                    (*Id.*, Ex. 29

10   at META-EPDMS_00181520; Ekström Decl., Ex. 15.)

11   **IV.** **Meta Has Demonstrated a Brazen Disregard for Epidemic's Rights**

12        A. *Meta Knowingly Provides Epidemic the Wrong Version of the Rights Manager Tool*

13        Meta's infringement was exacerbated by its deliberate refusal to give Epidemic access to

14   Meta's music-specific Rights Manager, preventing Epidemic from discovering the extent of

15   infringement by Meta or from otherwise protecting its intellectual property on the platform.

16        Meta offers certain rightsholders access to its proprietary digital rights management system

17   called, "Rights Manager" ("RM").  (Simonian Decl., Ex. 55.)  Meta boasts that RM is "a video,

18   audio and image-matching tool that [Meta] developed for rights holders of all sizes – from

19   individual creators to media publishers, sports leagues, music labels and others – to identify and

20   manage their content on Facebook and Instagram, including Live videos."  (*Id.*)  According to

21   Meta, its RM system was built and designed to identify copyrighted materials used on its platforms,

22   to enforce rights and to purportedly prevent infringement of such materials.  (*Id.*, Exs. 55-56.)

23   Meta's internal documents describe the RM team

24

25        (*Id.*, Ex. 49.)[15]

26   ───────────────────────

27   [15] Prior to and during development of RM, Meta employed a third-party vendor, Audible Magic,
     to scan all music usage on its platforms against Audible Magic's audio fingerprinting database to
     determine music usage on its platforms.  (Simonian Decl. Ex., 49 at META-EPDMS_00184799.)

28   In or around July 2022, Meta ceased using Audible Magic and then, in or around October 2022 –
     four months after the start of this lawsuit – Meta deleted all of the specific audio match data

1   Meta has different versions of RM with different capabilities.  For example, "Rights

2   Manager for Music" ("RM4M") is █████████████████████████████████████████

3   and "Rights Manager Pro" ("RM Pro") ████████████████████████████████████

4   ████████████████████████████████    (*Id*., Ex. 18 at 46:12-50:22; Ex. 36.)

5   Meta unilaterally determines which version of RM it will provide to any particular

6   rightsholder.  (*See id.* Ex. 55*,* Ex. 49; Ex. 18 at 56:2-5, 58:6-13.)  Thus, while Meta concedes that

7   RM4M is intended to allow music rightsholders to "identify and manage their content on Facebook

8   and Instagram," in reality, Meta only grants access ██████████████████████████████

9   █████████████████████████████████████████████████    (*Id.*, Ex. 18 at 54:19-23,

10  59:6-21, 60:21-25; Ex. 36; Ex. 62 (████████████████████████████████████████████

11  ██████████████████████████████████████████████████████).)

12  Despite the undisputed fact that Epidemic owns a music catalog consisting of tens of

13  thousands of sound recordings and musical compositions, Meta has only granted Epidemic an RM

14  Pro account intended for video (not audio) content owners.  RM Pro does not permit monitoring

15  of Meta's Audio Library content and does not allow for monitoring or controlling music usage at

16  scale.  (Simonian Decl., Exs. 36*;* 62; Melander Decl. ¶¶ 12-13.)  It is undisputed that (i) Epidemic

17  repeatedly requested access to RM4M so that it could adequately protect its copyrighted music at

18  scale, and (ii) Meta has consistently refused these requests.    (Melander Decl. ¶¶ 14-23.)

19  Meanwhile, internally, Meta employees ████████████████████████████████████████

20  ██████.  (Simonian Decl., Ex. 27 ████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  Meta's deliberate and undisputed refusal to grant such access to Epidemic is not

23  inconsequential.  As a general matter, the various versions of RM operate by comparing "reference

24  files" of content that RM users upload (content that they are *supposed* to own and are seeking to

25  protect), which allows Meta to digitally compare their content to content used on Meta's platforms.

26  *See id.* Exs. 49, 63; *see also* Ex. 36.)

27

28  identified by Audible Magic (thereby erasing all evidence of infringement of Epidemic's tracks
    that Audible Magic had identified on Meta's behalf up to that point).

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

The same scanning and matching process is undertaken by Meta for contents added to its Audio Library, as Meta also compares content between separate reference files (one or both of which could be in Meta's Audio Library).  (*See id.*, Exs. 21, 63, 49; 11 at 37:16-20.)  Since all RM users are supposed to own their reference files, such a match generates an "ownership conflict." Meta notifies

(*Id.*, Ex. 14 at 160:9-13.)

But not all "ownership conflicts" with Audio Library content are treated alike.  Rather, as Meta admits, Meta's RM system gives

(*Id.*, Ex. 14 at 160:9-13, 218:12-21.)

.  (*Id.*)  If a licensor with a RM4M account uploads a reference file that matches to an Epidemic reference file (*i.e.*, a track owned by Epidemic), ***Meta's systems prevents Epidemic from challenging that conflict and claiming ownership as against one of Meta's licensors***.  (*Id.*; Melander Decl. ¶¶ 12-13; Simonian Decl., Ex. 21 (

).)  Instead, Meta ***automatically***

(Simonian Decl., Ex. 14 at 218:12-21.)

Worse yet, once Meta determines the "other" party is the "owner" (based on nothing more than Meta has a license from that party), Meta's RM

(*Id.*, Ex. 18 at 281:8-17, 282;25-283:14.)  At bottom, RM is a discriminatory system built by Meta through which Meta determines who does and does not own content on its platforms.  For users like Epidemic, who had been given an inappropriate version of RM, Meta has made clear that its options are limited –

namely, to disclaim its ownership by removing/excluding reference files altogether, or altering the territories in which Epidemic may claims rights (and thus, being unable to police or protect Epidemic music on Meta's platforms).  (*Id.*, Ex. 18 at 274:22-278:7; Ex. 22.)

B.  *Epidemic Repeatedly Informed Meta That It Needed RM4M, As RM Pro Was Hindering Epidemic's Ability to Protect Its Music and Discover Meta's Infringements*

Epidemic repeatedly notified Meta of the unauthorized use of its music on Meta's platforms, the false claims of ownership on Epidemic's tracks and pleaded, over and over, for access to RM4M to allow it to protect its music.  The requests fell on deaf ears.

For example, in May 2018, after news spread of Meta entering into licenses with rightsholders (but before the Audio Library was released), Epidemic reached out to Meta ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Melander Decl., Ex. 1.) Epidemic advised Meta that its music ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 1 at -0843.) Epidemic further advised that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 1 at -0843.)[16] ▮▮▮▮▮▮▮ In June 2018, Epidemic advised Meta that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (*Id.*, Ex. 2 at -0925.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 2 at -0924.) Epidemic also advised Meta ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 2 at -0924.)  Epidemic then requested

---

[16] Meta had not yet introduced its Audio Library (or the OA/RR Features) at this time, and thus, Epidemic could not have possibly been aware of those future infringements.

(*Id.*, Ex. 2 at -0924.)  Epidemic advised Meta that

(*Id.*, Ex. 2 at -0924.)  Meta did nothing.

In July 2018, Epidemic notified Meta

(*Id.*, Ex. 2 at -0923 (emphases added).)  In response, Meta referred Epidemic

(*Id.*, Ex. 2 at -0923.)

(*Id.*, Ex. 2 at -0922.)

(*Id.* ¶ 19.)  Indeed, at this time, Epidemic had no idea that Meta was even offering an Audio Library to its users.  (*Id.* ¶¶ 19 n.2, 24-28.)

Epidemic repeatedly pointed Meta to conflicts being generated by Meta's RM system

---

[17] At this time, Epidemic was not even provided with the name of the track that was purportedly conflicting with Epidemic's music – another example of how Meta crippled Epidemic's ability to protect its rights. (Melander Decl., ¶¶ 12, 18.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

where Epidemic's songs were being falsely claimed by RM4M users, requesting Meta's assistance. (*See, e.g.*, *id.*, Exs. 1-5 & ¶¶ 14-23.)  Epidemic confirmed that it was the exclusive owner and distributor of its works.  (*Id.*, Ex. 3 at -0804-0805.)  Meta admitted it did not review Epidemic's conflicts or take any steps to address false claims.  (Simonian Decl., Ex.18 at 296:16-306:8.)

Epidemic raised with Meta the issues with RM every chance it could throughout 2019 and 2020.  (Melander Decl. ¶ 22 & Ex. 5.)  When Epidemic was finally able to see which tracks actually conflicting with Epidemic's reference files, Epidemic repeatedly notified Meta that infringing tracks were being delivered to Meta and Meta was assigning these false claimants the rights to control Epidemic's music.  (*Id.*, Ex. 4.)  Meta continued to ignore Epidemic's pleas and continued to refuse (even to this day) to give Epidemic access to RM4M.  (*Id.* ¶ 23.)  It also continued to allow its licensors to claim and win conflicts over Epidemic, despite being put on notice repeatedly that these distributors did not own the tracks (and there is no evidence that any of these distributors claimed to own them once a dispute arose).

### C.  *Epidemic Discovers in 2020 That Its Tracks Are Being Offered In Meta's Audio Library*

In late 2020, Epidemic discovered for the first time that an infringing track was in Meta's Audio Library.  (*Id.* ¶¶ 24-25.)  Epidemic also learned at that time that, in addition to not being able to dispute conflicts in their RM Pro account, their account did not notify Epidemic that conflicting tracks were in Meta's Audio Library.  (*Id.* ¶¶ 25-26.)  Alarmed, Epidemic then investigated to determine how many of its tracks were being reproduced and distributed in Meta's Audio Library.  (*Id.* ¶ 27.)  The investigation revealed that hundreds of Epidemic's tracks were being offered by Meta to its billions of users through the Audio Library, without license.  Many were delivered under fake titles and artist names (they were simply stolen), and many directly copied Epidemic's titles or artist.  (*Id.* ¶ 28.)

On December 17, 2021, Epidemic sent Meta a cease-and-desist letter, identifying 100 example tracks that were being made available in the Audio Library or were being infringed through the OA/RR Features.  (Simonian Decl., Ex. 38.)  Still, Meta did not remove the infringing tracks or cease infringing Epidemic's music.  Epidemic and Meta, through counsel, exchanged several more communications (and Epidemic identified additional works being infringed) over the

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1    course of several months.  (*Id.*, Exs. 39-41.)  Meta continued to take no action.  Ultimately,

2    Epidemic was forced to commence this lawsuit.[18]

3                **LEGAL STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 56**

4              Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment,

5    identifying each claim or defense—or the part of each claim or defense—on which summary

6    judgment is sought."  Summary judgment is proper "if the movant shows that there is no genuine

7    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

8    Civ. P. 56(a).  "The moving party bears the initial burden of demonstrating the lack of a genuine

9    issue of material fact."  *Watkins Fam. Tr. Dated 1/7/94 v. Wallace*, No. 24-cv-02785 (JSC), 2025

10   WL 2210012, at *2 (N.D. Cal. Aug. 4, 2025) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

11   (1986)).  "Where … the nonmoving party [] has the burden of proof at trial" – *e.g.*, Meta with

12   respect to its affirmative defenses – "the moving party can meet its burden on summary judgment

13   by pointing out that there is an absence of evidence to support the nonmoving party's case."

14   *Travelers Cas. & Sur. Co. of Am. v. Coyle/Reno Joint Venture*, No. 17-cv-03141 (JSC), 2018 WL

15   3344661, at *7 (N.D. Cal. July 9, 2018) (citation omitted).  There is no genuine dispute that Meta

16   has infringed Epidemic's copyrighted music through its Audio Library and its OA/RR Features.

17                                    **ARGUMENT**

18   **I.      META DIRECTLY INFRINGED EPIDEMIC'S COPYRIGHTS**

19            "To establish copyright infringement, a plaintiff must prove two elements: '(1) ownership

20   of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *L.A.*

21   *Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012), *as amended on denial*

22   *of reh'g and reh'g en banc* (June 13, 2012) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,

23   499 U.S. 340, 361 (1991)).  "The word 'copying' is shorthand for the infringing of any of the

24   copyright owner's [six] exclusive rights" under Section 106 of the Copyright Act.  *Range Rd.*

25   *Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153-54 (9th Cir. 2012); *A&M Recs., Inc. v.*

26   *Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  Copying can be established by direct evidence

27

28   _____

[18] Meta continues to allow infringing tracks into its Audio Library and continues to withhold
Epidemic access to RM4M.  (Melander Decl. ¶ 23.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

of copying.  *Range Rd. Music*, 668 F.3d at 1154. Copying can also be established by showing (1) that the defendant had access to the plaintiff's work and (2) that the two works are substantially similar.  *L.A. Printex*, 676 F.3d at 846 (quotation and citation omitted).  Here, it is undisputed that the AL Infringing Tracks and the OA/RR Infringing Audio are substantially similar to the Epidemic Tracks and that Meta's use of the Epidemic Tracks is unauthorized.  It is also undisputed that Meta controls its Audio Library and its OA/RR Features, and makes affirmative decisions about what music it chooses to license (or not).

## A.  <u>Epidemic Owns Valid Copyrights in the Epidemic Tracks</u>

Epidemic has copyright registrations for all of the Epidemic Tracks – including both the sound recording and the underlying musical composition[19] – which plainly identify "Epidemic Sound, AB" as the Copyright Claimant.  (*See* Ekström Decl. ¶¶ 4-5, Exs.1, 1A.)  The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).

For 537 of the Epidemic Tracks, the copyright registrations were made before or within five years after first publication and are presumptively valid.  *See id.*; *see also, Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1075 (9th Cir. 2000); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) ("A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.'").  The remaining registrations are still *prima facie* evidence of Epidemic's ownership, as routinely held by the Ninth Circuit.  *See, e.g.*, *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.,* No. 10-cv-419 (GPC) (WVG), 2012 WL 6553403, at *2 (S.D. Cal. Dec. 13, 2012); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1242 (N.D. Cal. 1995); *Rosen v. Masterpiece Mktg. Grp.*, LLC, No. 15-cv-06629 (SJO) (ASx), 2016 WL 7444688, at *6 (C.D. Cal. Nov. 29, 2016) (granting summary judgment for plaintiff because "the Court attributes substantial weight to the individual

---

[19] Music is generally covered by two separate copyrights: (1) a musical composition copyright, which covers the music and lyrics that make up a musical work or "song;" and (2) a sound recording copyright, which covers the recording of a particular performance of that musical composition or song.

1    registration certificates and finds them to be prima facie evidence of [plaintiff's] valid copyrights")

2    (citation omitted).

3         Epidemic also produced exhaustive chain-of-title documentation for all of the Epidemic

4    Tracks.  (Ekström Decl., ¶ 7 Ex. 1C.)  Each of the transfer agreements clearly provide that

5    Epidemic is the <u>sole and exclusive owner of all right, title and interest in the tracks.</u>

6         Epidemic does not solely rely on representations in transfer agreements to ensure its rights.

7    (*Id.* ¶¶ 12, 17.)  Epidemic participates in the creation of its tracks, working intimately with its

8    artists and creators throughout the creation process up through their final mixes.  Epidemic thus

9    has direct knowledge of *who* created its tracks, and *how* they were created.  (*Id.*)

10        Meta has not produced a single instance where any of its licensors or any third party

11   claimed to be the rightful owner of an Epidemic Track much less provided a copyright registration

12   or other documentary proof of ownership of any AL Infringing Track or OA/RR Infringing

13   Audio.[20]

14

15                    (Ekström Decl. ¶¶ 23-28, Exs. 13-38.)[21]

16                                                                                          (*Id.* ¶

17   25, Exs. 13-20.)  Epidemic's copyright ownership in the works at issue is undisputed.

18   **B.  <u>The Infringing Works Copied Epidemic's Tracks.</u>**

19        *1.  Meta Has Admitted Substantial Similarity Exists Between the Epidemic Tracks and*
          *the Infringing Tracks At Issue*

20        This is not a case where the Court must presume that copying occurred through reliance on

21   circumstantial evidence.  Rather, Meta has stipulated (ECF 350), as confirmed by Meta's systems

22   and Prof. Geluso, that the infringing works contain "a substantial portion of actual sounds" from

23   the Epidemic Tracks, which is the only similarity required to be shown for sound recording

24   infringement.  *VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 883 (9th Cir. 2016) (infringement

25   where "substantial portion of the actual sounds that go to make up a copyrighted sound recording

26

27   [20] While Meta may argue that a handful of rightsholders disputed infringement, none of those
     disputes concerned an AL Infringing Track actually at issue in this case, nor did anyone dispute

28   Epidemic's ownership of *the Epidemic Track* much less produce evidence of their ownership.
     [21] For the avoidance of doubt,                                                          .

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

are reproduced"); *see also Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 322 (2d Cir. 1995) ("[I]nfringement of copyright owner's reproduction right takes place 'whenever all or any substantial portion of the actual sounds that go to make up a copyrighted sound recording are reproduced'") (quoting H.R.Rep. No. 487, 92nd Cong., 1st Sess. at 106 (1971)); 17 U.S.C. § 114(b).  Meta has also stipulated that there is substantial similarity between the underlying musical compositions embodied in the Epidemic Tracks and Infringing Tracks.  ECF.350; *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (stating "the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities" and that, where works are "deemed substantially similar," that means "both tests [*i.e.*, the Ninth Circuit's extrinsic and intrinsic tests]" are "satisfied") (citation omitted).

The Stipulation is consistent with the findings of the only music expert to examine nearly all of the works at issue.  Because Meta failed to preserve its own data concerning the percentage of overlapping audio between the Epidemic Tracks and the AL Infringing Tracks and OA/RR Infringing Audio (and waited until the deadline for summary judgment to stipulate to substantial similarity), Epidemic engaged a music expert to evaluate the Epidemic Tracks on the one hand and the infringing works identified by Meta on the other hand.  Using a methodology and analysis that Prof. Geluso has performed previously and that the has Ninth Circuit expressly approved – *see ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 421 (9th Cir. 2018) (holding that Prof. Geluso's critical listening, waveform and spectral analysis was a reliable method of analyzing sound recordings and "his testimony should be considered in full") – Prof. Geluso determined that each of the of the AL Infringing Tracks at issue in this case reproduced or embodied the entirety or a substantial portion of the Epidemic Track, including both the sound recording and the underlying musical composition embodied therein.  (Geluso Decl., Ex. 1 ¶¶ 57-59 & Visual Ex. A; Ex. 2 ¶¶ 7-8 & Visual Ex. C.)  Prof. Geluso also concluded that the OA/RR Infringing Audio also embodied the actual sounds and musical compositions from the Epidemic Tracks, a fact that Meta's own systems and witnesses do not dispute.  (*Id.*, Ex. 1 ¶ 60 & Visual Ex. B; *accord* Simonian Decl., Ex. 11 at 45:2-10.)

Thus, the infringing works are plainly substantially similar to Epidemic's copyrighted

sound recordings and the musical compositions embodied therein (as Meta has stipulated).  And where, as here, the infringing works are strikingly similar to the infringed works, that is sufficient on its own to sustain an infringement claim.  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ("Furthermore, in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were 'strikingly similar.'"); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983) ("A grant of summary judgment for plaintiff is proper where works are so overwhelmingly identical that the possibility of independent creation is precluded.").  The sheer significance of the similarity of the AL Infringing Tracks to Epidemic's could only occur if they had copied from Epidemic.  *Asia Ent., Inc. v. Nguyen*, No. 94-cv-985 (GLT) (EEx), 1996 WL 652767, at *6 (C.D. Cal. June 10, 1996) (granting summary judgment on striking similarity where expert testified that infringing song had the same melody and lyrics as infringed song).

2.  *The Stipulation Is Consistent with the Direct Evidence of Copying from Epidemic*

The Stipulation is consistent with the direct evidence arising directly from Meta's own data.  Meta's audio recognition tools identified matches between the AL Infringing Tracks and the Epidemic Tracks.[22]  Meta compiled these matches and verified that they were, in fact, matches to the Epidemic Tracks in its Rog 7 Response.  (Simonian Decl., Ex. 3.)  Similarly, Meta recorded instances where the Epidemic Tracks were ripped out of content and reused by its users via Meta's OA/RR Features, and Meta identified these matches in its Rog 8 Response.  (*Id.*, Ex. 4.)

Meta's systems flagged the theft of Epidemic's music.  For example:

- Several of the AL Infringing Tracks included the same or very similar titles to the Epidemic Tracks, and several even included "Epidemic" in the title or artist.  (ECF 350; *see, e.g., id.*, Ex. 1 at Rows 89-93, 97-98, 120, 201, 248-250, 582-585, 593 and Rows 138, 140, 142-3, 146-48.)

- Many parties who delivered the AL Infringing Tracks to Meta **admitted** that they copied

---

[22] Meta's systems would flag conflicts between Epidemic Tracks and the initial infringing track when it was added to the Audio Library.  However, because Meta's systems automatically credited its own licensors over Epidemic as the rightsholder of that infringing track, Epidemic was not notified of any subsequent tracks that infringed that Epidemic Track in the Audio Library.  Epidemic only learned of those additional Audio Library Infringing Tracks in Meta's Rog 7 Response.

1    the Epidemic Tracks.  (*See, e.g.*, Ekström Decl. ¶¶ 29-33, Exs. 39-41.)

2    •    ████████████████████████████████████████

3    ████████████████████████  (Simonian Decl., Ex. 3 at Rows 1484,1652, and

4    1928; Geluso Decl., Ex. 1, Visual Ex. A at AE001526, -1695, -1973.)

5    •    Meta allowed *Entrenar Duro en el Gym* to remain in the Audio Library ████████, and
     allowed it to be distributed from the Audio Library to its users to use in their posts ████

6    separate times, while ignoring the infringement that its own systems flagged (and
     compensated its licensors for use of these stolen works, while continuing to refuse to obtain

7    a license from Epidemic).  (Simonian Decl., Ex. 3 at Rows 1484,1652, and 1928).  Meta
     also refused to allow Epidemic to take any steps to address the conflict themselves.

8    (Melander Decl. ¶¶ 12-13.)

9        These are just a few examples of the direct evidence of copying Epidemic's Tracks,

10   sufficient to establish copying.  *Clayborn v. Indep. Online Distribution All., Inc.*, is particularly

11   instructive on this point.  No. 12-cv-6022 (PSG) (JCx), 2013 WL 12114835 (C.D. Cal. July 31,

12   2013).  There, the court granted summary judgment in plaintiff's favor on its direct infringement

13   claim, without conducting a detailed similarity analysis, because there was direct evidence of

14   copying.  *Id.* at *3 (citation omitted).  The court relied on testimony that the plaintiff's works were

15   available for sale or download through online platforms, and that samples of the works sounded

16   identical to plaintiff's works.  *Id.*  And as is the case here, the court found it convincing that seven

17   of the infringing songs made available "h[ad] the exact same title" as identified on the plaintiff's

18   copyright registrations.  *Id.*  The court held that this evidence alone directly proved copying,

19   despite not even having the infringing audio files available for analysis.  *Id.* at *4; *see also Range*

20   *Rd. Music, Inc.*, 668 F.3d at 1154 ("A showing of 'substantial similarity' is irrelevant in a case like

21   this one, in which the Music Companies produced evidence that the public performances entailed

22   direct copying of copyrighted works."); *Disney Enters., Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d

23   708, 716-18 (C.D. Cal. 2019).  Here, given Epidemic's substantial evidence of direct copying taken

24   from Meta's own data, copying cannot be genuinely disputed.

25        *3.  Epidemic's Tracks Are Widely Disseminated and Were Copied*

26        Nor is there any dispute that Meta and the music licensors who delivered the AL Infringing

27   Tracks to it had access to the Epidemic Tracks and copied the Epidemic Tracks.  "Proof of access

28   requires an opportunity to view or to copy plaintiff's work."  *L.A. Printex*, 676 F.3d at 847.

1    "Absent direct evidence of access, a plaintiff can prove access using circumstantial evidence of …

2    widespread dissemination of the plaintiff's work." *Id.* (internal citations and quotations omitted);

3    *see also Gray v. Perry*, No. 15-cv05642 (CAS) (JCx), 2018 WL 3954008, at *5 (C.D. Cal. Aug.

4    13, 2018) (song's availability on YouTube and MySpace, with millions of views).

5    There is no dispute that Epidemic's catalog, including the Epidemic Tracks at issue, is

6    widely disseminated.  Epidemic's music is prevalent on the major media platforms, like Spotify,

7    YouTube, and TikTok and its undeniable popularity is measurable.  In 2017, Epidemic's catalog

8    was being streamed over 250 million hours per month on YouTube and by 2023, Epidemic's music

9    was featured in over 26 million YouTube and TikTok videos, generating 2.5 billion views per day;

10    today its music is now featured in over 3 billion daily views across YouTube and TikTok.

11    (Höglund Decl., ¶¶ 6-8.)  And Epidemic's music is utilized by the world's largest content creators,

12    including Mr. Beast.  (*Id.* ¶ 8)[23].

13    **C.  Meta Directly Infringed The Epidemic Tracks By Distributing, Reproducing, and**

14    **Performing the Infringing Works**

15    *1.  Meta Reproduced, Distributed and Performed the Infringing Works Through the*
      *Audio Library and OA/RR*

16    The law is clear that making unauthorized copies of copyrighted works available for users

17    to copy, synchronize, stream or download violates the exclusive right of distribution under Section

18    106(3) of the Copyright Act.  *See Napster, Inc.*, 239 F.3d at 1014 (making files available in a

19    search index for others to copy violate plaintiffs' distribution rights); *Columbia Pictures Indus.,*

20    *Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) (holding that making unauthorized copies of

21    copyrighted works available for download violates the copyright holders right to distribution and

22    reproduction); *Lions Gate Films Inc. v. Saleh*, No. 14-cv-06033 (ODW) (AGR), 2016 WL

23    6822748, at *3 (C.D. Cal. Mar. 24, 2016) (By hosting copies of a copyrighted film online,

24    defendants made copyrighted material available for download, which violated plaintiff's

25    distribution rights.); *see also* 2 Nimmer on Copyright § 8.11[B][4][d] (2025) ("The distribution

26    right accorded by Section 106(3) is to be interpreted broadly, consonant with the intention

27

28    ---

[23] Meta's employee categorized Epidemic's subscriber, MrBeast, as a ████████ ████████ (Simonian Dec., Ex. 10 at 41:5-14.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

expressed by its drafters. It extends to the offer to the general public to make a work available for distribution without permission of the copyright owner.").

Meta concedes – as it must – that the AL Infringing Tracks were offered and distributed to Meta's users for incorporation into content on Meta's platforms through its curated Audio Library. (Simonian Decl., Exs. 1, 3.) ███████████████████████████████████████ ███████████████████████████████████████████████████████████ (*Id.*, Ex. 3.)  Meta likewise distributed the OA/RR Infringing Audio via the OA/RR Features, allowing its users to rip the music and reuse and synchronize that music with their own content into a new post.  (*Id.,* Exs. 2, 4.)  During the course of this lawsuit, Meta also created and curated the admittedly "unlicensed" Original Audio assets in its Audio Library to make them available to users to incorporate into content on its platforms.  (*Id.* Ex. 13 at 17:18-24, 41:20-42:23, Ex. 10 at 42:11-23.)  Meta undeniably creates, curates and markets a library of knowingly unlicensed "original audio" to be distributed to its users.  There can be no genuine dispute that Epidemic's exclusive right of distribution has been violated.

### 2. Meta Reproduced the Infringing Works

Meta also infringed Epidemic's exclusive right of reproduction in at least two ways.  17 U.S.C. §§ 106(1), 114(b).  *First*, as described above, it is undisputed that, when the AL Infringing Tracks were delivered to Meta by its licensors, Meta downloaded them to its servers in order to offer them through the Audio Library.  (Simonian Decl., Ex. 20 at 16:19-17:12.)  It is further undisputed that Meta allowed users to preview and save the Epidemic Tracks, which required Meta to create a copy – or reproduce – the track for the user's offline use.  The Ninth Circuit has consistently held that downloading and/or creating copies of copyrighted material violates the exclusive right of reproduction and constitutes direct infringement.  *See, e.g.*, *A&M Records*, 239 F.3d at 1014; *Fung*, 710 F.3d at 1034; *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518 (9th Cir. 1993); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648-50 (S.D.N.Y. 2013).  Thus, by making copies to seed the Audio Library, delivering tracks to its users, and providing previews and saves to its users, Meta has directly violated Epidemic's exclusive right to reproduction.

1    It is also undisputed that when a user selected to use one of the AL Infringing Tracks from

2  the Audio Library, Meta delivered a reproduction of that track for incorporation into the

3  audiovisual content created by the user. The law is clear that "[a] synchronization of previously

4  recorded sounds onto the soundtrack of an audiovisual work is simply an example of the

5  reproduction right explicitly granted by section 114(b) to the owner of rights in a sound recording."

6  *Agee*, 59 F.3d at 322.

7    With respect to the OA/RR Infringing Audio, Meta's documents clearly establish that

8  

9    (Simonian Decl., Ex. 46 at META-EPDMS_00281208 (

10  

11  ).

12    *(Id.*, at p.18 (identifying

13  Meta had "~15B" custom Original Audio assets as of the date of the document).

14    **D.  Meta's Conduct Was Plainly Volitional**

15    Because "copyright infringement is a strict liability tort," "the word 'volition' in [the

16  copyright] context does not really mean an act of willing or choosing or an act of deciding, but

17  merely the unremarkable proposition that proximate causation historically underlies copyright

18  infringement liability no less than other torts." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065,

19  1081 (9th Cir. 2021) (quotations and citation omitted). Meta's conduct here – (i) electing to create

20  and support an Audio Library it makes available to its users, (ii) seeding that library with

21  copyrighted material (including the AL Infringing Tracks); and (iii) creating tools whose sole

22  function is to allow users to rip knowingly "unlicensed" audio (including the OA/RR Infringing

23  Audio) – was volitional and directly caused the infringements.[24]

24    Meta's infringement through the Audio Library was and continues to be undisputedly

25  volitional. Meta exercises direct control on what music it licenses, what music enters and what is

26  removed from the Library. *Bell*, 12 F.4th at 1081; *see* Section III.D.1, *supra; see also, Arista Recs.*

27  *LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009) (granting summary judgment

28  
─────────────────
[24] Thus, Meta's "Lack of Requisite Volition" defense fails. (ECF 57 at 13, Second Defense.)

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

for volitional conduct where defendants had and exercised control over which infringing songs their servers accepted and store and rejected).

Similarly, Meta's creation and implementation of the OA/RR Features specifically intended to allow reproduction of unlicensed music is undisputedly volitional. Meta decided to create, fully controls and operates these features, in that (i) it creates the unauthorized reproduction of the unlicensed audio assets, (ii) it decides when and on which posts these tools should be available for use, and (iii) it has the ability to disable these tools on certain posts and in certain instances (*See* Section III.E.1, *supra*.) And Meta admits ███████████████████████

████████████████████████████████████

████ (Simonian Decl., Exs. 13 at 23:8-24; 16 at 32:24-33:15, 116:18-117:6.) There can be no dispute that Meta has "exercised control" over these infringements and "has acted volitionally" for the purposes of direct infringement. *Bell*, 12 F.4th at 1081.

Nor can Meta simply point the finger at its users to deflect responsibility. In *ABC, Inc. v Aereo, Inc.*, the Supreme Court held that the defendant's service offering, which allowed subscribers to watch copyrighted television programs "almost as they are being broadcast," was directly liable for copyright infringement. 573 U.S. 431, 442 (2014). The *Aereo* majority rejected the argument that Aereo could not be directly liable because it was Aereo's subscribers that selected the content performed. *Id.*

Indeed, *Aereo* helped to "draw the proximate causation line for direct liability" where users of the defendant's service play some role in the infringement, establishing beyond doubt that:

> [W]hen an entire system is engineered to allow users to infringe copyright *each time* the user 'presses the button,' the system is the proximate cause of the infringement as surely as the individuals who use it. … The mere fact that a user 'presses the button' (or performs another comparably minor activity) cannot immunize from direct liability a defendant who spent millions investing in infrastructure and equipment designed for unauthorized exploitation of copyrighted material by members of the public.

4 Nimmer on Copyright § 13E.09 (2025).[25] Indeed, Courts have regularly held defendants directly liable for creation and implementation of systems of infringement. *See, e.g.*, *ReDigi Inc.*, 934 F.

---

[25] Nimmer's chapter on volitional conduct for direct liability has been approvingly cited by the Ninth Circuit numerous times, including in *Bell*, 12 F.4th at 1081.

EPIDEMIC'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-CV-04223-JSC

Supp. at 657 (system where copyrighted music could be sold); *Usenet.com, Inc.*, 633 F. Supp. 2d

at 148 (system where copyrighted music could be uploaded and downloaded by users); *Playboy*

*Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997) (system that

distributed copyrighted photographs).

## II.   ALTERNATIVELY, META IS SECONDARILY LIABLE FOR INFRINGEMENT BY ITS USERS VIA META'S OA/RR FEATURES

Even if, *arguendo*, there is an issue of fact regarding direct infringement for the OA/RR

Infringing Audio, Meta is nonetheless secondarily liable.

To establish secondary liability for copyright infringement, a plaintiff must show that the

defendant (i) had knowledge of the direct infringement; and (ii) either (a) materially contributed

or (b) induced the infringement.  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670 (9th Cir.

2017) (citing *Perfect 10, Inc. v. Visa Int'l Serv, Ass'n,* 494 F. 3d 788, 7995 (9th Cir. 2007)).  "In

an internet context, contributory liability is established when the defendant engages in personal

conduct that encourages or assists the infringement."  *Bright Solutions for Dyslexia, Inc. v. Lee,*

No. 15-cv-01618-JSC, 2017 WL 10398818, at *9 (N.D. Cal. Dec. 20, 2017) (Corley, M.J.) (citing

*Visa Int'l Serv., Ass'n,* 494 F.3d at 795) (finding, on default judgment, that the primary infringers

"could not complete transactions" without the actions of the contributory liability defendant).

Knowledge can be actual or constructive, meaning that the defendant knew or should have known

of the infringing activities.  *Adobe Sys. Inc. v. Canus Prods, Inc.,* 173 F. Supp. 2d 1044, 1048

(2001) (citing *Cable/Home Comm. Corp. v. Network Prods.,* 902 F.2d 829, 845-46 & n.29 (11th

Cir. 1990); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374

(N.D. Cal. 1995).  Here, the undisputed evidence demonstrates Meta's knowledge of the use of

Epidemic's works on its platforms, by its users, who reproduced, performed, and distributed its

works using Meta's own OA/RR Features, which were designed to propagate "unlicensed music"

across Meta's platforms.

### A.   Meta Had Knowledge of the Direct Copyright Infringement of its Users

Meta's use and deployment of digital rights management systems like RM (and prior to

RM, Audible Magic) provided Meta with full transparency into the use of sound recordings on its

platforms, at least for those that were registered with Meta, as the Epidemic Tracks were. It is undisputed that Meta's systems recorded the overlapping or conflicting uses of the Epidemic Tracks across Meta's platforms. It is undisputed that Meta's internal systems recorded the manner in which such uses occurred – for example, via Meta's Audio Library tracks, user upload already containing music, via the OA/RR Features. (*See, e.g.,* Simonian Decl. Exs. 3-4 (identifying such uses).)[26]

It is also undisputed that Epidemic repeatedly placed Meta on notice that Epidemic owns all of the rights to its tracks, that Meta had no license to exploit those tracks (even though it knew it needed one), and that Epidemic did not work with any distributors or third-party licensors at all. (Melander Decl., Ex. ¶¶ 14-23.) Thus, it is beyond dispute that the content generated by Meta's OA/RR Features containing the Epidemic Tracks was and is infringing. Despite Meta's substantial knowledge of specific infringement of the Epidemic's Tracks, it took no steps to remove the infringing material and, in many cases, largely ignored Epidemic's repeated outreach, which continues to this day. Having learned of specific infringement on its platforms and failing to purge such material, Meta "knows of and contributes to direct infringement." *Napster,* 239 F.3d at 1021.

## B. Meta Induced its Users to Infringe Epidemic's Copyrights Through Its Development and Offering of the OA/RR Features

A defendant induces copyright infringement when it (i) distributes a device or product; (ii) by which others commit copyright infringement; (iii) with the object of promoting its use to infringe copyright; (iv) which object caused the infringement by others. *See Fung*, 710 F.3d at 1020. This rule of inducement "applies to services available on the Internet as well as to devices or products." *Id.*; *see also Visa Int'l Serv. Ass'n*, 494 F.3d at 795. Meta's distribution of its Original Audio and Reels Remix tools via its platforms easily satisfies the standard for inducement of copyright infringement articulated by the Ninth Circuit.

It is undisputed that promoting the reuse of music for which Meta has no license ██████████████████████████████████████████████████████████ And, ██████████████████████████████████████████████████████████

---

[26] Meta's record on these uses (both the fact and the extent thereof) while robust, is just a fraction thereof, due to Meta's spoliation of critical data, as discussed in Epidemic's Sanctions Motion.

1  ████████████  underscoring Meta's intentional disregard for the rights of music content

2  owners, and its misleading (and incorrect) description of this tool of infringement to its users.

3  (Simonian Decl., Exs. 14 at 96:16-97:19 (███████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ██████████████████████████); *id.*, Ex. 13 at 83:5-84:1, 84:21-86:6.)

7      Meta's implementation of these features, which it admits drives user engagement, is

8  financially motived.  Increased user engagement is a key metric in increasing advertising revenues

9  on Meta's platforms.   These financial benefits can be substantial.  Meta's advertising revenue for

10  2024, for instance, totaled $160.6 billion.[27]

11      C.  **Meta's OA/RR Features Materially Contribute Users' Infringement**

12      Where a service, like Meta, provides "the site and facilities" for direct infringement, it

13  materially contributes to the infringing activity.  *Napster, Inc.,* 239 F.3d at 1022 (citing *Fonovisa,*

14  *Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996)).  Here, it is undisputed that Meta

15  provides the platforms and tools through which its users directly infringed Epidemic's copyrights

16  by creating, distributing and performing unauthorized copies.  This illegal conduct was made

17  possible only through Meta's offering of its OA/RR Features, which necessarily enabled the

18  infringement to occur.  Without such features, Meta's users could not rip the Epidemic Tracks out

19  of prior user posts and synchronize that music to their own content, thereby exponentially

20  increasing infringement of Epidemic's music on Meta's platforms.

21  **III.   META'S INFRINGEMENT WAS NOT INNOCENT BUT IS WILLFUL**

22      "[T]o prove willfulness under the Copyright Act, the plaintiff must show (1) that the

23  defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the

24  result of reckless disregard for, or willful blindness to, the copyright holder's rights."  *Nintendo of*

25  *Am., Inc. v. Storman*, No. 19-cv-7818 (CBM) (RAOx), 2021 WL 4780329, at *5 (C.D. Cal. Aug.

26  5, 2021) (quoting *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017)).  Such

27

28  [27] *See* https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results

knowledge of the infringement may be inferred from the defendant's conduct.  *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1010 (2d Cir. 1995).  Courts more readily hold that sophisticated party's infringement was willful, because they more likely were – or should have been – aware of the infringing activity.  *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (affirming willful infringement where defendant aired infringing works after notice despite being "an experienced businessman who understood the nature of [plaintiff's] copyright infringement claims").  Where "the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment."  *Sanrio, Inc. v. Ronnie Home Textile, Inc.,* No. 14-cv-06369 (RSWL) (JEMx), 2016 WL 5956096, at *8 (C.D. Cal. Jan. 5, 2016).

As the Ninth Circuit has recognized, evidence that an infringer continued its conduct after it has been put on notice of the infringement "is perhaps the most persuasive evidence of willfulness."  *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) (quoting *Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1227 (7th Cir.1991)).  Courts routinely hold that infringement was willful where it continues after, for example, the receipt of a cease-and-desist letter.  *See, e.g.*, *Turtle v. Sanctuary Recs. Grp., Inc.*, No. 03-cv-3922 (MMC), 2005 WL 2290310, at *2-3 (N.D. Cal. Sept. 20, 2005); *Sanrio*, 2016 WL 5956096, at *8.  There can be no doubt that Meta's infringements continued after its notice.

Epidemic pled with Meta, for years, to address the rampant infringement of its music on Meta's platforms – even before it was aware of these particular Epidemic Tracks being infringed. (Melander Decl., ¶¶ 14-23 & Exs. 1-5.)  Upon discovering n late 2020 that Meta *itself* was infringing Epidemic's music[28] – and specifically the Epidemic Tracks— through its Audio Library and through the OA/RR Features, Epidemic repeated its request that Meta address the infringement – a request that continued to fall on deaf ears even after Epidemic commenced this litigation.  (*Id.*, ¶¶ 24-28.)

But Meta did not need Epidemic to alert it to its infringements.  Meta – one of the most

---

[28] As explained further below (*infra* Argument § IV.C), though Epidemic was aware that Meta's platforms were littered with its works, it was *not* aware that Meta was distributing its works through the Audio Library until November 2020.

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

sophisticated technology companies in the world – knew of the infringements because its own systems and data flagged them.  Thus, when Meta was seeding its Audio Library, Meta was (or certainly should have been) aware of its illegal reproduction and distribution of the AL Infringing Tracks upon delivery to Meta, because Meta's systems flagged that the tracks were already in RM as belonging to Epidemic.  (*Id.*, ¶¶ 12-13 & Exs. 1-5.)  The same is true for the OA/RR Infringing Audio, which Meta knew would cause massive infringement and which triggered thousands of matches in Meta's own RM system.

Meta also refused to grant Epidemic access to the appropriate RM tools that would have allowed Epidemic to take steps to protect its works.  It did so knowing that Epidemic could do nothing to resolve the infringements in the Audio Library because of the limitations within their existing RM Pro access.

Meta was also put on direct notice of the infringements via two cease and desist letters sent by Epidemic's counsel on December 17, 2021 and again on February 17, 2022.  (Simonian Decl., Exs. 38-39.)  These letters contained detailed information on the nature of Meta's infringements and identified representative lists of hundreds of works being infringed in Meta's Audio Library and through its OA/RR Features. (*Id.*)  Still Meta failed to take any steps to remove the infringing works from the Audio Library, and indeed, continued to infringe many more of Epidemic Tracks, including many of the Epidemic Tracks at issue here.

Meta's infringement ***continued during the course of the litigation and in fact continues to this day***.  Meta's own records show that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (*See* Simonian Decl., Ex. 1.)  It is simply undeniable that such action is willful.  *Leegin Creative Leather Prods., Inc. v. Belts by Nadim, Inc.*, 316 F. App'x 573, 574 (9th Cir. 2009) (affirming summary judgment for willfulness where "the evidence established that Nadim continued to sell infringing watches after receiving notice of Leegin's lawsuit"); *Nintendo of Am., Inc.*, 2021 WL 4780329, at *5 (granting plaintiff summary judgment for willful infringement of 49 copyrights where plaintiff provided notice of "several infringing" copies, yet the infringement continued "after this lawsuit was filed");

1   *Krypton Broad. of Birmingham*, 259 F.3d at 1195 (affirming finding of willfulness where

2   defendant aired infringing works "well into the course of [the] litigation").

3       Meta also ███████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████ (Simonian Decl., Ex. 13 at 17:18-24,

6   41:20-42:23, Ex. 10 at 42:11-23.)  This brazen infringement of the Epidemic Tracks after being

7   sued, and its encouragement of the infringement of all rightsholders from whom Meta has no

8   license, is undeniably willful.

9       Meta knows it needs a license to distribute and otherwise exploit works on its platforms.

10  As explained above, Meta has spent ███████████████████████ to license catalogs of

11  music to distribute via the Audio Library.  And Meta knows it must license Epidemic's works,

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████. (Ekström Decl., Exs. 13-21.)  Thus, Meta's

14  continued infringement of the Epidemic Tracks after it was on clear notice by Epidemic and its

15  own data records constitutes willful infringement.  *See Peer Int'l Corp. v. Pausa Recs., Inc.*, 909

16  F.2d 1332, 1335-1336 (9th Cir. 1990); *Unicolors*, 853 F.3d at 991.

17      Epidemic should be granted summary judgment on a finding that Meta's infringement was

18  willful and Meta's affirmative defense of "Innocent Infringement" should be dismissed.

## IV.   EPIDEMIC IS ENTITLED TO JUDGEMENT DISMISSING META'S REMAINING AFFIRMATIVE DEFENSES

### A.   Meta's DMCA Safe Harbor Defense Fails

22      Meta asserts that it is immune from liability under Section 512(c) of the DMCA's "safe

23  harbor" provisions.  (ECF 57 at 14, Fifth Defense.)  It is not.  Section 512(c) of the DMCA provides

24  a safe harbor to "service provider[s]" for copyright infringement in certain expressly-defined

25  circumstances surrounding UGC only.  17 U.S.C. § 512(c).  "'To be eligible at the threshold for

26  the § 512(c) safe harbor, a service provider must show that the infringing material was stored **at**

27  **the direction of the user**.'"  *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113

28  (N.D. Cal. 2021) (quoting *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052

1   (9th Cir. 2017) (emphasis added); *see also ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619,

2   625 (4th Cir. 2001) ("This immunity, however, is not presumptive, but granted only to 'innocent'

3   service providers …").  As much as Meta tries, this case is not about UGC or content "stored at

4   the direction of the user."  The infringement at issue is based on, and has always been based on,

5   **Meta's** distribution and reproduction of the Epidemic Tracks – *i.e.*, *Meta's* curation and

6   implementation of an Audio Library through which it distributed the Epidemic Tracks to its

7   billions of users without a license and *Meta's* creation and implementation of features that allow

8   its users to rip Epidemic's music out of UGC and use it in subsequent unlicensed content.  *See*

9   *Werner v. Evolve Media, LLC*, No. 18-cv-7188 (VAP) (SKx), 2020 WL 3213808, at *8 (C.D. Cal.

10  Apr. 28, 2020).

11       Meta's infringements through the OA/RR Features are likewise not "by reason of the

12  storage at the direction of a user."  The infringement at issue here is not that users are uploading

13  content containing unlicensed Epidemic tracks onto Meta's platforms.  Rather, it concerns what

14  **Meta** does **after** Epidemic's music (whether licensed or unlicensed) is uploaded to its platforms.

15  Such activity is not protected by Section 512(c).

16       On this point, *Atari* is instructive.  515 F. Supp. 3d at 1113-14.  There, Atari sued

17  Redbubble – an online marketplace that sells products (*e.g.*, shirts, mugs, etc.) displaying user-

18  uploaded designs – for, *inter alia*, copyright infringement.  *Id.* at 1096.  The district court rejected

19  the argument that the user-uploaded infringing designs were being stored "at the direction of"

20  Redbubble's users and granted plaintiff's motion for summary judgment on the DMCA defense.

21  *Id.* at 1113-14.  The court relied on the fact that Redbubble was being sued not for storing the

22  uploaded images, but actions that it took **after** the upload, *i.e.*, because "Redbubble actively

23  participates in modifying the files uploaded by users to display the designs on Redbubble-selected

24  physical products."  *Id.* at 1114.  The same is true here.

25       Because the infringement at issue is *Meta's* infringing activity, Meta cannot establish this

26  threshold requirement for DMCA safe harbor.  Indeed, the legislative history makes clear that the

27  DMCA safe harbor does not protect infringements caused "through [the service provider's] ***own***

28  ***acts or decisions***."  H.R. Rep. No. 105–551, at 53 (1998) (emphasis added) (noting that such

1  infringements are "not at the direction of a user").

2  Nor can Meta meet another threshold requirement to claim DMCA safe harbor for its

3  infringements through the Audio Library, *i.e.*, that it had a "takedown" procedure in place that

4  allowed copyright owners to submit notifications of claimed infringement, which Meta

5  "expeditiously" responds to by removing the infringing content. *See* 17 U.S.C. § 512(c)(1)(C).

6

7

8  (Simonian Decl., Ex. 14 at Errata;

9  *see also*, Ex. 17 at 126:21-127:6 and Ex. 14 at 91:12-93:12, 101:14-102:19, 103:17-104:21).

10  Nor can Meta show, among other elements, "that (1) it lacked actual or red flag knowledge

11  of the infringing material; and (2) it did not receive a 'financial benefit directly attributable to the

12  infringing activity, in a case in which the service provider has the right and ability to control such

13  activity.'" *Livejournal*, 873 F.3d at 1052 (quoting 17 U.S.C. § 512(c)(1)).[29]  Because the Section

14  512(c) safe harbor is an affirmative defense, Meta must establish "beyond controversy every

15  essential element" or lose the protection of the safe harbor. *Id.*

16  Epidemic repeatedly notified Meta that its works were being infringed, including at least

17  two detailed cease-and-desist letters identifying hundreds of infringed works. (Melander Decl.,

18  Exs. 38-40.)  Meta's own systems (as admitted by Meta's Interrogatory Responses) provided Meta

19  with actual knowledge of all of the Audio Library conflicts and OA/RR Infringing Audio at issue

20  in this case, or at the very least, provided Meta with the information to make it "aware of facts or

21  circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(1)(A)(i) & (ii).

22  Thus, the DMCA safe harbor is unavailable.

23  Meta is also ineligible for the Section 512(c) safe harbor because it "receive[d] a financial

24  benefit directly attributable to the infringing activity, in a case in which the service provider has

25  the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  Meta controlled the

26

27  [29] This section is not exhaustive, and there are additional elements that Meta cannot establish
including but not limited to that it (1) is a service provider, (2) adopted and reasonably
28  implemented a repeat infringer policy, and (3) did not interfere with standard technical measures
used to identify or protect copyrighted works, to name a few.

1  activity. (*See* Facts § III.D.1, III.E.1 *supra*.) Meta annually derives hundreds of billions of dollars

2  from advertising revenue based on ads surrounding its posts and thus received a financial benefit

3  directly attributable to the infringing activity. *See Fung*, 710 F.3d at 1045 (granting summary

4  judgment for plaintiff where "Fung's income stream derived from advertising is sufficiently direct

5  to meet the direct 'financial benefit' prong" where Fung, *inter alia*, promoted advertising by

6  pointing to infringing activity, obtained advertising revenue that depended on the number of

7  visitors to his sites, and encouraged that infringing activity).

8  **B. Epidemic Is Entitled to Judgment on Meta's Express/Implied License Defense**

9  Meta has never obtained a license from Epidemic for the use of Epidemic's music (or

10 specifically the Epidemic Tracks) in either the Audio Library or through its OA/RR Features.

11 *1. There Is No Express License*

12 "A defendant asserting a license defense has the initial burden of identifying any license

13 provision that puts it in the clear." *Oracle Am., Inc. v. Terix Comput. Co., Inc.*, No. 13-cv-03385-

14 PSG, 2015 WL 2090191, at *1 (N.D. Cal. May 5, 2015); *Menzel v. Scholastic, Inc.*, No. 17-cv-

15 05499, 2019 WL 6896145, at *2-3 (N.D. Cal. Dec. 18, 2019) (quoting *Bourne v. Walt Disney Co.*,

16 68 F.3d 621, 631 (2d Cir. 1995)). Meta cannot meet that burden.

17

18

19 (Simonian Decl., Ex. 7 at RFAs 9, 10.)

20 (*Id.* at Ex. 17 at 58:9-59:15, 60:1-22; 211:21-212:3, Ex. 12

21 at 30:9-18.) In fact,

22

23

24

25 Nor is there any express license authorizing Meta to reproduce and distribute Epidemic's

26 tracks through its OA/RR feature. Rather,

27 (*Id.*, Ex. 29 at META-EPDMS_00181520.) Meta then

28

1  ███████████████ (Ekström Decl. ¶ 26, Exs. 15, 17, 18.)

2      *2.  Meta Has No Implied License*

3      Implied licenses are found only in "exceedingly narrow" circumstances. *Oracle*, 2015 WL

4  2090191, at \*8; *Oracle Am., Inc. v. Google Inc.*, No. 10-cv-03561, 2012 WL 1965778, at \*1 (N.D.

5  Cal. May 31, 2012).   Meta's alleged "implied license" seems to stem from its argument that

6  because Epidemic is "encouraging its [licensed] subscribers to post their content on Meta's

7  platforms" and authorizing their "certain uses of content on Meta's platform," Meta appears to

8  suggest that it then has free reign to then take Epidemic's music and do what it wishes with it.

9  (ECF 57 at 14.) But Meta's reliance on the conduct of Epidemic's paying subscribers is misplaced.

10      It is axiomatic that one "cannot convey away that which he does not own." *Filmvideo*

11  *Releasing Corp. v. Hastings*, 668 F.2d 91, 93 (2d Cir. 1981).   First, it is wholly unclear how Meta

12  could claim an "implied license" to distribute Epidemic's tracks through its <u>Audio Library</u> simply

13  because a user, who appropriately obtained a license from Epidemic, used that licensed music in

14  an authorized post.  Epidemic's limited subscriber licenses plainly and expressly prohibit the sub-

15  licensing of Epidemic's works beyond Epidemic's subscribers' own audiovisual posts, and further

16  prohibit distribution of Epidemic's audio on a standalone basis (*i.e.*, separate from the audiovisual

17  content of that subscriber).  (Höglund Decl., Exs. 1-3.)  And because subscribers have no right to

18  sublicense or distribute Epidemic's tracks separate and apart from their synchronized audiovisual

19  content under their licenses with Epidemic, neither Meta nor its billions of users could have

20  obtained the right to re-use that audio using the OA/RR features to create unlimited other

21  synchronized uses. Put simply, Epidemic's subscribers could not have granted to Meta a right they

22  never had.  *See GoPro, Inc. v. 360Heros, Inc.*, 291 F. Supp. 3d 1060, 1074 (N.D. Cal. 2017), *on*

23  *reconsideration*, No. 16-CV-01944-SI, 2018 WL 574930 (N.D. Cal. Jan. 26, 2018); *see also*

24  *Oracle*, 2015 WL 2090191, at \*8.  Thus, the suggestion that Meta has an "implied license" to offer

25  Epidemic's entire (or even a portion) catalog of musical compositions and sound recordings to its

26  billions of users for free, without compensation to Epidemic or its creators, because Epidemic's

27  (paid) subscribers are allowed to create posts pursuant to their license with Epidemic is baseless.

28      Moreover, Meta could not possibly have inferred that Epidemic consented to its use of

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1   Epidemic's works when Epidemic was consistently and repeatedly objecting to the use of its works

2   on Meta's platforms.  *Id.* (no implied license because there was "no reasonable justification" for

3   how "a clear objection to their conduct could constitute consent").  ██████████████████

4   ████████  in license fees to others further underscores that even Meta does not believe it

5   can claim a retroactive license based on authorized licensee posts.  Meta's affirmative defense

6   based on an "implied" or "express" license should be dismissed.

7      **C.  Epidemic Is Entitled to Judgment on Meta's Statute of Limitations Defense**

8      Meta's statute of limitations defense, claiming that "[a]ny claims based on conduct prior

9   to July 2019 are [] barred" is wrong, both on as a matter of law and on the record.  (ECF 57 at 14-

10   15, Seventh Defense.)

11     There is a three-year statute of limitations for copyright infringement.  In the Ninth Circuit,

12   a copyright infringement claim accrues "when the copyright owner discovers, or reasonably should

13   have discovered, the infringement."  *Starz Ent., LLC v. MGM Domestic TV Distrib., LLC*, 39 F.

14   4th 1236, 1240-41 (9th Cir. 2022); *see also UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, No.

15   14-cv-3466 (GW) (JPRx), 2016 WL 3457179, at *1 (C.D. Cal. Apr. 20, 2016).  "[T]he statute of

16   limitations runs separately for each successive incident of infringement."  *Starz*, 39 F.4th at 1241.

17      *1.  Epidemic's Claims Are Timely*

18     Epidemic commenced this action on July 20, 2022 (ECF 1, 14) and thus any claim accruing

19   on or after July 20, 2019 is unquestionably timely.  First, Meta launched the OA/RR Features on

20   its platforms in 2020 and 2021, thus all of Epidemic's claims for infringement via these features

21   are timely, as they could not have accrued before the launch of the infringing tool.

22     With respect to the claims for the Audio Library infringements, Meta ███████████

23   ████████████████████████████████████, and thus, Meta's distribution and

24   reproductions occurred within three years of the commencement of this action. (Simonian Decl.,

25   Ex. 1.) ███████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ███████████████████████████████████  (*Id.*) As such, the

28   claims for infringement based on Meta's distribution and/or reproductions are undoubtedly timely

1   under the separate-accrual rule. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014)

2   ("Each time an infringing work is reproduced or distributed, the infringer commits a new wrong.

3   Each wrong gives rise to a discrete 'claim' that 'accrues' at the time the wrong occurs."); *Goodman*

4   *v. Universal Beauty Prods. Inc.*, No. 17-CV-1716 (KBF), 2018 WL 1274855, at *7 (S.D.N.Y. Mar.

5   9, 2018) (statute of limitations did not bar damages for infringing acts – subsequent sales of the

6   product featuring the infringing photograph – within the three-year period).

7        Further, for the AL Infringing Tracks, Epidemic did not discover these infringing tracks

8   until <u>at the earliest</u> November 2020 when it undertook an investigation after learning that one of

9   its tracks being claimed by another rightsholder was being distributed by Meta in its Audio Library

10   (a fact that Meta had failed to disclose to Epidemic despite repeated discussions between the parties

11   concerning these false claims). (Melander Decl., ¶¶ 24-28.) That investigation led to the discovery

12   of Meta's infringement of the Epidemic Tracks in late 2020 and through 2021, and ultimately this

13   commencement of this suit in 2022. (*Id.*) Within approximately one year from the launch of

14   Epidemic's investigation, it had sent Meta a detailed cease-and-desist letter, identifying numerous

15   tracks that were being made available in the Audio Library without authorization, and within less

16   than 7 months from that point, Epidemic sued Meta. (Simonian Decl., Exs. 38-39.) The law is

17   clear that a copyright infringement claim "accrue[s] when the copyright owner discovers, or

18   reasonably should have discovered, the infringement." *Starz*, 39 F.4th at 1241.

19      **D.  Epidemic Is Entitled to Summary Judgment on Meta's Copyright Misuse Defense**

20        Epidemic previously explained in its motion to strike why Meta's copyright misuse defense

21   fails as a matter of law. (ECF 126, 133.) While this Court expressed skepticism about Meta's

22   misuse theory, observing "[i]t didn't sound like" copyright misuse, the Court permitted the defense

23   to proceed to discovery. (Dec. 18, 2023 Tr. 47:13.) There is nothing in the record to support a

24   "copyright misuse" defense.

25        "The defense of copyright misuse forbids a copyright holder from securing an exclusive

26   right or limited monopoly not granted by the Copyright Office." *Napster, Inc.*, 239 F.3d at 1026

27   (citation & quotation omitted). Put differently, the copyright misuse doctrine prevents holders of

28   copyrights "from leveraging their limited monopoly ***to allow them control of areas outside the***

1   ***monopoly***." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011) (quoting *Napster*,

2   239 F.3d at 1026) (internal quotation marks omitted) (emphasis added); *Oracle USA, Inc. v. Rimini*

3   *St., Inc.*, 879 F.3d 948, 958 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873 (2019) (quoting *Apple*,

4   658 F.3d at 1157) ("specifically, [copyright misuse] operates when copyright holders attempt to

5   impose license agreements that would 'prevent ... licensees from using ***any other competing***

6   ***product***'") (emphasis in original).  Copyright misuse typically would apply where there is "a

7   violation of the antitrust laws … [or] the public policies underlying the copyright laws." *Omega*

8   *S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 700 (9th Cir. 2015) (Wardlaw, J. concurring).[30]

9   Courts have been cautioned by the Ninth Circuit to "appl[y] the doctrine sparingly." *Apple*, 658

10   F.3d at 1157.

11        There is no evidence in the record to support Meta's copyright misuse defense.  There is

12   no evidence that Epidemic is using its copyrights to control rights outside copyright, or to prevent

13   Meta's use of competing products.  Rather, Meta's "copyright misuse" defense boils down to

14   Epidemic's unremarkable assertion that Meta needed a license to exploit Epidemic's music on its

15   platforms and through its Audio Library and OA/RR features.

16        Meta seeks to admonish Epidemic for seeking "a blanket license to Epidemic's complete

17   catalog" while suing on a smaller subset of works, ███████████████████████

18   ████████████████████████████████ Meta cannot avoid liability for its mass

19   infringement simply because Epidemic sought ████████████████████[31]

20        The law is abundantly clear that, as a copyright holder, Epidemic controls the terms on

21   which its works may or may not be licensed.  *Stewart v. Abend*, 495 U.S. 207, 229 (1990) ("[T]his

22   Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who

23   seeks to exploit the work."); *Napster*, 239 F.3d at 1027; *Michael Grecco Prods., Inc. v. Valuewalk,*

24

---

25  [30] Meta has previously argued to this Court that "the overwhelming majority of cases in which the misuse doctrine has been invoked deal with instances in which a copyright holder licensed rights

26  to its copyright to a third-party on the condition that the third-party would not also use a competitor's products." *Facebook, Inc. v. Power Ventures, Inc.*, No. 08-cv-05780 (JF) (RS), Dkt. 58, 2009 WL 6326764 (N.D. Cal.).

27  [31] ████████████████████████████████████

28  █████████████████████████████████

*LLC*, 345 F. Supp. 3d 482, 511 (S.D.N.Y. 2018) (no copyright misuse because "[a]s part of the rights granted to it under the Copyright Act, Plaintiff is entitled to issue licenses only on terms the copyright owner finds acceptable if it wishes") (citation & quotation omitted).  While Meta need not accept Epidemic's terms, it certainly cannot reject those terms and then absolve itself of liability for mass infringement because it wished for a more favorable offer.  *See, e.g.*, *Webcaster All., Inc. v. Recording Indus. Ass'n of Am., Inc.*, No. 03-cv-3948 (WHA), 2004 WL 1465722, at *6 (N.D. Cal. Apr. 1, 2004) (dismissing copyright misuse claim based on a supposed "refusal to license" because "the law [] give[s] the copyright holders *an absolute right* to refuse to license") (emphasis added); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) (no copyright misuse where plaintiff supposedly refused to grant a license and subsequently sued for copyright infringement because "[t]he right to exclude is inherent in the grant of a copyright; a copyright is not improperly expanded simply because the owner has exercised his or her power to exclude").

When Epidemic became aware of infringing uses on Meta's platforms ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (Melander Decl. ¶¶ 14-23, Ex. 1.)  When that failed, Epidemic sued Meta for infringement.  That is permissible copyright enforcement, not copyright misuse.  *Napster*, 239 F.3d at 1027 (no copyright misuse where plaintiffs seek to control reproduction and distribution of copyrighted works); *Metro-Goldwyn-Mayer Studios*, 454 F. Supp. 2d at 998 ("plaintiff's enforcement of its copyrights does not constitute copyright misuse").

### E.  Epidemic Is Entitled to Summary Judgment on Meta's Unclean Hands Defense

Meta's "unclean hands" defense should also be dismissed.  (ECF 57 at 16.)  "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant."  *Taylor Holland LLC v. MVMT Watches, Inc*., No. 2:15-CV-03578-SVW-JC, 2016 WL 6892097, at *11 (C.D. Cal. Aug. 11, 2016) (quotation omitted).  "[T]he unclean hands defense is recognized only rarely, when the plaintiff's transgression is of

serious proportions and relates directly to the subject matter of the infringement action.  For instance, the defense has been recognized when the plaintiff misused the process of the courts by falsifying a court order, by falsifying evidence, or by misrepresenting the scope of his copyright to the court and opposing party." *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-CV-04476-SI, 2024 WL 4057403, at *8 (N.D. Cal. Sept. 3, 2024) (internal citations and quotations omitted).

When asked to "[d]escribe the facts and circumstances constituting" its unclean hands defense, Meta responded that it believed Epidemic "affirmatively foster[ed]" infringement and then "fail[ed] to enforce its rights on Meta's platforms, intentionally permitting Meta to continue the alleged infringement . . .; and Epidemic's choice to accumulate leverage pursuant to the Copyright Act's generous damages provisions and to file suit when most advantageous." (Simonian Decl., Ex. 6.)

There is no evidence to support Meta's theory of unclean hands, much less anything approaching such "transgressions of serious proportions."  Meta ignores that its own systems, by design, prevented Epidemic from being able to take down the AL Infringing Tracks and its own tools allowed users to infringe the Epidemic Tracks while depriving Epidemic of the ability to control such uses or address them through a proper Rights Manager system. The record is clear that Epidemic repeatedly notified Meta of its unauthorized use of Epidemic's music on Meta's platforms, practically begged Meta for help, and the infringements "accumulated" because Meta refused to cease the infringements after such notice or provide access to RM4M.  Meta also never *once* offered license terms to Epidemic in the years Epidemic pleaded with Meta to stop.

Further, upon discovering the infringements at issue in this case, Epidemic swiftly investigated them and filed suit.  There is nothing "unclean" about Epidemic's action.  Indeed, Meta's theory incentivizes large defendants to sit back and do nothing, continue to use other's intellectual property for free, and when sued, try to deflect the egregiousness of the vast number of infringements by claiming that a copyright owner has been "accumulating" infringements in bad faith.  The "best defense is a good offense" strategy should be seen for what it is and rejected.

*Roblox* is instructive.  2024 WL 4057403, at *8-9.  There, relying on clear statements from the Supreme Court that "[c]opyright owners need not 'challenge each and every actionable

1   infringement' and can 'defer suit until [they] can estimate whether litigation is worth the candle,'"

2   *id.* at \*9 (quoting *Petrella*, 572 U.S. at 682-83), the court easily rejected the unclean hands theory

3   that plaintiff "sought to intimidate [defendant] through selective, inconsistent, overreaching and/or

4   retroactive enforcement of its" copyrights.  *Id.* at \*8 (granting summary judgment to plaintiff on

5   unclean hands defense).  Here, too, Meta's defense fails.  *See also Taylor Holland*, 2016 WL

6   6892097, at \*12 ("the filing of a lawsuit cannot itself form the basis of an unclean hands defense");

7   *Oracle America, Inc. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393-(JST), 2017 WL 2311296,

8   at \*3 (N.D. Cal. May 26, 2017).

9               **F.  Epidemic Is Entitled to Summary Judgment on Meta's Fair Use Defense**

10          Though Meta has never seriously pursued this defense, Meta claims in its Amended

11  Answer that the Copyright Act's fair use doctrine applies to Meta's infringements.  It does not.

12  (ECF 57 at 17, Fifteenth Defense.)  The Copyright Act provides four factors that the Court must

13  consider in determining whether a use was fair:

14          (1) the purpose and character of the use, including whether such use is of a
            commercial nature or is for non-profit educational purposes; (2) the nature of the
15          copyrighted work; (3) the amount and substantiality of the portion used in relation
            to the copyrighted work as a whole; and (4) the effect of the use upon the potential
16          market for or value of the copyrighted work.

17  17 U.S.C. § 107.  All four factors weigh against Meta and mandate denial of the defense.

18          *First*, the Ninth Circuit analyzes the "purpose and character of the use" factor using three

19  principles:  "news reporting; transformation; and commercial use."  *Monge v. Maya Mags., Inc.*,

20  688 F.3d 1164, 1173 (9th Cir. 2012).  None of these apply here; in fact, the wholesale stealing of

21  Epidemic's musical works to generate engagement to increase advertising revenue – was clearly

22  commercial.  *Second*, musical works "fall within the core of copyright protection," which weighs

23  in favor of Epidemic.  *Leadsinger, Inc. v. BMG Music Publ'g.*, 512 F.3d 522, 532 (9th Cir. 2008).

24  *Third*, Meta copied substantial portions of Epidemic's works, in many cases copying the *entirety*

25  of Epidemic's works.  And *fourth*, Meta's infringements reduced the likelihood that users would

26  subscribe to Epidemic's services, and have caused Epidemic hundreds of millions of dollars in

27  actual damages.  Meta's use was anything but fair.

28

### G.  **Epidemic Is Entitled to Summary Judgment on Meta's *De Minimis* Defense**

Meta stated that if it were to rely on a *de minimis* copying defense, it would do so through "expert discovery." (ROG 19.)  Expert discovery is now closed, and Meta has no evidence, expert or otherwise, that its copying here was *de minimis*.  "As a rule, a taking is considered *de minimis* only if it is so meager and fragmentary that the average audience would not recognize the appropriation."  *Fisher v. Dees*, 794 F.2d 432, 435 n.2 (9th Cir. 1986).  Meta's copying of substantial portions of Epidemic's works – in almost all cases copying uninterrupted minutes of the works and in most cases copying the *entirety* of the works – is not meager, fragmentary, nor *de minimis*.  In fact, Meta has stipulated away this defense.  (ECF 350.)

### H.  **Epidemic Is Entitled to Summary Judgment on Meta's Estoppel Defense**

Meta's "estoppel" defense also should be dismissed.  (ECF 57 at 17, Eighteenth Defense.)

Estoppel occurs if: "(1) the plaintiff knew of the defendant's allegedly infringing conduct; (2) the plaintiff intended that the defendant rely upon his conduct or act so that the defendant has a right to believe it is so intended; (3) the defendant is ignorant of the true facts; and (4) the defendant detrimentally relied upon the plaintiff's conduct." *Adobe Sys. Inc. v. NA Tech Direct Inc.*, No. 17-CV-05226-YGR, 2019 WL 5579472, at *5 (N.D. Cal. Oct. 29, 2019) (citation omitted).  Reliance is not justifiable if the party invoking estoppel "had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means." *Associated Press v. Meltwater U.S. Holdings*, Inc., 931 F. Supp. 2d 537, 565 (S.D.N.Y. 2013) (citations omitted). Notably, equitable estoppel is "disfavored and should only be applied as needed to avoid injustice."  *Adobe Sys. Inc.,* 2019 WL 5579472, at *5.

Meta cannot identify any conduct by Epidemic "specifically directed at" Meta suggesting it was permitting Meta's unauthorized usage of Epidemic's works.  *Daybreak Game Co. LLC v. Takahashi*, No. 25-CV-01489-BAS-BLM, 2025 WL 2691161, at *9 (S.D. Cal. Sept. 19, 2025). To the contrary, as already established above (Argument § IV.C), Epidemic was long unaware of the nature and specific infringements (*i.e.*, that *Meta* itself was infringing Epidemic's tracks) and, upon learning of the infringements at issue in this case, consistently and repeatedly corresponded

with Meta informing Meta that its use was *not* authorized.  (Melander Decl., Exs. 1-5.)  Thus, even if Meta could identify any relevant conduct by Epidemic upon which it relied (it cannot), there is simply no argument that Meta reasonably relied on it in the face of such notices from Epidemic.  *See Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1116 (C.D. Cal. 2010) (granting plaintiff summary judgment on estoppel where "the evidence establishes that Plaintiff sent multiple notices indicating that it objected to Defendants' copying and/or distribution of its copyrighted programs at issue"); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 194 (S.D.N.Y.), *modified on reconsideration*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009) (where suit was brought timely after discovery of infringement, defendant could not have "reasonably believed SimplexGrinnell intended it to continue its unauthorized usage").  Finally, Meta certainly was not "ignorant of the true facts."  Epidemic repeatedly notified Meta, Meta's own RM systems flagged the AL infringements and OA/RR matches at issue in this case, and ██████████████████████████████████████████████████████████████████████████ .

## I.   Epidemic Is Entitled to Summary Judgment on Meta's Waiver Defense

Meta's defense that Epidemic "waived its rights to assert copyright infringement" should be dismissed (ECF 57 at 17, Nineteenth Defense.)  In copyright, waiver only occurs "if there is an intent by the copyright proprietor to surrender rights in his work," as "manifested by an overt act indicative of a right-holder's intent to completely abandon those rights." *Adobe Sys. Inc.,* 2019 WL 5579472, at *5 (citation and quotations omitted).  The conduct constituting waiver must be "clear, unmistakable and without ambiguity." *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540 (S.D.N.Y. 2015) (citation and quotations omitted).   "[E]vidence of inaction alone is insufficient to abandon a right." *Taylor Holland LLC,* 2016 WL 6892097, at *9.  Further, waiver is right- and work-specific; that is, abandoning one right is not the same as abandoning all rights.  *BackGrid USA, Inc. v. Haute Living Inc.*, No. 2:21-CV-06543-FWS-SK, 2023 WL 2347082, at *9 (C.D. Cal. Jan. 6, 2023) (citing *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (9th Cir. 1998)).

There is no evidence of any overt act by Epidemic manifesting an express intent to abandon its rights to any of the Epidemic Tracks at issue.  Meta has, at most, accused Epidemic generally

of not utilizing RM Pro to block certain UGC content – *i.e.*, of **inaction**.  First, this case **is not about infringing UGC** – it is about Meta's infringing use in its Audio Library and features it offers to its users.  Meta does not, and cannot, dispute that Epidemic could not use RM to address Meta's conduct. But even if this case were about infringing UGC (which it is not), Meta's accusation is (1) false, and (2) utterly disingenuous, given Meta's knowing refusal to provide Epidemic with the ability to adequately protect its rights.  The law is abundantly clear that inaction cannot constitute waiver, as such allegations are repeatedly rejected by courts.  *See, e.g.*, *Adobe Sys. Inc.*, 2019 WL 5579472, at *5 ("Adobe's failure to act does not create a genuine dispute regarding [waiver].");  *Taylor Holland*, 2016 WL 6892097, at *9 (C.D. Cal. Aug. 11, 2016) (rejecting waiver defense because "[e]vidence of inaction alone is insufficient to abandon a right" and plaintiff "made no statements and took no action indicative of intent to completely abandon his rights in the Photograph and allow the public to copy it");  *Joe Hand Promotions, Inc. v. Maupin*, 2:15-cv-06355 (ADS) (AKT), 2018 WL 2417840, at *5 (E.D.N.Y. May 25, 2018) (dismissing waiver defense based on alleged "silence," noting "[t]he Plaintiffs never gave any explicit indication that they intended to release the Defendants from liability for infringement").

Moreover, the record here forecloses any waiver argument.  Epidemic acted as a diligent rights holder, repeatedly alerting Meta that its uses of Epidemic's works were unauthorized and, swiftly upon the discovery of the infringements at issue in this suit, sent cease-and-desist letters to and then sued Meta.  Upon such facts, there can be no waiver.  *See, e.g.*, *Munoz v. Albuquerque A.R.T. Co.*, 829 F. Supp. 309, 316 (D. Alaska 1993), *aff'd*, 38 F.3d 1218 (9th Cir. 1994).

## II.     CONCLUSION

For the foregoing reasons, Epidemic respectfully requests that the Court grant (i) Epidemic's Motion for Summary Judgment and find Meta liable for infringement of each of the Epidemic Tracks, (ii) grant judgment to Epidemic dismissing Meta's Affirmative Defenses, and (iii) grant such other relief as the Court deems just and proper.

1    Dated: November 19, 2025                    Respectfully submitted,

2

3                                                PRYOR CASHMAN LLP

4                                                *Ilene S. Farkas*
                                                 Ilene S. Farkas (*pro hac vice*)
5                                                  ifarkas@pryorcashman.com
                                                 M. Mona Simonian (*pro hac vice*)
6                                                  msimonian@pryorcashman.com
                                                 Marion R. Harris (*pro hac vice*)
7                                                  m.harris@pryorcashman.com
                                                 Brian M. Maida (*pro hac vice*)
8                                                  bmaida@pryorcashman.com
                                                 7 Times Square
9                                                New York, New York 10036
                                                 Telephone: +1.212.421.4100
10

11                                               *Attorneys for Plaintiff Epidemic Sound, AB*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EPIDEMIC'S MOTION FOR SUMMARY
JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1

## **ATTESTATION**

2          Pursuant to Civil Local Rule 5-1(i)(3), I attest that all other signatories listed, and on whose

3  behalf this filing is submitted, concur in the filing's content and have authorized the filing.

4          Dated:  November 19, 2025

5                                                    */s/ Marion R. Harris*
                                                    Marion R. Harris

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28