1   LATHAM & WATKINS LLP
       Joseph R. Wetzel (SBN 238008)
2       Brittany N. Lovejoy (SBN 286813)
    505 Montgomery Street, Suite 2000
3   San Francisco, California  94111
    Telephone:  415.391.0600
4   Email:  *Joe.Wetzel@lw.com*
             *Britt.Lovejoy@lw.com*
5
    LATHAM & WATKINS LLP
6       Allison L. Stillman (*pro hac vice*)
    1271 Avenue of the Americas
7   New York, New York 10020
    Telephone:  212.906.1747
8   Email:    *Alli.Stillman@lw.com*

9   LATHAM & WATKINS LLP
       Sarang V. Damle (*pro hac vice*)
10      Brent T.F. Murphy (*pro hac vice*)
    555 Eleventh Street, NW, Suite 1000
11  Washington, DC 20004
    Telephone:  202.637.2200
12  Email:  *Sy.Damle@lw.com*
             *Brent.Murphy@lw.com*
13
    *Attorneys for Defendant Meta Platforms, Inc.*
14

15              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
16                **SAN FRANCISCO DIVISION**

17

18  EPIDEMIC SOUND, AB,                    CASE NO. 3:22-cv-04223-JSC

19                 Plaintiff,
                                           **DEFENDANT META PLATFORMS, INC.'S**
20       vs.                               **NOTICE OF MOTION AND MOTION FOR**
                                           **SUMMARY JUDGMENT; MEMORANDUM**
21  META PLATFORMS, INC.,                  **OF POINTS AND AUTHORITIES IN**
                                           **SUPPORT**
22                 Defendant.
                                           The Honorable Jacqueline Scott Corley
23                                         Hearing Date: February 26, 2026
                                           Hearing Time: 10:00 am
24                                         Courtroom: 8, 19th Floor

25             __CORRECTED REDACTED VERSION__

26

27

28

1    **NOTICE OF MOTION AND MOTION**

2    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3        PLEASE TAKE NOTICE that on February 26, 2026, at 10:00 a.m., or at such date and

4    time as the Court may order, Defendant Meta Platforms, Inc. ("Meta") will move this Court for an

5    order, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in Meta's favor.

6    This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the

7    concurrently filed Declaration of Brent T.F. Murphy with its accompanying materials, the

8    concurrently filed Declarations of Robert Arcamona, Tony Cox and Andrew Young, the complete

9    files and records in this action, and any additional material and arguments as may be considered

10   in connection with the hearing.

11   **ISSUES TO BE DECIDED**

12       Whether Meta is entitled to summary judgment on:

13       1.      Plaintiff Epidemic Sound AB's ("Epidemic") claim for direct copyright

14   infringement, because Epidemic has failed to carry its burden to demonstrate that the sound

15   recordings it is asserting are the same as the copyrighted works it registered, as embodied in their

16   deposit copies;

17       2.      Epidemic's claim for contributory copyright infringement, because (a) Epidemic

18   has failed to carry its burden regarding proof of its deposit copies; (b) Epidemic cannot meet its

19   burden to demonstrate Meta's knowledge of direct infringements; and/or (c) Epidemic cannot meet

20   its burden to show Meta induced or materially contributed to direct infringement;

21       3.      Epidemic's claims for direct and contributory copyright infringement, because

22   Epidemic's claims are barred by Meta's affirmative defenses of (a) express or implied license; (b)

23   equitable estoppel, unclean hands, and/or waiver; and/or (c) copyright misuse; and

24       4.      Epidemic's request for statutory damages to the extent (a) Epidemic is ineligible

25   for statutory damages, and/or (b) Epidemic cannot meet its burden to show Meta willfully

26   infringed; and Epidemic's request for actual damages to the extent it seeks to recover damages for

27   time-barred infringements.

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    INTRODUCTION ......................................................................... 1

II.   BACKGROUND ........................................................................... 3

    A.    Factual Background ........................................................... 3

        1.    Meta and Its Services ........................................... 3

        2.    Meta's "Rights Manager" Tool ............................ 7

        3.    Epidemic's Business Model ................................. 10

        4.    Epidemic's Years-Long Refusal to Enforce Its Rights .................................................................. 11

        5.    Epidemic's Demand for a Blanket License ........... 14

        6.    Epidemic's Asserted Works .................................. 16

    B.    Procedural History ........................................................... 16

III.  LEGAL STANDARD .................................................................... 17

IV.   ARGUMENT ................................................................................ 17

    A.    Meta Is Entitled to Summary Judgment on Epidemic's Direct Liability Claims Because Epidemic Cannot Carry Its Burden to Show the Sound Recordings It Is Asserting Are the Same as the Copyrighted Works It Registered .................. 18

    B.    Meta Is Entitled to Summary Judgment on Epidemic's Contributory Infringement Claims .......................................... 23

        1.    Epidemic Cannot Meet Its Burden to Show Meta's Knowledge of Each Underlying Direct Infringement ................. 25

        2.    Epidemic Cannot Meet Its Burden to Show Meta Induced or Materially Contributed to Direct Infringement ............. 27

        a.    Meta Did Not Induce Users' Infringement .................................. 28

        b.    Meta Did Not Materially Contribute to Users' Infringement .................................. 29

    C.    Epidemic's Claims Are Barred by Meta's Affirmative

Defenses ........................................................................................................ 31

1.    Meta Did Not Infringe Because Epidemic Licensed the Use ............................................................................. 31

a.    Epidemic Authorized Use of the Works Via Express Licenses in the Rights Manager Terms of Service ................... 31

b.    Epidemic Authorized Use of the Works Via Implied License ................................................................................... 32

2.    Epidemic's Claims Are Barred by Meta's Other Equitable Defenses ............................................................ 34

a.    Epidemic's Claims Are Barred by Equitable Estoppel, Unclean Hands, and Waiver ........................ 35

b.    Epidemic's Claims Are Barred by the Doctrine of Copyright Misuse ................................................................ 39

D.    Meta Is Entitled to Summary Judgment on Epidemic's Requested Damages ..................................................... 41

1.    Epidemic Is Not Entitled to Statutory Damages for the Vast Majority of Its Asserted Works .................... 41

2.    No Reasonable Jury Could Conclude Meta Was Willful .............................................................................. 43

3.    Meta Is Entitled to Summary Judgment on Time-Barred Claims ................................................................ 44

V.    Conclusion ......................................................................................................... 45

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

4

*A&M Records, Inc. v. Napster*,
  239 F.3d 1004 (9th Cir. 2001) ...............................................................................25

5

*A&M Records, Inc. v. Napster, Inc.*,
6   114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part, rev'd in part*, 239 F.3d
    1004 (9th Cir. 2001)...............................................................................................28
7

8
*Adobe Sys. Inc. v. Tanvir*,
  2017 WL 2986219 (N.D. Cal. July 13, 2017).........................................................18

9
*AirWair Int'l Ltd. v. Schultz*,
10   84 F. Supp. 3d 943 (N.D. Cal. 2015) .................................................................38, 39

11
*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) ..................................................................................40
12

13
*ALS Scan, Inc. v. Steadfast Networks, LLC*,
  2018 WL 11350607 (C.D. Cal. Mar. 30, 2018), *aff'd*, 819 F. App'x 522 (9th
14   Cir. 2020) ...............................................................................................................30

15
*Amicus Curiae, Cox Commc'ns, Inc. v. Sony Music Entm't*,
  No. 24-171, 2025 WL 1533667 (U.S. May 27, 2025)............................................25
16

17
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................17

18
*Antonick v. Elec. Arts, Inc.*,
19   841 F.3d 1062 (9th Cir. 2016) ................................................................................23

20
*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
  487 F. Supp. 2d 1099 (N.D. Cal. 2007) ..................................................................36
21

22
*Broad. Music, Inc. v. Hearst/ABC Viacom Ent. Servs.*,
  746 F. Supp. 320 (S.D.N.Y. 1990) .........................................................................41

23
*Bryant v. Media Right Productions, Inc.*,
  603 F.3d 135 (2d Cir. 2010)....................................................................................44
24

25
*Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*,
  821 F. App'x 701 (9th Cir. 2020) ...........................................................................38
26

27
*Corbello v. DeVito*,
  777 F.3d 1058 (9th Cir. 2015) ................................................................................32

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

META'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-CV-04223-JSC

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,*
   2025 WL 2647269 (C.D. Cal. June 25, 2025) ..........................................................35, 38, 45

*Cox Commc'ns, Inc. v. Sony Music Ent.,*
   145 S. Ct. 2841 (2025)...............................................................................2, 25, 28, 29

*Derek Andrew, Inc. v. Poof Apparel Corp.,*
   528 F.3d 696 (9th Cir. 2008) ...........................................................................42

*Disney Enterps., Inc. v. Redbox Automated Retail, LLC,*
   2018 WL 1942139 (C.D. Cal. Feb. 20, 2018)............................................................41

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
   844 F.3d 79 (2d Cir. 2016)..............................................................................24

*Evergreen Safety Council v. RSA Network Inc.,*
   697 F.3d 1221 (9th Cir. 2012) .........................................................................43

*Experexchange, Inc. v. Doculex, Inc.,*
   2009 WL 3837275 (N.D. Cal. Nov. 16, 2009) ......................................................33, 34

*Field v. Google,*
   412 F. Supp. 2d 1106 (D. Nev. 2006) ...................................................................33

*Flava Works, Inc. v. Gunter,*
   689 F.3d 754 (7th Cir. 2012) ...........................................................................24

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC,*
   586 U.S. 296 (2019)....................................................................................18

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
   563 U.S. 754 (2011) ...................................................................................24

*In re Barboza,*
   545 F.3d 702 (9th Cir. 2008) ...........................................................................43

*Intent Drivers, Inc. v. Primesolarquotes,*
   2022 WL 17080203 (C.D. Cal. Aug. 4, 2022)...........................................................19

*Interscope Recs. v. Time Warner, Inc.,*
   2010 WL 11505708 (C.D. Cal. June 28, 2010) ......................................................34, 37

*Keane Dealer Services, Inc. v. Harts,*
   968 F. Supp. 944 (S.D.N.Y. July 1, 1997)...............................................................37

*Kelly Toys Holdings, LLC v. Zuru,*
   2024 WL 1641977 (C.D. Cal. Mar. 5, 2024) .............................................................19

*King v. Ames*,
1997 WL 327019 (N.D. Tex. June 4, 1997), *aff'd*, 179 F.3d 370 (5th Cir.
1999) ...............................................................................................................................23

*Kodadek v. MTV Networks, Inc.*,
152 F.3d 1209 (9th Cir. 1998) ........................................................................................18

*Kramer v. From the Heart Prods.*,
300 F. App'x 555 (9th Cir. 2008) ...................................................................................37

*Livingston v. Art.com, Inc.*,
2014 WL 3404722, at *3 (N.D. Cal. Jul. 11, 2014)........................................................42

*Luvdarts, LLC v. AT&T Mobility, LLC*,
710 F.3d 1068 (9th Cir. 2013) ........................................................................................25

*Malibu Media, LLC v. Cuddy*,
2015 WL 1280783 (D. Colo. Mar. 18, 2015) ..................................................................41

*Marshall v. Babbs*,
2019 WL 1557429 (C.D. Cal. Apr. 10, 2019) .................................................................42

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).................................................................................................. *passim*

*Netbula, LLC v. BindView Dev. Corp.*,
516 F. Supp. 2d 1137 (N.D. Cal. 2007) ..........................................................................31

*Omega S.A. v. Costco Wholesale Corp.*,
776 F.3d 692 (9th Cir. 2015) ................................................................................39, 40, 41

*Oracle Am., Inc. v. Hewlett Packard Enterp. Co.*,
2017 WL 635291 (N.D. Cal Feb. 16, 2017) ...................................................................37

*Oracle Am., Inc. v. Hewlett Packard Enterps. Co.*,
971 F.3d 1042 (9th Cir. 2020) ........................................................................................31

*Parker v. Hinton*,
2023 WL 370910 (6th Cir. Jan. 24, 2023) ......................................................................23

*Parker v. Yahoo!, Inc.*,
2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) .................................................................34

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ...................................................................................25, 29

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) .............................................................................28, 29, 30

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663 (2014) ..........................................................................................................44

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ............................................................................................39

*Reinicke v. Creative Empire, LLC*,
   669 F. App'x 470 (9th Cir. 2016) .....................................................................................34

*Roblox Corp. v. WowWee Grp. Ltd.*,
   2024 WL 4057403 (N.D. Cal. Sept. 3, 2024) ..................................................................36

*SA Music LLC v. Apple, Inc.*,
   592 F. Supp. 3d 869 (N.D. Cal. 2022) .............................................................................43

*Seiler v. Lucasfilm, Ltd.*,
   808 F.2d 1316 (9th Cir. 1987) ..........................................................................................23

*SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*,
   804 F. App'x 668 (9th Cir. 2020) .....................................................................................18

*Shloss v. Sweeney*,
   515 F. Supp. 2d 1068 (N.D. Cal. 2007) ..............................................................37, 38, 39

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
   642 F. Supp. 2d 167 (S.D.N.Y.), *modified on reconsideration*, 642 F. Supp. 2d
   206 (S.D.N.Y. 2009) .........................................................................................................42

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) (en banc) .....................................................................19, 20

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
   605 U.S. 280 (2025) ......................................................................................................24, 29

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ......................................................................................................24, 25

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
   93 F.4th 222 (4th Cir. 2024), *cert. granted*, 145 S. Ct. 2841 (2025) ...........................26

*Starz Ent., LLC v. MGM Domestic Television Distribution, LLC*,
   39 F.4th 1236 (9th Cir. 2022) ...........................................................................................44

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
   786 F.2d 1400 (9th Cir. 1986) ..........................................................................................38

*Tetsuo Akaosugi v. Benihana Inc.*,
   2012 WL 4513989 (N.D. Cal. Oct. 2, 2012) ....................................................................20

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)........................................................................................................24, 29

*United States v. King Feature Ent., Inc.*,
    843 F.2d 394 (9th Cir. 1988) ........................................................................................38, 39

*Urb. Textile, Inc. v. Rue 21, Inc.*,
    No. 214-cv-08285, 2016 WL 6951925 (C.D. Cal. Nov. 28, 2016) .......................................22

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ...........................................................................24, 26, 29, 30

*Warner Chappell Music, Inc. v. Nealy*,
    601 U.S. 366 (2024)........................................................................................................44, 45

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ..............................................................................................19

## STATUTES

17 U.S.C.
    § 408(b)(1)–(2)....................................................................................................................18
    § 410(c)..............................................................................................................................22
    § 411(a)..............................................................................................................................18
    § 411(b)..............................................................................................................................41
    § 412(2)..............................................................................................................................42
    § 504(c)..............................................................................................................................43
    § 507(b)..............................................................................................................................44
    § 512....................................................................................................................................8

## RULES

Fed. R. Civ. P. 56(a) ...................................................................................................................17

## REGULATIONS

*Report of the Register of Copyrights on the General Revision of the U.S.*
    *Copyright Law* 72, 77 (1961),
    https://www.copyright.gov/history/1961_registers_report.pdf.............................................20

## OTHER AUTHORITIES

*About Reels,* Instagram, https://about.instagram.com/features/reels; ............................................6

*Compendium (Third)* §§618.5, 621............................................................................................22, 41

Epidemic Sound, https://www.epidemicsound.com/ ....................................................................10

Epidemic Sound, *Instagram SEO: Your 2023 Guide*,
    https://www.epidemicsound.com/blog/instagram-seo/..........................................................10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

META'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-CV-04223-JSC

*Facebook*, Epidemic Sound, https://www.epidemicsound.com/facebook/music-
    for-facebook/; ................................................................................................................ 33

Facebook and Instagram. Epidemic Sound, *Here's why you should create content
    for Facebook Stories*, https://www.epidemicsound.com/blog/create-content-
    for-facebook-stories/ ...................................................................................................... 10

*Instagram Videos*, Epidemic Sound,
    https://www.epidemicsound.com/instagram/music-for-instagram-videos/; ........................... 33

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.17[A] (rev.
    ed. 2025) ....................................................................................................................... 19

Music, Epidemic Sound, https://www.epidemicsound.com/music ............................................... 33

New Features on Instagram Reels: Trends, Editing and Gifts, Meta (Apr. 14,
    2023), https://about.fb.com/news/2023/04/instagram-reels-trending-audio-
    and-gifts-updates/ .............................................................................................................. 4

4 *Nimmer on Copyright* § 14.04[E][1][b][i] (rev. ed. 2025) ................................................. 18

Petrs. Br. *21-43, 2025 WL 2556953 (U.S. Aug. 29, 2025) ..................................................... 29

U.S. Br. *10-29, 2025 WL 2616625 (U.S. Sep. 5, 2025) .......................................................... 29

U.S. Copyright Office, *Compendium of Copyright Office Practices* § 1502 (3d ed.
    2021) .............................................................................................................................. 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

viii

META'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-CV-04223-JSC

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      Despite its strong rhetoric, Epidemic's primary goal in this case is not to stop infringement

4   of its works on Meta's platforms; it could have done so at any time years before bringing suit but

5   chose not to.  What Epidemic is really doing is using the judicial process to gain bargaining

6   leverage over an unwilling licensing partner.  Epidemic hopes to force Meta to take a catalog-wide

7   license for its recordings, which consist of background music for videos.  As part of this effort,

8   Epidemic designed its business model to take advantage of user engagement on Meta's popular

9   services, encouraging users to post and share Epidemic music in their videos on Facebook and

10  Instagram.  Epidemic watched *for years* as its content spread across Meta's platforms (as it

11  intended).  It refused to use free tools offered by Meta to put a stop to any purportedly unwanted

12  use.  To the contrary, it implemented a "never block" policy for its tracks, quietly allowing their

13  use to propagate, while gathering information about third parties who were using music Epidemic

14  claimed to own, or music that shared commonalities with Epidemic's music.  Then, once it built a

15  sufficiently large stockpile of alleged infringements to (incorrectly) threaten over $100 million in

16  statutory damages, Epidemic aimed its claims at Meta—rather than the parties using the music or

17  supplying it to Meta—threatening litigation if Meta did not capitulate to a broad license for

18  Epidemic's entire catalog, on Epidemic's terms.  Meta declined, and this lawsuit is the result.

19      Meta is entitled to summary judgment on Epidemic's direct infringement claims for

20  multiple independent reasons.  First, and critically, Epidemic cannot make even the most basic

21  showing required to prove a claim of infringement—that any of the audio files it claims was copied

22  is the same as the deposit copy Epidemic submitted to the Copyright Office when it submitted its

23  registrations.  That essential defect is fatal to Epidemic's claims and the case must be resolved in

24  Meta's favor for that reason.

25      Meta is likewise entitled to summary judgment on Epidemic's contributory infringement

26  claims, which are even more far-fetched.  Contributory infringement requires proof of specific

27  instances of direct infringement, as well as proof that the defendant knew about that direct

28  infringement and engaged in affirmative conduct with the purpose of furthering its

commission. Epidemic's claims fail at every level; Epidemic can establish neither underlying direct infringement, nor the knowledge, inducement, or material contribution elements. It has built its case by relying on "match" and "conflict" data from Meta's Rights Manager tool, but that data cannot establish knowledge of infringement because (even assuming Meta could be imputed with knowledge of that data) a match or conflict says nothing about whether the cause of a match is infringing. And, significantly, Epidemic has not even attempted to establish knowledge the way other rightsholders have in other recent contributory infringement litigation—e.g., by pointing to DMCA takedown notices for allegedly infringing content. That is because Epidemic *never sent a single takedown notice* for any work at issue in this litigation; it chose to do nothing and to lie in wait. Nor can Epidemic establish inducement of or material contribution to infringement, which requires proof that Meta engaged in affirmative conduct intended to further infringement on its platforms. To the contrary, Meta's services are designed for—and overwhelmingly used for—noninfringing uses, and Meta provides a robust set of tools designed to allow rightsholders like Epidemic to protect their intellectual property. Thus, there is no viable claim for contributory infringement even if the Supreme Court leaves binding Ninth Circuit precedent undisturbed in *Cox Communications, Inc. v. Sony Music Entertainment*.

These fundamental problems with Epidemic's affirmative case aside, Epidemic's claims are also barred by a host of Meta's defenses. Foremost among them, Epidemic licensed—expressly or impliedly—the alleged infringement at issue here. It did so expressly pursuant to Meta's Terms of Use; and it did so impliedly through a calculated business strategy that encouraged users to upload Epidemic's works to Meta's platforms, employing the aforementioned "never block" policy that ensured even allegedly infringing uses of those works on Meta's platforms would remain and proliferate. And the same facts support multiple equitable defenses, including equitable estoppel, waiver, unclean hands, and copyright misuse. Meta's affirmative defenses thus bar Epidemic's infringement claims in any event.

And even if any of Epidemic's claims could survive summary judgment on the merits, there are multiple fundamental legal flaws with Epidemic's damages claims. First, Epidemic is categorically ineligible for statutory damages for any work that (1) was not registered within three

1   months after its first publication and (2) was not registered before its alleged infringement began

2   on Meta's services. Epidemic has conceded that it did not register *any* of the works in suit within

3   three months of first publication, *and* that it only began to register works *after* it allegedly

4   discovered Meta's infringement. As a result, Epidemic cannot recover statutory damages for all

5   but six of the 900 works in suit. Second, to the extent statutory damages are available, Epidemic

6   cannot establish that any alleged infringement by Meta was willful. Finally, Epidemic seeks actual

7   damages for infringements that occurred more than three years before the filing of its complaint,

8   despite having actual or constructive notice of alleged infringement since at least 2017. Such

9   claims are time-barred. Meta is entitled to judgment on each of these issues as a matter of law.

10          The Court should grant summary judgment to Meta.

11  **II.    BACKGROUND**

12          **A.    Factual Background**

13                  ***1.    Meta and Its Services***

14          Meta is one of the world's leading social media and technology companies. It owns and

15  operates a wide variety of services that help people share life's moments, nurture and build

16  relationships, find and build communities, and grow businesses. *See* Ex. 1, at Pt. I Item 1.[1] Meta's

17  social-networking platforms include Facebook and Instagram, which have roughly 3 billion daily

18  active users who connect with other users and share vast amounts of creative content every day

19  through personal or business accounts. *See* Decl. of Andrew Young ("Young Decl.") ¶2. By

20  offering tools that enable users to effortlessly share news, information, ideas, experiences,

21  memories, and other content with their communities and across the world, Meta has expanded the

22  many ways in which people can meet new friends and loved ones, discover businesses,

23  communicate, and engage in political advocacy, community outreach, and shared interests. *See*

24  Ex. 1 at Pt. I Item 1.

25  ███████████████████████████████████████████████████████

26  █████████        *See* Ex. 2 ("Young Tr.") 26:6. Reels launched on Instagram on August 5, 2020,

27

---

28  [1] "Ex." refers to Exhibits to the Declaration of Brent T.F. Murphy filed concurrently with this motion.

1    and on Facebook for U.S. users on September 29, 2021. Young Decl. ¶¶ 3–4. Reels was

2    developed in part ███████████████████████████████████████████████████

3    ███████████████████    *See* Young Tr. 23:2–23. Using Reels, Facebook and Instagram users can

4    choose to record, edit, and share short videos with audio and other effects. ██████████████

5    ███████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████. Young Decl. ¶ 7. These posts

7    cover myriad topics, genres and themes, including, but not limited to, educational and financial

8    literacy, political advocacy and campaigning, health, fitness and wellness, "memes" or viral jokes,

9    dance challenges, and even stop-motion animation. Young Decl. ¶ 8; *see also* New Features on

10   Instagram    Reels:    Trends,    Editing    and    Gifts,    Meta    (Apr.    14,    2023),

11   https://about.fb.com/news/2023/04/instagram-reels-trending-audio-and-gifts-updates/    (featuring

12   interviews with comedy and beauty creators that share Reels on Instagram).

13        Much of the video content uploaded and shared by Facebook and Instagram users,

14   including Reels, includes an audio component. ████████████████████████████████

15   ███████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████. Young Tr.

19   97:4–25.

20        Content in Meta's Audio Library is sourced directly from select music content providers,

21   including major and independent record labels, who partner with Meta to license their music

22   content, provide representations and warranties that they have the authority to distribute that

23   content, and grant to Meta rights to use the content in connection with Meta's services. *See* Ex. 1

24   at 94. ████████████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████████████████

26   ███████████████████████    *See* Young Tr. 72:11–15.

27        Alternatively, when Instagram and Facebook users upload UGC that already includes audio

28   as part of their content, Meta's automated systems attempt to match that audio to content in the

Audio Library. ██████████████████████████████████████████████████

██████████████████████████████████. *Id.* 71:14–73:25. ████████████

██████████████████████████████████████████████████. Ex.

3 at 85.  Meta adopted the term "Original Audio" to encourage creators to provide "their unique

and authentic sounds." Young Tr. 22:16–20.  As noted, Original Audio is often simply the ambient

audio that is recorded at the same time as the video, which might be a user's narration, an original

song or performance, or the sounds of traffic or footsteps on pavement. *See id.* 20:15–25; *see also*

Young Decl. ¶ 13.

████████████████████████████████████████████████████████████

█████████████████████████████████. Young Tr. 32:25–33:7; *see also* Ex. 4 ("Neiss Tr.")

50:23–51:3–5. ██████████████████████████████████████████ Young

Tr. 39:10–12; Neiss Tr. 80:14–22; 81:16–17.  It developed the Original Audio feature concurrently

with Reels, and Original Audio has been available since Reels launched on Instagram on August

5, 2020.  *See* Young Tr. 22:23–23:7. ██████████████████████████████████

██████████████  *See Id.* at 23:8–24:6.  Spoken word Original Audio has become

particularly popular on Facebook and Instagram, including @melissaherriott's "I Like Stuff,"

@tuxedochester's "Perfection," and @neabeauty.ca's "10/10," or environmental sounds, such as

@kazdan_kashkan_bala's sound of a child being chased by ducks, and @taavakoskinen's "Stormy

summer day." *See* Young Decl. ¶ 14.

A different feature of Reels, called "Reels Remix," allows a Facebook or Instagram user

to stitch her own, new audiovisual clip to another user's Reel and share that combined Reel (with

both the prior user's Reel, including that Reel's audio, embedded in it) in her own feed. *See* Neiss

Tr. 109:3–17; Ex. 5 ("Fleishman Tr.") 22:17–22. ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████ Fleishman Tr. 33:17–25. ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████ *See* Neiss Tr. 116:18–117:6;

Young Decl. ¶¶ 10–11.  Specifically, Reels Remix allows users to comment on, or respond to,

other users' Reels, irrespective of whether the first Reel contains Original Audio or licensed music. For example, if User *A* uploaded a Reel of herself performing a stand-up comedy routine (audio that would be classified as "Original Audio"), User *B* could, using Reels Remix, stitch User *A*'s video and record a side-by-side commentary. As another example, User *C* could upload a Reel of himself dancing to a song licensed by one of Meta's distributor partners, and User *D* could, using Reels Remix, upload a side-by-side video of herself replicating User *C*'s choreography. *See, e.g.*, *About Reels,* Instagram, https://about.instagram.com/features/reels; *see also* Fleishman Tr. 48:21–50:16.

The use of Reels, Original Audio, and Reels Remix (like all Meta's services) are governed by Meta's Terms of Use. *See, e.g.*, Ex. 6; Ex. 7; Ex. 8; Ex. 9; *see also* Decl. of Michael Duffey ("Duffey Decl.") ¶¶ 2–3. Users assent to these Terms of Use when first signing up for Facebook and Instagram. *Id*. They are informed of any subsequent changes to the Terms of Use, both through email notifications and through pop-up banners on each platform. *See* Duffey Decl. ¶¶ 7–8. On Instagram, the Terms of Use provide that users must "[c]omply with all applicable laws and regulations," and cannot "provide or promote content that violates the rights of any person, including but not limited to intellectual property rights, rights of privacy, or rights of personality." *See* Ex. 6. On Facebook, users are similarly prohibited from sharing content that "infringes or violates someone else's rights, including their intellectual property rights (such as by infringing another's copyright or trademark)." Ex. 7. In addition, users are informed that failure to comply with these terms may result in "remove[d] or restrict[ed] access to certain features, services, or information" if Meta determines that "doing so is reasonably necessary to avoid or mitigate misuse" of Meta's services, and may also result in content removal, blocking, and/or account termination. *See id.*; Ex. 6.

Meta's Terms of Use further provide that, when users "share, post, or upload content that is covered by intellectual property rights on or in connection with [Meta's] products," users grant a "non-exclusive, transferable, sublicensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, or create derivative works of

[their uploaded] content," consistent with the users' chosen privacy and application settings.  *See*
Ex. 7.

### 2.  *Meta's "Rights Manager" Tool*

Meta provides rights holders with a content management tool called "Rights Manager" that
is designed to help rightsholders protect, authorize, and manage their intellectual property across
Meta's platforms, including Facebook and Instagram.  *See* Decl. of Robert Arcamona ("Arcamona
Decl.") ¶ 2.  When Meta first launched Rights Manager in April 2016, it only offered a single
version of the tool, now known as Rights Manager for Video or Rights Manager Pro
("RMPro").  At Epidemic's request, Meta provided Epidemic with access to that tool in 2017. *Id.*
¶ 3.

In the following years, Meta developed additional versions of the tool tailored to the
specific needs of different types of rightsholders.  *Id.* ¶ 4.  Towards the end of 2017, for example,
Meta launched Rights Manager for Music for use by the specific music distributors with which
Meta had just begun entering into commercial licensing agreements.  *Id.*  This version offers
features tailored specifically to the terms of the partners' license agreements with Meta.  *Id.*  Meta
also developed different versions of Rights Manager with toolsets tailored to the needs of
individual content creators and image rightsholders.  *Id.*

In every version of Rights Manager, rightsholders may upload content into their accounts
as "reference files."  *Id.* ¶ 5.  Rights Manager then scans those reference files against both (1) UGC
uploaded across Facebook and Instagram and (2) reference files provided by other rightsholders
who use Rights Manager.  .  When Rights Manager identifies that some portions of a reference file
are potentially similar to UGC, a "match" is created, and the rightsholder is notified.  *Id.* ¶¶ 6–10;
*see* Ex. 10 ("Arcamona Tr.") 42:7–20.  Rights Manager generates matches against both public and
private content, but only certain information is displayed to the Rights Manager user if the matched
content is private.  For both public and private content, Rights Manager displays certain
information about the matched content, including the match duration and the matching
segments.  Arcamona Decl. ¶¶ 7–8.  For public content, Rights Manager also shows the
rightsholder the title of the matching content, a link to the matched post, information identifying

1    the page that posted the content, the number of followers of the page, and the number of views of

2    the video. *Id.* ¶¶ 9–10.

3        Rightsholders, such as Epidemic, have several options to manage these "matches" within

4    Rights Manager. *Id.* ¶ 11  First, a rightsholder can "block" the matched content, which prevents

5    the content from being viewed by anyone other than the uploader. *Id.* ¶ 12.  Alternatively, a

6    rightsholder can "monitor" the matched content, which does not affect how the matched content

7    is viewed by others, but allows the rightsholder to gain insights about how their content is being

8    used, including audience-related information and the content's engagement statistics on Meta's

9    platforms—i.e., the number of times it has been viewed and reshared. *Id.* ¶ 13.  A rightsholder can

10   also apply an ownership link to the matched content, which allows the rightsholder to link the

11   content to the promotional destination of their choice. *Id.* ¶ 14.  And, since 2022, qualifying

12   rightsholders have been able to "monetize" eligible matched content, which gives them a share of

13   any advertising revenue generated by the video incorporating their content. *Id.*

14   ¶ 15.  Rightsholders can select one of these actions manually for each match, or they can select a

15   "match rule" for each reference file, which applies a preselected action to all matches to that

16   reference file. *Id.* ¶¶ 16–17.  In the latter case, any time the reference file receives a "match," the

17   preselected "match rule" (monetizing, blocking, or monitoring) applies automatically. *Id.*  Rights

18   Manager also allows enrolled rightsholders to exempt a list of content pages or user accounts that

19   are authorized to use its content ("allowlist") such that any automated match rule does not apply

20   to UGC posted by those accounts. *Id.* ¶¶ 18–19.  All of the Rights Manager policies and functions

21   described above apply and are made available to RMPro users like Epidemic regardless of whether

22   they reach content license agreements with Meta.

23       A Rights Manager user, including Epidemic, can also use Rights Manager to send Meta a

24   "takedown notice"—i.e., a notice that the rightsholder believes content infringes its intellectual

25   property and requests that Meta take down that content pursuant to Meta's Digital Millennium

26   Copyright Act ("DMCA") policy. *Id.* ¶ 22.[2] ████████████████████████

27   ████████████████████████████████████████████████ *Id*;

28

---

[2] *See generally* 17 U.S.C. § 512.

Arcamona Tr. 349:14–350:17. Again, Meta makes all of this available for free to rightsholders, including Epidemic. This is in addition to the other methods that Meta provides for submitting takedown notices, such as Meta's IP reporting form which Epidemic was well aware of. Ex. 11 (Rights Manager Support directing Epidemic to Facebook's IP reporting form, May 12, 2020); Ex. 12 (same on June 4, 2020); Ex. 13 (same on June 10, 2021); Ex. 14 (same on January 28, 2022)]. Indeed, Epidemic successfully utilized this procedure in a rare circumstance of enforcing an artist's "moral rights," resulting in a track (not at issue in this case) being disabled in a user's post, and then restored, both at Epidemic's request. Ex. 15.

In addition to scanning rightsholders' reference files against UGC, Rights Manager also scans those reference files against other reference files provided by other rightsholders using Rights Manager. Arcamona Decl. ¶¶ 26, 28. This is designed to allow rightsholders to identify and resolve ownership conflicts among one another. *Id.* ¶17. ██████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ *Id.*; Arcamona Tr. 43:25–44:13.

When there is an audio conflict between a Rights Manager for Music user (i.e., one of Meta's Audio Library licensors) and another rightsholder that is not such a licensor (like Epidemic), the latter rightsholder is given seven days to resolve the conflict with the licensor, after which the conflict resolves in favor of Meta's music licensor as a default. Arcamona Decl. ¶ 29. The time limit, which is disclosed in the conflict notification, is designed to prompt licensors and other rightsholders to resolve conflicts expeditiously. *Id.* ¶ 30. The default in favor of licensors in the event of no further action by the conflicting parties is designed to ensure that any earned advertising revenue owed to rightsholders pursuant to Meta's contractual license obligations is not unnecessarily frozen. *Id.* Those licensing partners deliver audio tracks representing and warranting that they have the rights to license all content that they deliver in heavily negotiated contracts. *Id.* Reliance on those representations and warranties is standard practice across the music industry for entities like Meta that license music content at scale. Marks Decl., Ex. 1 at ¶¶ 47, 55, 62.

### 3. Epidemic's Business Model

Epidemic is a "production music library" ("PML")—an entity that generally offers low-cost, royalty-free music intended to support *other* productions, like video content or podcasts. Marks Decl., Ex. 1 at ¶¶22–23; *see also Music*, Epidemic Sound, epidemicsound.com/music ("Epidemic Sound is the ultimate solution for content creators looking to add music to their projects.")]. As content that is primarily meant to serve as "background" music, Epidemic's catalog is typically authored by unknown or anonymous artists, is not made for radio airplay or critical consumption, and has not been recognized with the types of accolades that are typical for major music distributors, like Grammy awards or ███████████████████████████ ████████ Ex. 16 ("Hoglund Tr.") 255:13–14; Marks Decl., Ex. 2. at ¶ 30; Ex. 17 at Nos. 62–67 ; *see also* Epidemic Sound, https://www.epidemicsound.com/. ███████████████████ ██████████████████████████████████████████████████████████████████ Ex. 18 ("Ekstrom Tr.") 70:21–83:19; Ex. 19. Accordingly, Epidemic is able to offer online creators low-cost subscriptions to use any of the music in its library, with no additional license payments or royalties. Marks Decl., Ex. 1 at ¶23.

Because Epidemic's business is licensing backing tracks for content creators to incorporate into their audio or audiovisual productions, and because Meta's Facebook and Instagram platforms are among the most popular services in the world for creators to share content, Epidemic has built its own business, in large measure, off of Meta's. Epidemic strategically capitalized on the vast reach of Meta's services by specifically promoting its subscriptions for use in posts on Facebook and Instagram. Indeed, Epidemic's marketing strategy explicitly encourages online creators to use its music in videos shared on social media platforms like Facebook and Instagram. Epidemic Sound, *Here's why you should create content for Facebook Stories*, https://www.epidemicsound.com/blog/create-content-for-facebook-stories/ ("Choosing music while creating your Facebook Story means you're limited to Facebook's library. It's decent, but if you want to find music to fit a particular mood or theme within your Story, you might struggle. So, why not try Epidemic Sound?"); Epidemic Sound, *Instagram SEO: Your 2023 Guide*, https://www.epidemicsound.com/blog/instagram-seo/ ("If you need some music for your content,

1  why limit yourself to Instagram's offering? Find the perfect track every time with Epidemic

2  Sound…"). Epidemic's leveraging of Meta's services is reflected in its licensing practices:

3  Epidemic's subscription terms expressly authorize subscribers to post Epidemic content on

4  Facebook and Instagram.   Ex. 17 at Nos. 46-47.[3] ████████████████████████████████

5  ████████████████████████  Ex. 28 at -59. ███████████████████████████

6  ████████████████████████████████████  *See, e.g.*, Ex. 29 at Section

7  2.10. ██████████████████████████████████████████████████████

8  ██████████████████  *See*, *e.g.*, Ex. 30.

9  **4.   *Epidemic's Years-Long Refusal to Enforce Its Rights***

10          As noted, Epidemic has had a Rights Manager Pro account since 2017.  Ex. 31 No.

11  17. ██████████████████████████████████████████

12  ███████████████████████████  Ex. 32 ("Melander Tr. Vol. 1") 73:4–

13  14.  But Epidemic consistently refused to use Rights Manager to do so.  For example, Epidemic

14  received match notices through Rights Manager for UGC appearing on Meta's services for years,

15  Ex. 31 at Nos. 22, 25, 26, 31; Ex. 33 at Nos. 40–41, as well as conflict notices for its reference

16  files that conflicted with other rightsholders' content, Ex. 31 at No. 34; Ex. 17 at No. 51 (admitting

17  being aware of such notices as early as June 2018.  Rather than use this information to enforce its

18  copyrights, Epidemic actively monitored the use of its claimed works in UGC on Facebook and

19  Instagram, while allowing and encouraging that use to grow, and took no meaningful steps to

20  address or resolve conflicts with competing rightsholders.

21          Indeed, with only two isolated exceptions, Epidemic *never* took action to block allegedly

22  infringing content on Meta's services.[4]  Those instances, concerning works not at issue in this

23  lawsuit, are only relevant here to confirm that Epidemic had the ability and wherewithal to enforce

24  its rights to block allegedly infringing content on Meta's services when it so chose.  But it

25

26  [3] Even before the express terms were clear, Epidemic routinely extended permissions to customers
27  inquiring whether they could post on Meta's services. *See, e.g.*, Ex. 20; Ex. 21; Ex. 22; Ex. 23; Ex. 24; Ex. 25; Ex. 26; Ex. 2723; Ex. 24; Ex. 25; Ex. 26; Ex. 27; *see also* Ex. 17 at Nos. 48-49.

28  [4] Epidemic produced only two takedown notices sent through Facebook's copyright report form, one in 2021 and one in 2022, concerning works not asserted in this litigation. *See* Ex. 34; Ex. 15.

1    didn't. That was a calculated choice. Epidemic employed a team with dozens of individuals who

2    "were responsible for monitoring Epidemic's [R]ights [M]anager," "includ[ing] uploading

3    reference files, setting 'match rules,' and/or taking action in response to 'match' or 'conflict'

4    notifications." Ex. 35 at No. 7. ██████████████████████████████████████████████

5    ██████████████████████████████████████  Ex. 36; Ex. 37; Ex. 38

6    ████████████████████████████████████████████████████████████

7    ████████

8          Epidemic's strategy with respect to Meta's services was rooted in a broader business

9    strategy that eschewed enforcement in favor of ██████████████████████████████████

10   ███████  Ex. 39 at -06 (May 3, 2018 Email from Tom Hoglund to Tamara Hrivnak). As part

11   of that strategy, Epidemic employed a "never-block" policy, pursuant to which "Epidemic does

12   not block the use of its works in user-generated content on Meta's platforms," even when a usage

13   is unlicensed. Ex. 40 at No. 23; *see also* Ex. 31 at Nos. 30, 33. Epidemic routinely touted this

14   "never-block" policy in its customer communications, effectively using it as a selling point for the

15   service. *See, e.g.*, Ex. 41 (March 4, 2018 email from Lina Melander to an Epidemic customer, "We

16   never block anything that uses our music on Facebook and we have our entire library uploaded in

17   Facebook Rights Manager to ensure that no one else [blocks our content] falsely."); Ex. 42 (March

18   8, 2018 email from Lina Melander to Epidemic Customer Support to be sent to an Epidemic

19   customer complaining about muting, "We use Facebook Rights Manager to protect our content on

20   Instagram. However, it's our creator friendly company policy to never block or remove unlicensed

21   usage, we always monetize, unless it violates the moral rights of our composers."); Ex. 43 ████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████ Ex.

25   44 ██████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ███████████████████████; Ex. 45(███████████████████████████████████

28   ████████████████████████████████████████████████████████████████

1
2     Ex. 46
3
4
5
6
7
8
9  *See, e.g.,* Ex. 39 at -07
10
11
12
13
14  ; *id.* at -06
15
16
17  ; Ex. 47 at -31-33 (2020 correspondence
18  from Tom Hoglund to Tamara Hrivnak, "...I wanted to reach out hoping that you're open to a
19  pragmatic discussion on how we can mutually benefit from our music across FB products. [...] We
20  would be happy to issue a broad license to clear all usage across Facebook if we are treated at
21  equal terms with other music rights holders in relation to our actual market share across
22  Facebook."); Ex. 48 at -36 (2020 draft email composed by Lina Melander to Rob Arcamona and
23  Aileen Atkins, "In the hope of not resorting to the takedown avenues explained in your email, we
24  would more happy to pick up these [partnership] discussions at your earliest convenience."). *See*
25  *also* Ex. 49 at -52 (
26
27
28

1

2

### 5. Epidemic's Demand for a Blanket License

4

5 Ex.

6 50.

7 *Id*. at -83; Ex. 51 ("Hrivnak Tr.")

8 101:4–102:5

9

10

11

12

13 Hrivnak Tr. 41:22–23; Hoglund Tr. 266:16–267:3,

14

15 Ex. 52

16 ("Sellwood Tr.")  181:2–182:7.

17

18

19

20 Ex. 49.

Epidemic soon changed negotiating tactics, threatening that, if Meta did not give it a deal akin to those with the major labels, it would "start taking down unlicensed usages" on Meta's platforms because without a deal, marketing, or monetisation, "it just doesn't make sense to keep allowing infringement." Ex. 53. But Meta repeatedly and consistently encouraged Epidemic to do just that, i.e., use Meta's takedown tools to request removal of any unauthorized Epidemic content it could identify.  Ex. 39 at -06 (on 5/2/2018,

1

2

3

4    Ex. 49.  But Epidemic repeatedly refused, opting to leave content it believed to be infringing on

5    the services so it could threaten enforcement if Meta did not sign a blanket license under the terms

6    Epidemic demanded.  Ex. 39 at -06

7

8

9                                                (emphasis added)).

10        Epidemic once again changed negotiating tactics in April 2019.  After years of cultivating

11   unlicensed usage on Meta's platforms, Epidemic

12

13

14                                                                      Ex. 55 (Melander

15   asking internally

16                      Ex. 88, ("Melander Tr. Vol. 2") 291:23–25 ("

17

18

19

20                                                           Ex. 56 at -85.

21

22                                                           Ex. 57

23   (Melander explaining,

24                                    (emphasis added)).

25        Armed    with                                   but   without   identifying   *any   specific

26   *infringements*—i.e., nothing that could be acted upon and removed or taken down—Epidemic

27   accused Meta of widespread copyright infringement on its services, demanded payment for a

28   "broad license to clear all usage" across Facebook and Instagram, and threatened a "massive[]

1   increase [in] unlicensed usages" if Meta did not capitulate, since Epidemic had grown its user base

2   to include companies whose users actively post across Meta's platforms. Ex. 47. Meta responded

3   by reminding Epidemic of the numerous rights management tools Meta made available for

4   Epidemic to enforce its rights, and also invited Epidemic to discuss a flat-fee direct licensing deal.

5   *Id.*; Ex. 48. Epidemic rejected that invitation, and instead filed this lawsuit in July 2022. To

6   Meta's knowledge, Epidemic has still, to this day, never sought to resolve the alleged "unlicensed

7   usages" with the entities who supplied to Meta's platforms the content allegedly infringing the

8   works in suit, and instead has maintained its demand for a blanket license agreement with Meta.

9                        **6.  *Epidemic's Asserted Works***

10          Epidemic asserts Meta infringed 900 sound recording works (the "Asserted Works") out

11   of its catalog of more than 50,000 tracks. Dkt. 14. In anticipation of litigation with Meta, Epidemic

12   ████████████████████████████████████████████████████████ Ekstrom

13   Tr. 85:12–86:15, 87:20–23, 93:25–94:4, 97:13–16, 283:1–6. None of the 900 works was registered

14   within three months of the date of its first publication. Leonard Decl. ¶ 168 & Ex. 11a; *see also*

15   Dkt. 31-4; Dkt. 37 (judicially noticing registration and publication information). And many were

16   registered more than five years after publication. *See* Leonard Decl. ¶ 168 & Ex. 11a.

17   **B.   Procedural History**

18          Epidemic filed this suit on July 20, 2022. Dkt. 1. The Complaint asserted three counts:

19   (1) direct copyright infringement, (2) secondary copyright infringement premised on Meta's

20   alleged "inducement" of users' direct infringement, and (3) secondary copyright infringement

21   premised on Meta's "contributory" liability for users' direct infringement. *Id.* ¶¶58–80. The

22   Complaint identified 952 Epidemic sound recording works it accused Meta of infringing (the

23   "Asserted Works"). *Id.*, Ex. A. Epidemic withdrew 52 of these works from the case in July

24   2023. *See* Dkt. 95; Dkt. 98.[5] Its initial Complaint did not identify *any* particular instances of

25   alleged infringement. *See generally* Dkt. 1.

26

27

28   _____

     [5] The Court has clarified that the case will proceed to adjudicate Epidemic's claims as to the 900
     remaining Asserted Works. Ex. 58, Tr. of Proceedings (Jan. 28, 2025) at 9:10-11.

1    Concurrently with this Motion for Summary Judgment, Meta filed two *Daubert* motions to
2    exclude the testimony of Epidemic's expert witnesses Bradley Sharp and Paul Geluso.  Meta
3    moved to exclude Sharp based on a number of flaws in his methodology, including (most
4    significantly) his approach that calculates damages not only with respect to allegedly infringing
5    uses of the 900 Asserted Works in suit, but also for extrapolated uses of more than 50,000
6    unasserted works in Epidemic's catalog that are not at issue in this lawsuit.  Dkt. 358.  Meta moved
7    to exclude Geluso because his testimony asserts, based on his expert "critical listening," that any
8    similarities between Epidemic's Asserted Works and the works that appeared on Meta's services
9    must have been the result of copying, but he fails to exclude prior art or account for other sources
10   of similarity, and he did not even have access to Epidemic's copyright registrations or deposit
11   copies, raising questions about what exactly he compared.  Additionally, Geluso's opinion
12   threatens to usurp the jury's role and is unduly prejudicial.  Dkt. 352.

13   **III.    LEGAL STANDARD**

14   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as
15   to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
16   56(a).  A dispute of fact is "material" if it "might affect the outcome of the suit under the governing
17   law"; "disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby,*
18   *Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of fact is "genuine" only "if the evidence is such
19   that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

20   **IV.    ARGUMENT**

21   Meta is entitled to summary judgment on *all* of Epidemic's claims.  First, Meta is entitled
22   to summary judgment on Epidemic's direct copyright liability claims because Epidemic has failed
23   to carry its burden to prove infringement of its registered works.  Second, Meta is entitled to
24   summary judgment on Epidemic's contributory liability claims because Epidemic cannot establish
25   the required elements of direct infringement, or knowledge, inducement, or material
26   contribution.  Third, Epidemic's claims are barred by Meta's defenses in any event.  Finally, even
27   if any aspect of Epidemic's claims survived summary judgment as a matter of law, Epidemic's
28   damages demands cannot, because Epidemic is not entitled to statutory damages (and certainly not

1    enhanced damages on the basis of "willfulness"), and it seeks damages for infringements that are

2    time-barred.

3    **A. Meta Is Entitled to Summary Judgment on Epidemic's Direct Liability Claims**

4    **Because Epidemic Cannot Carry Its Burden to Show the Sound Recordings It Is**

5    **Asserting Are the Same as the Copyrighted Works It Registered**

6    All of Epidemic's direct liability claims—whether related to audio uses originating from

7    Meta's Audio Library, or related to user-generated content originating from the use of Meta's

8    Original Audio and Reels Remix features—fail because Epidemic failed to carry its key burden to

9    establish that any work on Meta's services accused of infringement is substantially similar to any

10    of Epidemic's registered Asserted Works, as evidenced in the deposit copies of those sound

11    recordings with the U.S. Copyright Office.[6]  This is a fundamental failure of proof that cannot be

12    cured now.  Meta is entitled to summary judgment.

13    A copyright plaintiff must obtain a valid copyright registration from the U.S. Copyright

14    Office before it can file an infringement lawsuit.  17 U.S.C. § 411(a); *Fourth Estate Pub. Ben.*

15    *Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019).  To obtain a registration, "an applicant

16    must deposit as part of his application a 'copy' or 'copies' of the work." *Kodadek v. MTV*

17    *Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998) (quoting 17 U.S.C. § 408(b)(1)–(2)).  The

18    deposit copy must be a "bona fide cop[y] of the original work," i.e., a copy that is "virtually

19    identical to the original" and "produced by directly referring to the original." *Id.* at 1211–12

20    (citation omitted) (granting summary judgment to defendants where deposits were not bona fide

21    copies); *see also SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*, 804 F. App'x 668, 670

22    (9th Cir. 2020) (affirming invalidation of registration where deposits were inaccurate).  The

23    _____

24    [6] Epidemic has never developed any independent claims that any works on Meta's services
    infringed any musical composition. Indeed, Epidemic's audio engineering expert Paul Geluso
25    disclaimed any opinion as to compositions, which confirms this view.  *See* Motion to Exclude
    Expert Testimony of Paul Geluso.  Dkt. 352.  Nevertheless, all of the arguments in this motion
26    would apply equally to such claims, and Epidemic's business model of owning and licensing
    composition and derivative sound recording rights together as a single unit would preclude
27    recovery of multiple statutory damages awards if Epidemic were entitled to them at all. *See Adobe*
    *Sys. Inc. v. Tanvir*, 2017 WL 2986219, at *7 n.3 (N.D. Cal. July 13, 2017) (only one award when
28    asserting original and derivative work together); 4 *Nimmer on Copyright* § 14.04[E][1][b][i] (rev.
    ed. 2025) (same).

1    purpose of a deposit is "to make a record of the claimed copyright, provide notice to third parties,

2    and prevent confusion about the scope of the copyright." *Skidmore v. Led Zeppelin*, 952 F.3d

3    1051, 1063 (9th Cir. 2020) (en banc). That is, a "deposit copy defines the four corners of [a

4    plaintiff's] copyright." *Id.* at 1064.

5        It is Epidemic's burden, as part of its claim for copyright infringement, to prove that each

6    of the sound recordings that it asserts was infringed is the same as what was deposited with the

7    Copyright Office when Epidemic registered its works before suit. *See Intent Drivers, Inc. v.

8    Primesolarquotes*, 2022 WL 17080203, at *6 (C.D. Cal. Aug. 4, 2022) (dismissing copyright

9    infringement claim where it was "unclear . . . that [the asserted work] is a deposit copy of the

10    provided copyright"); *Kelly Toys Holdings, LLC v. Zuru*, 2024 WL 1641977, at *3 (C.D. Cal. Mar.

11    5, 2024) (noting "the copyright infringement claims will fail if [plaintiff] cannot establish the

12    photos it provided in the complaint are the subject of copyright registrations"). And it is

13    Epidemic's burden to prove that each allegedly infringing sound recording it is accusing in this

14    lawsuit is substantially similar to the *deposit copy* of the sound recording Epidemic submitted to

15    the Copyright Office when it registered its works. *See Skidmore*, 952 F.3d at 1063, 1073, 1077;

16    *Williams v. Gaye*, 895 F.3d 1106, 1124 (9th Cir. 2018); 2 Melville B. Nimmer & David Nimmer,

17    *Nimmer on Copyright* § 7.17[A] (rev. ed. 2025).

18        Epidemic has failed to make that basic showing. It has not produced the deposit copies of

19    its registered sound recordings, and they are not in the record. Instead, Epidemic has attempted to

20    establish copying by relying on *other*, non-deposit copy audio files that it produced in this

21    litigation. In other words, Epidemic's position necessarily assumes away Epidemic's burden of

22    proof to establish that these audio files it produced are *the same* as the deposit copies of the

23    registered sound recordings it is asserting in this case. But critically, there is nothing—besides

24    Epidemic's counsel's say-so—to support the conclusion that the produced audio files and the

25    deposit copies are the same. Indeed, Epidemic repeatedly refused to provide Meta with the actual

26    deposit copies in discovery, which would have enabled Meta, and the Court, to verify Epidemic's

27

28

1  assertion that the produced audio and the deposit copies are the same.[7] Nor did Epidemic identify

2  any witness in its initial disclosures with personal knowledge sufficient to link the produced audio

3  files to the submitted deposit copies. Its 30(b)(6) witness on the subject testified that Epidemic

4  engaged ███████████████████████████████████ Ekstrom Tr. 85:12–25;

5  97:13–16; 100:23–101:3. As a result, there is *no* evidence in the record that establishes that any

6  of the audio files Epidemic is using to try to claim infringement here is the same as any deposit

7  copy of a work registered with the Copyright Office. And no properly disclosed Epidemic witness

8  is competent to make such a proffer at trial. *See Tetsuo Akaosugi v. Benihana Inc.*, 2012 WL

9  4513989, at *2 (N.D. Cal. Oct. 2, 2012) ("[W]itnesses that were not properly disclosed in

10 plaintiffs' initial disclosures or interrogatory responses may not testify at trial."). That means that

11 Epidemic *cannot prove* that any of the works on Meta's services that Epidemic is accusing of

12 infringement is substantially similar *to the deposit copy* of any of Epidemic's registered sound

13 recordings.

14        Requiring Epidemic to prove this connection is no mere technicality. It was the deposit

15 copies that the Copyright Office actually "used to examine the work[s] for copyright authorship,

16 to verify the authorship claimed in the application, and to verify the facts stated in the application"

17 when granting registration—not the reference file audio. U.S. Copyright Office, *Compendium of*

18 *Copyright Office Practices* § 1502 (3d ed. 2021) ("*Compendium (Third)*"). And it is the deposit

19 copies that "provide[] accessible records from which [the public] can obtain information regarding

20 the existence and basis of a copyright claim, the extent of the claim (e.g., in a new version of a

21 preexisting work)," and "identify the work being registered." *Report of the Register of Copyrights*

22 *on the General Revision of the U.S. Copyright Law* 72, 77 (1961).[8] That is why the Ninth Circuit

23 has held that "the scope of the copyright is limited by the deposit copy"—it is the only thing the

24 Copyright Office actually reviewed when issuing a registration, and that registration is what

25 creates a verifiable record of the copyright claim for the public. *Skidmore*, 952 F.3d at 1063.

26

---

27 [7] Meta requested that Epidemic produce the deposit copies of Epidemic's registered works, which
would have permitted those deposit copies to be compared to the reference files Epidemic uploaded
28 to Rights Manager to determine whether the sound recordings are the same. Ex. 59 at 4.

[8] https://www.copyright.gov/history/1961_registers_report.pdf.

1   Absent that, all we have is attorney say-so to identify *what* is protected by copyright. That is
2   insufficient, as a matter of law.

3        And it is particularly problematic here, where at least 214 of the 900 Epidemic's Asserted
4   Works have titles that have been recently changed. Ex. 60. For example, six of the Asserted
5   Works were named "Mediterranean Feeling" followed by a number, before Epidemic later
6   changed their titles. *Id.* And six of the Asserted Works were named "Arabian Nights," followed
7   by a number, before Epidemic changed those titles. *Id.* And the new titles are nothing like their
8   old ones. For example, Epidemic changed the title of one song from "Various Guitar Mood 8" to
9   "Shoes Full of Sand," and another from "Chill RnB Soul 3" to "Blurry Eyed." *Id.*

10       Even more, Epidemic's reference files, which it proffers as evidence of infringement, *also*
11  either don't have titles at all, or have titles that do not match *any* Asserted Work. Ex. 61. When
12  Meta asked Epidemic to identify which reference files among its over 50,000 reference files
13  correspond to each of the Asserted Works, Epidemic merely provided Meta with a list of 1,459
14  reference file IDs that "Epidemic [was] able to associate to *a* work at issue." Ex. 62. Meta
15  followed up asking Epidemic to identify *which* reference file corresponded to *which* Asserted
16  Work. Epidemic responded that it "does not maintain a document" with that information. *Id.* In
17  response, Meta reasonably asked Epidemic to explain how it generally "identif[ied] and select[ed]
18  [the] reference [files] as the ones associated with the [copyrighted] works asserted in this
19  case[.]" *Id* . Epidemic refused to answer on the ground the question was "seeking protected work
20  product." *Id.* Finally, when Meta tried to understand Epidemic's copyright registration process
21  during a 30(b)(6) deposition, the witness could not testify to the registration process, because that
22  process had been ██████████████████ and Epidemic refused to allow its witness to answer
23  questions about that ███████████████████ citing work product privilege
24  grounds. Ekstrom Tr. 84:4–8; 89:7–91:15. Epidemic's lawyers are simply saying, "trust us - the
25  audio files we produced are the same as the ones that were registered" (despite, in many cases,
26  indications to the contrary). But that is not what the law requires, and for good reason.

27       Nor could Epidemic's copyright registrations themselves paper over this threshold
28  evidentiary deficiency. Epidemic's late-filed registrations themselves are not entitled to any

evidentiary presumption regarding the "validity of the copyright" or "the facts stated in the certificate." 17 U.S.C. § 410(c). And the record in this case demonstrates the unreliability of the facts stated in those registrations. For example, for at least seven works, Epidemic registered both a vocal sound recording and a derivative instrumental version of the same work, without excluding the preexisting, already-registered material—as black-letter copyright law and the Copyright Office rules require.[9] *See Urb. Textile, Inc. v. Rue 21, Inc.*, No. 214-cv-08285, 2016 WL 6951925, at *2 (C.D. Cal. Nov. 28, 2016) ('Further, while a registration applicant need not exclude from his or her claim uncopyrightable elements in a work (such as familiar symbols), the applicant should exclude 'previously published material, previously registered material, material that is in the public domain, and material owned by someone other than the claimant named on the application.'"); *see also Compendium (Third)* §§618.5, 621. After discovery, Epidemic produced communications demonstrating that several works registered to bring this lawsuit incorporated preexisting recorded material such as common loops or samples. Dkt. 335-1; Dkt. 335-2; Ex. 86; *see also* Ex. 67 (disclaiming numerous "[m]atching loop[s] not claimed as infringing by [Epidemic]"); Ex. 76 ("Melander Tr. Vol. 4") 442:24–461:4 (authenticating Dep. Ex. 404); *id.* at 603:5–9 ("[I]f a track incorporates a shared sample or a shared element that is not owned by anyone, no, that's not an infringement[.]"); *id.* at 614:19–24, 615:2–4 ("If there is a shared loop that we have identified that is matching . . . no, we don't claim that that's an infringement[.]"). None of Epidemic's registrations disclaims these non-original materials, raising further questions about the reliability of the facts provided to the Copyright Office as part of Epidemic's prelitigation registration spree. Under these circumstances, the Court need not, and should not, in its discretion rely on any facts in the registrations as true absent some other showing demonstrating their reliability—a showing Epidemic has failed to make. The made-for-litigation registrations cannot connect the dots for Epidemic due to Epidemic's failure to produce evidence that would allow it

---

[9] These include the works "Belong" and "Belong (Instrumental Version)," "Christmas In My Heart" and "Christmas In My Heart (Instrumental Version)," "I Just Need Someone Like You" and "I Just Need Someone Like You (Instrumental Version)," "I Told You So" and "I Told You So (Instrumental Version)," "Reckless and Reckless (Instrumental Version)," and "Wordless" and "Wordless (Instrumental Version)." *See* Ex. 77; Ex. 63; Ex. 66; Ex. 65; Ex. 68; Ex. 69; Ex. 70; Ex. 71; Ex. 73; Ex. 72; Ex. 75; and Ex. 74.

1    to prove substantial similarity between any accused work on Meta's services and the *deposit copies*

2    that underlie and define the scope of its copyrighted works.

3        The Sixth Circuit recently affirmed the grant of summary judgment against copyright

4    holders in a similar case involving alleged copying of a musical riff from the plaintiffs' song.  *See*

5    *Parker v. Hinton*, 2023 WL 370910 (6th Cir. Jan. 24, 2023).  There, as here, "Plaintiffs never

6    produced a deposit copy of their [work]."  *Id.* at *4.  As a result, the plaintiffs could not create a

7    genuine dispute of material fact on the question whether there was substantial similarity between

8    the defendant's allegedly infringing work and the deposit copy of the plaintiff's copyrighted work,

9    because there was no evidence from which the jury could draw that conclusion without the deposit

10   copy in evidence.  *Id.* at *5.  The plaintiffs "therefore failed to meet their burden on summary

11   judgment."  *Id.* at *4; *accord King v. Ames*, 1997 WL 327019, at *5 (N.D. Tex. June 4, 1997)

12   (dismissing copyright claim where plaintiff "failed to produce the copies of the sound recordings

13   she deposited with the United States Copyright Office"), *aff'd*, 179 F.3d 370, 376 (5th Cir. 1999)

14   (explaining that such failure "vitiates her [copyright] claim").  So too here:  there is no evidence

15   from which a reasonable jury could conclude that the allegedly infringing sound recordings at issue

16   are substantially similar to those that were actually registered by Epidemic—i.e., the deposit

17   copies—and asserted in this case.  *See Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir.

18   2016) (concluding no reasonable jury could find substantial similarity when "none of the

19   [copyrighted] source code was in evidence"); *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th

20   Cir. 1987) (similar).  Meta is entitled to summary judgment as a result.

21       **B. Meta Is Entitled to Summary Judgment on Epidemic's Contributory**

22          **Infringement Claims**

23       In addition to its claim that *Meta* directly infringed Epidemic's copyrights, Epidemic also

24   claims that Meta is contributorily liable for Meta *users'* direct infringement on two theories, set

25   out in Counts II and III of the Complaint:  (1) that Meta "materially contributed" to direct acts of

26   infringement, and (2) that Meta "induced" those acts.  Meta is entitled to summary judgment on

27   these claims too, because Epidemic cannot meet its burden as to the elements of those claims.

28

1    To establish a claim for contributory liability the plaintiff must prove that the defendant

2  "(1) ha[d] knowledge of another's infringement and (2) either (a) materially contribute[d] to or (b)

3  induce[d] that infringement." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019)

4  (citation and internal quotations omitted).    Contributory infringement requires proof that the

5  defendant knew about specific instances of direct infringement by third parties and engaged in

6  affirmative conduct with the purpose of furthering that infringement. *See Metro-Goldwyn-Mayer*

7  *Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 930 (2005).  It is equivalent to aiding-and-abetting

8  liability. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 764 (2011) (defining

9  "contributory infringement" as "aiding and abetting of direct infringement by another party"); *EMI*

10  *Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016); *Flava Works, Inc.*

11  *v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).  Mere nonfeasance (i.e., failure to act) is not

12  enough. *Grokster*, 545 U.S. at 934, 939 n.12.  Nor is it enough, when a defendant has created and

13  offered a general-use product that has substantial noninfringing uses, to show that some users will

14  misuse the defendant's product to infringe. *Id.* at 932, 934–35; *Sony Corp. of Am. v. Universal*

15  *City Studios, Inc.*, 464 U.S. 417, 436, 439 (1984).

16    Instead, as the Supreme Court recently explained, aiding-and-abetting liability requires

17  proof the "defendant has … take[n] some 'affirmative act' 'with the intent of facilitating the

18  offense's commission." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488, 490 (2023) (citation

19  omitted); *accord Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291–

20  92 (2025) ("[A]n aider and abettor must 'participate in' a crime 'as in something that he wishes to

21  bring about' and 'seek by his action to make it succeed.'" (citation omitted)).  The Ninth Circuit

22  has adopted an exception to that rule:  if "a computer system operator … has *actual* knowledge

23  that *specific* infringing material is available using its system and can take *simple measures* to

24  prevent further damage to copyrighted work, yet continues to provide access to infringing works,"

25  it can be held liable for contributory infringement for the failure to take those "simple

26

27

28

1  measures." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) (citation

2  and internal quotation marks omitted) (emphasis modified).[10]

3      At the outset, Epidemic's failure to produce evidence that the sound recordings it is

4  asserting here are the same as its deposit copies is fatal to its contributory infringement claim

5  because it eliminates Epidemic's ability to establish that there were any underlying acts of direct

6  infringement for which Meta could be held liable. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508

7  F.3d 1146, 1169 (9th Cir. 2007) ("Secondary liability for copyright infringement does not exist in

8  the absence of direct infringement by a third party." (citation omitted)). Regardless, the

9  uncontroverted evidence in this case demonstrates Epidemic cannot meet its burden to show Meta

10  is contributorily liable because it cannot establish any other element of this claim either.

11        *1.  Epidemic Cannot Meet Its Burden to Show Meta's Knowledge of Each*

12          *Underlying Direct Infringement*

13      Epidemic's contributory infringement claims fail because Epidemic cannot prove that Meta

14  had actual knowledge of any specific instances of direct infringement using Meta's services.

15      The "knowledge" element of contributory liability cannot be imputed from a defendant's

16  generalized knowledge that infringement can (or even will) be committed using its product. *See,*

17  *e.g.*, *Grokster*, 545 U.S. at 935–37 ("[M]ere knowledge of infringing potential or of actual

18  infringing uses would not be enough."); *Sony*, 464 U.S. at 442; *Luvdarts, LLC v. AT&T Mobility,*

19  *LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). Instead, a plaintiff must prove that the defendant had

20  "*actual knowledge* that *specific* infringing material [wa]s available using its system." *Amazon.com,*

21  *Inc.*, 508 F.3d at 1172; *see also A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1021 (9th Cir.

22  2001) ("[A]bsent any specific information which identifies infringing activity, a computer system

23  operator cannot be liable for contributory infringement merely because the structure of the system

24

25

---

26  [10] Whether the "simple measures" exception will survive the Supreme Court's decision in *Cox*

*Communications, Inc. v. Sony Music Entertainment* is an open question. *But see* Br. for U.S. as

27  *Amicus Curiae, Cox Commc'ns, Inc. v. Sony Music Entm't*, No. 24-171, 2025 WL 1533667, at *16

(U.S. May 27, 2025) (contending the "simple-measures" standard "cannot be squared with the

28  requirement of conscious and culpable participation in the infringing conduct" articulated in

*Grokster*); Dkt. 275.

1    allows for the exchange of copyrighted material.").  Indeed, a defendant is under no duty to

2    proactively investigate or root out infringement.  *See VHT*,  918 F.3d at 745.

3         The record refutes any claim that Meta had the requisite knowledge.  Notably, with respect

4    to Original Audio and Reels Remix uses, Epidemic has not even attempted to establish Meta's

5    knowledge of direct infringement by relying on takedown notices, as rightsholders in other

6    litigations often do.  *Cf. Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 233–35 (4th Cir.

7    2024), *cert. granted*, 145 S. Ct. 2841 (2025).[11]  As noted above, Epidemic *never* sent a *single*

8    takedown notice related to direct infringement of a work at issue in this case.  To the contrary,

9    Epidemic explicitly chose *not* to request that its tracks be taken down, employing a "never block"

10   policy in response to matches surfaced in Epidemic's Rights Manager account. Ex. 41, Ex. 39 at -

11   10. For Audio Library tracks, the undisputed record is that each was provided to Meta subject to

12   a representation and warranty that the supplying distributor had the requisite rights. In fact, in the

13   only instances Epidemic actually identified specific alleged infringements to Meta,[12] Meta's

14   response was to notify any implicated distributor or otherwise seek to remedy the issue.  *See* Ex.

15   101; Ex. 100; Ex. 99; Ex. 104; Ex. 102; Ex. 105; Ex. 106; Ex. 103; Ex. 98; *see also* Dkt. 367-2

16   (Sharp Rep.) ¶50 ██████████████████████████████████

17        And while Epidemic has previously pointed to "matches" and "conflicts" generated by

18   Rights Manager to support Meta's knowledge, on the theory that those notices reveal the songs are

19   substantially similar, these notices do not support Meta's knowledge either.  Even assuming Meta

20   could be imputed to have knowledge of specific matches or conflicts within an individual user's

21   Rights Manager account (a premise Meta disputes[13]), such notices are insufficient to infer, let

22   alone conclude, that a particular reference file *infringes* or is a *copy* of another reference file.  That

23

---

24   [11] To be clear, even if Epidemic had submitted takedown notices, that would not have been
     sufficient to establish the knowledge necessary, especially given that each user agrees to Terms of
25   Service representing that they have the rights to the content they post. *See, e.g.*, Ex. 90 at -14.

26   [12] Importantly, the only instances in which Epidemic identified specific, actionable alleged
     infringements to Meta were through Epidemic's litigation counsel preparing and litigating this
27   lawsuit—including when it was *compelled* to do so in discovery.  July 5, 2023 Case Mgmt. Conf.
     Tr. at 3:20-8:23.

28   [13] Indeed, Meta does not in the ordinary course monitor its users' Rights Manager
     accounts. Arcamona Decl. ¶ 31.

1   is because a match or conflict could be generated by wholly innocent technical similarities between

2   some portion of the two files.  For example, the two files could share common loops or samples

3   from third party content—███████████████████████████████████████████

4   █████████████████████████████████████████████████████████████████████

5   ████  *See, e.g.*, Ex. 83; Ex. 85; Ex. 86.

6   ████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████        Arcamona  Tr.

9   278:18–21; 279:14–25.  Only a rightsholder will know the extent of their rights in any piece of

10  content.  *Id.*; Arcamona Decl. ¶ 31.  Knowledge of conflicts, then, is not sufficient to give Meta

11  knowledge of any specific acts of direct infringement.  And that's especially true in this context,

12  where distributors of Audio Library tracks have represented and warranted that they have the right

13  to license those tracks to Meta—further undermining any possibility Meta could have knowledge

14  of infringement based on a conflict alone.  The same logic applies to "matches" to user-generated

15  content identified in Rights Manager, including those using the Original Audio or Reels Remix

16  features; a match alone does not provide knowledge of infringement.  Indeed, a Facebook or

17  Instagram user could have licensed the audio that generated the match—something that

18  Epidemic's business model encouraged.  *See, e.g.*, Ex. 41.

19      Given Epidemic's complete failure to come forward with evidence of Meta's knowledge,

20  Meta is entitled to summary judgment on Epidemic's contributory infringement claim.

21          ***2.  Epidemic Cannot Meet Its Burden to Show Meta Induced or***

22          ***Materially Contributed to Direct Infringement***

23      Epidemic accuses Meta of both inducing and materially contributing to users' infringement

24  via its Audio Library and its Original Audio and Reels Remix features.  Compl. ¶¶ 67–73, ¶¶ 74–

25  80.  Neither theory is supported here.  Separate from Epidemic's failure to establish knowledge,

26  this failure is an independent basis for summary judgment on these claims.

27

28

### a. Meta Did Not Induce Users' Infringement

Meta is entitled to summary judgment on Epidemic's inducement theory. Inducement claims are meant to target defendants who intentionally design, adapt, or promote their products for use to infringe copyright. *See Grokster*, 545 U.S. at 918–19; *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 672 (9th Cir. 2017). The paradigmatic case for inducement is the defendant that designs and offers a product that is "good for nothing else but infringement," or advertises infringing uses of its product; examples include Napster and Grokster. *Grokster*, 545 U.S. at 932–33, 937–40; *see, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 916–17 (N.D. Cal. 2000), *aff'd in part, rev'd in part*, 239 F.3d 1004 (9th Cir. 2001). By contrast, if a "product is widely used for legitimate, unobjectionable purposes"—in other words, "capable of substantial noninfringing uses"—the mere fact that some consumers might use the defendant's product to commit copyright infringement does not subject the defendant to contributory liability for inducing infringement. *Sony*, 464 U.S. at 436–442; *see also Grokster*, 545 U.S. at 931–34; *Giganews*, 847 F.3d at 672.

Here, Meta's services—Audio Library, Original Audio, Reels Remix, and Facebook and Instagram more broadly—indisputably have overwhelmingly valid, lawful, and noninfringing uses. Meta developed these services to help users create new and inspiring content and foster new connections. *See* Young Tr. 22:16–20, 23:8–15; Neiss Tr. 116:18–117:6; Fleishman Tr. 33:17–25; Young Decl. ¶¶ 10–12. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████ *See* Marks Decl., Ex. 1 at ¶¶ 55–58; *see also, e.g.*, Ex. 95. And the Terms of Use and Community Guidelines governing all of these services prohibit users from doing or sharing anything that "infringes or violates someone else's rights, including their intellectual property rights," and encourage rightsholders to report content and conduct that they believe violates their rights. Ex. 7; Ex. 89; Ex. 90. Meta developed, at considerable expense, industry-leading tools that allow rightsholders to identify and report infringement, and makes them available for free. And Meta acts expeditiously to respond to takedown requests, in the event that any rightsholder believes

1    that there has been a specific instance of infringement. [Arcamona Decl.]  Nor has Epidemic

2    introduced any evidence that Meta advertises these services to infringers, or touts their use for

3    infringement.  *Cf. Grokster*, 545 U.S. at 936.  That is because there is no such evidence.  To the

4    contrary, Meta did nothing more than make "generally applicable tools . . . for users"; "no

5    reasonable juror could conclude [Meta] distributed its product with the object of promoting its use

6    to infringe copyright."  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) (quoting

7    *Giganews*, 847 F.3d at 672).  Meta is entitled to summary judgment on Epidemic's inducement

8    claim.

9                              **b.    Meta   Did   Not   Materially   Contribute   to   Users'**

10                                   **Infringement**

11        Epidemic's material contribution theory fares no better.  As an initial matter, there is some

12    uncertainty about exactly what standard applies to a claim of material contribution.  *See Cox*

13    *Commc'ns, Inc. v. Sony Music Ent.*, 145 S. Ct. 2841 (2025) (granting certiorari to review this

14    question).  The petitioners and the United States as amicus have argued that contributory liability

15    requires affirmative conduct taken with the purpose of furthering direct infringement, and that

16    mere nonfeasance (even with knowledge of infringement) is not enough.  *See* Petrs. Br. *21–43,

17    2025 WL 2556953 (U.S. Aug. 29, 2025); U.S. Br. *10–29, 2025 WL 2616625 (U.S. Sep. 5,

18    2025).  If the Supreme Court adopts that standard, Meta clearly cannot be held liable, given the

19    lack of any evidence that Meta engaged in affirmative conduct with the purpose of furthering

20    infringement.  Even if Epidemic could show that Meta failed to take action in response to direct

21    infringement by others, "failures, omissions, or inactions" are not enough to support contributory

22    liability.  *Smith & Wesson*, 145 S. Ct. at 292 (citation omitted); *Twitter*, 598 U.S. at 490.

23        Assuming the Ninth Circuit's "simple measures" test still applies, however, the result here

24    is the same.  Under that test, as noted, a "computer system operator" is liable "if it has actual

25    knowledge that specific infringing material is available using its system, and can take simple

26    measures to prevent further" infringement, but fails to deploy those simple measures.  *Amazon*,

27    508 F.3d at 1172 (citation and emphasis omitted).  Measures are "simple" if they are "reasonable

28    and feasible."  *Id.*  Epidemic's claim fails this test twice over.

1    *First*, as explained above, Epidemic has not shown Meta had specific knowledge of any

2    direct infringement, and as a result Meta had no opportunity or obligation to take "simple

3    measures" to mitigate any alleged infringement. *See VHT*, 918 F.3d at 745 (no material

4    contribution when platform "did not have appropriately 'specific' information necessary to take

5    'simple measures' to remedy the violation").

6    *Second*, there were no simple measures Meta could have employed to halt infringement

7    (and Epidemic has never identified any). As explained, Meta already has a robust system in place

8    for combatting infringement and for empowering rightsholders to protect their intellectual

9    property. Among other things, it has designed a highly effective notice and takedown process, and

10   it has invested significant resources in creating Rights Manager for rightsholders to manage their

11   content on Meta's platforms. Arcamona Decl. This investment in industry-leading rights

12   management tools goes well beyond the kind of simple measures sufficient to defeat liability for

13   material contribution. *See, e.g.*, *Giganews*, 847 F.3d at 671–72 (concluding there were no simple

14   measures defendant failed to take to remove infringing works when it had its own system for

15   removing infringing material and plaintiff's alternative "proposed method for locating infringing

16   messages was onerous and unreasonably complicated"); *VHT*, 918 F.3d at 745 (concluding no

17   simple measures defendant failed to take when it had a system for removing infringing material

18   and plaintiff's proposed alternative "did not [provide] appropriately 'specific' information

19   necessary to take 'simple measures' to remedy the violation"); *ALS Scan, Inc. v. Steadfast

20   Networks, LLC*, 2018 WL 11350607, at *12–14 (C.D. Cal. Mar. 30, 2018), *aff'd*, 819 F. App'x

21   522 (9th Cir. 2020) (defendant did not fail to take simple measures when it "took simple steps that

22   resulted in all of the at-issue images being removed" (emphasis omitted)). To the extent there

23   were any measures available that could have stopped further infringement, they were *Epidemic's*

24   to employ, by using Rights Manager as Meta intended—to block allegedly infringing content. But

25   Epidemic deliberately chose *to do the opposite*. Should Epidemic attempt to plead helplessness in

26   administering its own rights with the tools Meta made, such an argument is either belied by the

27   facts here or demonstrates the lack of simple measures available to Meta that would resolve

28   ownership disputes across Meta's platforms at scale for Epidemic and all other rights

1    owners. Requiring more of Meta in terms of monitoring for infringement of Epidemic's rights

2    would impose a higher burden on *Meta* than on *Epidemic*. As the Supreme Court has made clear,

3    however, that is not the law. *See Grokster*, 545 U.S. at 939 n.12. Meta is entitled to summary

4    judgment on Epidemic's material contribution claim.

5          **C.**    **Epidemic's Claims Are Barred by Meta's Affirmative Defenses**

6          Meta is also entitled to summary judgment on Epidemic's direct and contributory

7    infringement claims because those claims are barred, in whole or in part, by multiple of Meta's

8    affirmative defenses.

9                     *1.*   *Meta Did Not Infringe Because Epidemic Licensed the Use*

10          Meta is entitled to summary judgment on Epidemic's claims because any uses of

11    Epidemic's works (whether via Audio Library, Original Audio, or Reels Remix) were expressly,

12    or at a minimum impliedly, licensed.

13                    **a.**  **Epidemic Authorized Use of the Works Via Express**

14                          **Licenses in the Rights Manager Terms of Service**

15          Epidemic granted Meta an express license to all audio that matched to Original Audio or

16    Reels Remix through terms Epidemic accepted to create its Rights Manager account. "[A]n

17    infringement claim 'fails if the challenged use of the work falls within the scope of a valid

18    license.'" *Oracle Am., Inc. v. Hewlett Packard Enterps. Co.*, 971 F.3d 1042, 1051 (9th Cir.

19    2020) (citation omitted). While Meta bears the burden of establishing "the existence of a license,"

20    Epidemic, as the "copyright owner[,] bears the burden of proving that [Meta's alleged] copying

21    was unauthorized" under that license. *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d

22    1137, 1151 (N.D. Cal. 2007).

23          Meta has a license for all of Epidemic's works based on the Rights Manager Terms of Use

24    for any alleged infringement premised on Original Audio or Reels Remix. Exhibit 2 to the parties'

25    First Stipulation of Undisputed Facts, dated November 19, 2025, identifies Epidemic's claims of

26    infringement premised on Original Audio or Reels Remix posts for which Epidemic intends to

27    seek judgment against Meta in this action. Dkt. 350-2. Each of these allegedly infringing posts

28

1  was identified through match data from Epidemic's own Rights Manager account and was thus at

2  one point surfaced to Epidemic as a match.  *See* Ex. 84 ("Cox Tr.") 255:12–18; Cox Decl. ¶¶ 2–4.

3        The Rights Manager Terms of Use provide: "If Rights Manager surfaces a potential match

4  . . . between your Reference File Content and content uploaded to a Meta Product by a third party,

5  and you elect to allow such content to remain on that Meta Product . . . , you grant Meta the

6  authorization and/or license to the Claimed Content as described in the Meta Terms."  Rights

7  Manager Terms, Facebook, § F.[14] ████████████████████████████████████████

8  ████████████████████████  *See* Melander Tr. Vol. 1 142:12–143:3 ████████

9  ████████████████████████████████████████████████████████████████

10  ████████████████████████████████  Epidemic concedes: (1) that its "entire library

11  [is] uploaded in … Rights Manager," Ex. 41, (2)████████████████████████████████

12  ████████████, *see, e.g.*, Ex. 39 at 10, and (3) that it has never "select[ed] the 'Block' option

13  in response to matches," Ex. 31 at No. 30.  Indeed, there is no evidence whatsoever that Epidemic

14  reported any alleged infringement of a work in suit to Meta for takedown.  Thus, there is no

15  question that Epidemic, "allow[ed] [its] content" to remain on Facebook and Instagram, after being

16  informed of a "potential match . . . between [Epidemic's] Reference File Content and content

17  uploaded to a Meta Product by a third party."  Rights Manager Terms, Facebook, § F.  In so doing,

18  Epidemic granted Meta a license to all of the content in suit for any claim of infringement related

19  to Original Audio or Reels Remix.

20        **b.  Epidemic Authorized Use of the Works Via Implied**

21        **License**

22        Even if Meta did not hold an express license to use Epidemic's works, Meta at a minimum

23  holds an implied license to do so.  A nonexclusive license may be implied based on "'the licensor's

24  objective intent' . . . as  manifested by the parties' conduct."  *Corbello v. DeVito*, 777 F.3d 1058,

25  1067 (9th Cir. 2015) (quotation omitted).  "An implied license can be found where the copyright

26

27  ───────────────
   [14] While there has been slight variation in the wording of this license over time, the material effect
   of those terms has been the same since 2017—to grant a license to Meta for any content that
28  Epidemic permitted to remain on Meta's services after a match was generated.  *See* Ex. 94 (2020);
   Ex. 93 (September 2018); Ex. 107 (March 2018); Ex. 92 (November 2017); Ex. 91 (April 2017).

1    holder engages in conduct from which the other party may properly infer that the owner consents

2    to his use." *Experexchange, Inc. v. Doculex, Inc.*, 2009 WL 3837275, at *23 (N.D. Cal. Nov. 16,

3    2009) (alterations and citation omitted).  Consent "may be inferred based on silence where the

4    copyright holder knows of the use and encourages it." *Id.* (citation omitted).

5         There can be no dispute that Epidemic has known for years that its works were being used

6    and redistributed on Meta's platforms—via Audio Library, Original Audio, and Reels Remix—

7    yet never took any action to stop or prevent this despite being provided with the tools to do so.  This

8    alone is sufficient to confer an implied license to Meta for these uses.  *See, e.g., Field v. Google*,

9    412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (finding implied license when plaintiff knew "how

10   Google would use the copyrighted works" and knew "that he could prevent such use" but chose

11   not to).

12        But the record is also clear that Epidemic went much further—actively encouraging and

13   profiting from the presence of its works on Meta's services and promising users that if they

14   subscribed to Epidemic, they could publish and monetize Epidemic's works on Facebook and

15   Instagram.       *See       Music       for       Instagram       Videos*,       Epidemic       Sound,

16   https://www.epidemicsound.com/instagram/music-for-instagram-videos/; *Music for Facebook*,

17   Epidemic  Sound,  https://www.epidemicsound.com/facebook/music-for-facebook/;  *see  also*

18   Hoglund Tr. 30:10–25 █████████████████████████████  It is undisputed that

19   Epidemic licensed its works to its subscribers for use on online platforms, including Meta's.  Ex.

20   108 (emphasis added); *see also* Music, Epidemic Sound, https://www.epidemicsound.com/music

21   (explaining that, except for use in "explicit or illegal content," "our music has no limitations as

22   long as you have a valid subscription").  And when Epidemic subscribers, in turn, upload content

23   to Meta's platforms, they then grant Meta an additional, express license to the content, which

24   includes Epidemic's music.  *See* Terms of Use, Instagram, § 4.3 ("[Y]ou grant us a license to use

25   [your content].");  *see also* Terms of Service, Facebook, § 3.3 (similar).   As a result, there are

26   express licenses covering much of the user-uploaded audio at issue in Original Audio and Reels

27   Remix, in addition to the broader implied license.  That only underscores Epidemic's purposeful

28   design of its business model around licensing music for use on online services such as Meta's.

1   The same is true of claims premised on works in Meta's Audio Library.  The record is clear

2   that Epidemic's "entire library [is] uploaded in . . . Rights Manager," Ex. 41, and that ███

3   ████████████████████████████████████████████████████████████████████

4   ███  see, e.g., Ex. 39 at -10.  But there is no evidence that Epidemic ever took action to resolve

5   those competing ownership claims with rightsholders whose works appear in Audio Library, or

6   otherwise tried to bring a stop to alleged infringement via Audio Library tracks either.

7       Given all this, Epidemic's behavior is reasonably interpreted as the grant of a license to

8   Meta for all of its tracks in Rights Manager.  Courts routinely find an implied license in similar

9   circumstances.  See, e.g., Reinicke v. Creative Empire, LLC, 669 F. App'x 470, 471 (9th Cir. 2016)

10  (finding that an implied license existed where plaintiff "wanted [defendant] to use and distribute

11  her work" and "develop[ed] and submitt[ed] [the work] for distribution which, if distributed, would

12  infringe her copyright"); Experexchange, 2009 WL 3837275, at *24 (granting summary judgment

13  to defendant on implied license defense, where plaintiff knew of allegedly infringing uses and

14  "encouraged Defendants to incorporate Plaintiff's [work] into more of [their] products"); see also

15  Parker v. Yahoo!, Inc., 2008 WL 4410095, at *4 (E.D. Pa. Sept. 25, 2008) (finding an implied

16  license where plaintiff knew search engines would cache his works, failed to use opt-out protocols,

17  and remained silent, permitting a reasonable inference of consent); Interscope Recs. v. Time

18  Warner, Inc., 2010 WL 11505708, at *9 (C.D. Cal. June 28, 2010) (implied license defense proper

19  where Plaintiffs "knew Defendants were using their sound recordings on the Show," "sent sound

20  recordings to Defendants and encouraged them to use the recordings on the Show," and "reaped

21  benefits in the form of increased sales from the Show's use of their music," all while never

22  objecting to the Show's use of the music until years later).  The Court should do the same here.

23          **2.  Epidemic's Claims Are Barred by Meta's Other Equitable**

24                **Defenses**

25      Epidemic's infringement claims are also barred by Meta's equitable defenses of (a)

26  equitable estoppel, (b) unclean hands, (c) waiver, and (d) copyright misuse.

27

28

a. **Epidemic's Claims Are Barred by Equitable Estoppel, Unclean Hands, and Waiver**

The undisputed facts about how Epidemic built its business marketing subscriptions for use of its music on Meta's platforms, and used Rights Manager to accrue claims while choosing not to enforce its rights, establishes the grounds for equitable estoppel, waiver, and unclean hands—any one of which warrants judgment in Meta's favor.

Epidemic has had actual or constructive knowledge of Meta's allegedly infringing conduct since as early as 2017, and certainly no later than November 2020.[15] Ex. 31 at No. 1; Melander Tr. Vol. 2 318:14–17. Since that time, Epidemic consistently engaged in conduct that reflected a choice not to assert its copyrights against Meta or enforce its rights on Meta's platform at all.

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████     *See, e.g.*, Ex. 81 at -30-42; Ex. 96 at -18-29; Ex. 54 at -17-24; Ex. 54 at -520, -523. ██████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

█████████████    Ex. 45; *see* Ex. 42 ("[I]t's our creator friendly company policy to never block or remove unlicensed usage."). █████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████████

█████████████████████    Ex. 46. The only evidence in the record of takedowns or blocks by Epidemic on Meta's platforms concerned mistakes by Epidemic; when subscribers complained to Epidemic that their content had been taken down or blocked from Meta's services due to a potential

---

[15] Epidemic concedes that it "became aware of infringing content on Meta's platforms in or around November 2017," "admit[ted] that it suspected the presence of some infringing content on Meta's platforms in or around November 2017," and "admit[ted] that at least as early as June 2018, its Rights Manager Pro account identified certain conflict information," Ex. 31 at No. 4; Ex. 17, No. 51. But Epidemic asserts it never investigated these "suspic[ions]" or "conflict[s]" until November 2020, *years later*. *See* Ex. 31; *cf. CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2647269, at *19 (C.D. Cal. June 25, 2025) (plaintiff had constructive knowledge of infringement where it knew of possible infringement, yet did not use image-matching technology at its disposal to investigate).

1    copyright conflict with Epidemic's music claims, ███████████████████

2    ███████████████████████████████    *See* Ex. 42; Ex. 78; Ex. 41; Ex. 43; *see also* Ex. 109

3    ███████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████

5          Consistent with that "never block" policy, Epidemic never used its Rights Manager

6    account—to which it had uploaded its "entire library" (Ex. 41)—to block or takedown any

7    content. This is so even though Epidemic admitted receiving match information from Rights

8    Manager since as early as June 2018, Ex. 17, No. 51, and ██████████████████████

9    ██████████████████████████████████████    *see, e.g.*, Ex. 49 at -56; Ex. 48 at -35-36. Indeed,

10    Epidemic concedes that it "had the ability . . . to communicate or attempt to communicate with

11    Meta regarding [the alleged] infringement . . . and request that Meta cease infringing." Ex. 31, No.

12    10. Nonetheless, Epidemic offers no evidence that it used this information to request takedowns

13    or otherwise block the use of Epidemic's music on Meta's platform. Instead, the unrebutted

14    evidence shows that Epidemic used Rights Manager information to "ensure" that their content was

15    *not* "falsely" taken down by others. Ex 41. Given these facts, Epidemic's direct infringement

16    claim is barred by each of Meta's equitable defenses.

17          **Estoppel.** Equitable estoppel is a defense to copyright infringement where "equity and

18    justice require that a party be prevented from asserting its legal rights against another." *Bd. of Trs.*

19    *of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099, 1114 (N.D.

20    Cal. 2007). The defense "focuses not on a party's intent, but rather on the effects of his conduct

21    on another" and arises "when a party's conduct misleads another to believe that a right will not be

22    enforced and causes him to act to his detriment in reliance upon this belief." *Roblox Corp. v.*

23    *WowWee Grp. Ltd.*, 2024 WL 4057403, at *7 (N.D. Cal. Sept. 3, 2024) (quotation omitted). To

24    establish estoppel, "(1) the plaintiff must know the facts of the defendant's infringing conduct; (2)

25    the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a

26    right to believe that it is so intended; (3) the defendants must be ignorant of the true facts; and (4)

27    the defendant must rely on the plaintiff's conduct to its injury." *Oracle Am., Inc. v. Hewlett*

28    *Packard Enterp. Co.*, 2017 WL 635291, at *3 (N.D. Cal Feb. 16, 2017).

1   The facts here readily establish estoppel as a matter of law. Epidemic knew of—and knew
2   how to stop—Meta's conduct but affirmatively chose not to. Without any notice of these particular
3   infringements, Meta detrimentally relied on Epidemic's conduct by leaving the content on its
4   platform like any other content not subject to a takedown request. ████████████
5   ████████████████████████████████████████████████
6   ████████████████████████████████████████████████
7   ██████████████████████████████████████ Ex. 57.
8        That is the very pattern the court deemed actionable in *Interscope Records v. Time Warner*
9   *Inc.*, where record labels knew for years that the Ellen DeGeneres Show used their sound
10  recordings, encouraged the use by sending recordings and touting sales benefits, and defendants
11  would have ceased had plaintiffs objected. 2010 WL 11505708, at *11 (C.D. Cal. June 28, 2010).
12  So too here: ████████████████████████████████████████
13  ████████████████████████████████████████████████
14  ████████████████████████████████████████ *See,*
15  *e.g.*, *Kramer v. From the Heart Prods.*, 300 F. App'x 555, 556 (9th Cir. 2008) (plaintiff, who
16  "knew [defendants] were going to do the acts [plaintiff] later claimed were infringing" and
17  "encouraged" the acts, estopped from asserting copyright claims); *Keane Dealer Services, Inc. v.*
18  *Harts*, 968 F. Supp. 944, 947–48 (S.D.N.Y. July 1, 1997) (finding estoppel where the
19  rightsholder's predecessor knew a successor entity was using a software system, answered
20  questions about it, and chose not to object, leading the user to continue operations in
21  reliance). Permitting Epidemic to prevail despite this two-faced conduct would plainly be unjust.
22       **Unclean Hands.** "To prevail on an unclean hands defense, a defendant in a copyright
23  infringement action must demonstrate that (1) the plaintiff's conduct is inequitable and (2) the
24  conduct relates to the subject matter of its claims." *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1082
25  (N.D. Cal. 2007). Both prongs are satisfied here. This Court has already suggested as
26  much. When denying Epidemic's motion to strike Meta's affirmative defenses, the Court noted
27  that Meta's articulation of Epidemic's conduct "felt like it fit right into unclean hands." Dkt. 139
28  at 2:19, 23–24; 4:5–6. Epidemic has pursued two strategies that, alone or together, amount to

unclean hands. *First*, Epidemic induced its subscribers to post Epidemic's tracks on Meta's services in exchange for money—and in the process agree to Meta's Terms of Service—only to then assert that the further use of those induced posts subject to and as contemplated by Meta's Terms of Service constitutes infringement by Meta or its users. *Second*, Epidemic used Meta's Rights Manager tool to stockpile potential infringement claims (including the very uses it induced) without taking action on them.

Epidemic's induce and stockpile strategies violate basic standards of good faith and conscience by engineering the very uses it now characterizes as wrongful and by leveraging a rights-management tool not to resolve or mitigate purported infringement against the true culprits, but to bank claims for later assertion against the party providing the tool itself. *See Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 821 F. App'x 701, 703 (9th Cir. 2020) ("unclean hands bars relief to a plaintiff who has violated conscience, good faith, or other equitable principles in his prior conduct" (quotation omitted)); *see also CoStar*, 2025 WL 2647269, at *21 (citing *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1408 (9th Cir. 1986)). The Court's earlier observation that this conduct "felt like it fit right into unclean hands" has only been borne out by the record; as explained above, discovery has confirmed these allegations and made clear that no issues of material fact exist. And because Epidemic's inequitable conduct targets the same subject matter as its claims—the uses of its works on Meta's platforms pursuant to the Terms and through Rights Manager—both *Shloss* prongs are satisfied and the doctrine bars relief. *See Shloss*, 515 F. Supp. 2d at 1082.

**Waiver.**  "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." *United States v. King Feature Ent., Inc.*, 843 F.2d 394, 399 (9th Cir. 1988). It may be implied when "there is clear, decisive and unequivocal conduct which indicates a purpose to waive the legal rights involved.'" *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 957 (N.D. Cal. 2015) (quotation omitted). *King Feature* illustrates that contemporaneous, repeated objections negate waiver; there, despite delivering the films at issue and cashing payment for them, the court found no waiver because the rightsholder consistently objected and reaffirmed restrictions. 843 F.2d at 399 (noting that internal memos and handwritten

letters memorialized these objections). By contrast, Epidemic did not maintain or communicate objections to the challenged uses on Meta's platforms. As explained above, Epidemic instead encouraged its subscribers to use its music on Meta's platforms, then adopted and publicly advertised a policy of never taking down content matched to its reference files. *See AirWair*, 84 F. Supp. 3d at 958 (trademark rightsholder's statement to the defendant that it "would not file a lawsuit," which post-dated a cease and desist letter, supported waiver). And the undisputed facts demonstrate that Epidemic knew of and condoned the use of its music on Meta's services for years before it changed course and belatedly decided to enforce rights that it had deliberately declined to assert—and even then, this belated enforcement effort was not to ask Meta to take down or block Epidemic's content, but to try to force Meta to pay to keep the infringing content up via a blanket licensing agreement covering Epidemic's complete catalog (including tens of thousands of works not asserted in this case). Epidemic could have objected to the challenged uses on Meta's platforms. *Cf. King Feature*, 843 F.2d at 399 (repeated objections defeats waiver). It didn't. Epidemic's conduct amounts to waiver.

### b. Epidemic's Claims Are Barred by the Doctrine of Copyright Misuse

Copyright misuse is an affirmative defense to copyright infringement that "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office," and "precludes [the copyright's] enforcement during the period of misuse." *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 & n.9 (9th Cir. 1997) (citation omitted). Copyright misuse applies when "the copyright is being used in a manner violative of the public policy embodied in the grant of copyright." *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1080 (N.D. Cal. 2007) (citation and internal quotation marks omitted). That policy is "to stimulate artistic creativity for the general public good." *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698 (9th Cir. 2015) (Wardlaw, J., concurring) (quotation omitted). "[I]n the absence of such public benefit, the grant of a copyright monopoly to individuals would be unjustified." *Id.*

As described above, the undisputed record demonstrates that Epidemic for years deliberately encouraged its subscribers to use its music on Meta's services and maintained a policy

of never blocking or taking down content with its music, while also refusing to take action to

remove allegedly infringing tracks from Meta's Audio Library despite constructive knowledge of

the alleged infringements forming the basis of its claims. Epidemic's goal, as articulated by

Epidemic itself, was to ███████████████████████████████ Ex. 39 at -06,

███████████████████████████████ Ex. 28 at -63, ███████

███████████████" Ex. 82 and -89; *see also* Ex. 80 at -32 (Epidemic requesting, as early as 2017,

"to be the exclusive provider of music to the ['][FB Music Library'"); Ex. 39 at -09████; Ex.

79 ████████████████████████████████████████ When

Meta refused, Epidemic resorted to deceitful tactics, stockpiling unasserted copyright claims and

ultimately threatening legal action, in hopes of forcing Meta to agree to a commercial relationship

for a blanket license covering Epidemic's complete catalog (including tens of thousands of works

not asserted in this case)—a catalog that Meta does not want, and could not justify licensing under

its business model at the prices demanded. *See* Ex. 39 at -08.████████████████

████████████████████████████████████████████

███████



        Worse still, Epidemic has consistently sought to leverage infringement claims related to a

narrowly defined (and shrinking) number of tracks within its catalog to force Meta to purchase

rights in tens of thousands of unasserted works. It plans to ask this Court to sanction, and the jury

to validate, this misuse by proffering expert opinions extrapolating potential actual damages for

allegedly infringing uses of the 900 works in suit to Epidemic's *entire 54,000-work catalog*,

including works that Epidemic asserted in its complaint and actually *dismissed from this case in

2023*. In so doing, Epidemic "impermissibly 'used the defensive shield of copyright as an

offensive sword.'" *Omega S.A.*, 776 F.3d at 696 (Wardlaw, J., concurring); *see also Alcatel USA,

Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 793 (5th Cir. 1999) (finding copyright misuse because

defendant "used its copyrights to indirectly gain commercial control over [other] products"). That

those "other products" are separate, unasserted copyrights is of no moment.[16]

---

[16] Indeed, as discussed earlier the evidence suggests that in its efforts to stretch the scope of its
copyright protection as far as possible, Epidemic even impermissibly registered the same material

1     Epidemic's conduct "promoted neither the broad public availability of the arts nor the

2 public welfare." *Omega S.A.*, 776 F.3d at 705 (Wardlaw, J., concurring) . To the contrary,

3 Epidemic's conduct is inconsistent with the policies underlying the Copyright Act and is precisely

4 the sort of abuse of the copyright monopoly that the misuse defense is intended to guard

5 against. *See, e.g.*, *Disney Enterps., Inc. v. Redbox Automated Retail, LLC*, 2018 WL 1942139, at

6 *6 (C.D. Cal. Feb. 20, 2018) ("improper leveraging of Disney's copyright in the digital content to

7 restrict secondary transfers of physical copies" constitutes copyright misuse); *Broad. Music, Inc.*

8 *v. Hearst/ABC Viacom Ent. Servs.*, 746 F. Supp. 320, 328 (S.D.N.Y. 1990) (permitting misuse as

9 an affirmative defense where musical rights aggregator, BMI, was accused of attempting to use

10 infringement allegations to leverage a "blanket license at exorbitant prices"); *Malibu Media, LLC*

11 *v. Cuddy*, 2015 WL 1280783, at *9 (D. Colo. Mar. 18, 2015) (recognizing the viability

12 of copyright misuse claim where defendant alleged the plaintiff's "business model" was tracking

13 "IP addresses which may lead to a potential copyright infringer, in order to generate income for

14 the alleged downloads, rather than as a method of stopping the alleged infringements").

15     **D.**    **Meta Is Entitled to Summary Judgment on Epidemic's Requested Damages**

16     Meta is also entitled to summary judgment on three aspects of Epidemic's requested

17 damages: With respect to Epidemic's statutory damages claim, Epidemic is not entitled to statutory

18 damages for the vast majority of the Asserted Works, and to the extent any statutory damages are

19 available at all, Epidemic cannot seek enhanced damages for willful infringement. With respect

20 to Epidemic's alternative claims of actual damages, those claims are barred to the extent they are

21 premised on alleged infringements that occurred outside the statute of limitations period.

22     ***1.***   ***Epidemic Is Not Entitled to Statutory Damages for the Vast***

23     ***Majority of Its Asserted Works***

24     All but a handful of the Asserted Works are categorically ineligible for an award of

25 statutory damages as a matter of law because Epidemic registered them only after the alleged

26

27 for copyright protection twice, and asserted both against Meta while seeking per work statutory
damages awards. Had the Copyright Office been aware, it would not have approved such improper

28 applications. *Compendium (Third)* § 602.4(E). And it would be sufficient grounds to invalidate
Epidemic's duplicate registrations altogether. *See* 17 U.S.C. §411(b).

1  infringement began and more than three months after first publication.  A copyright owner cannot

2  obtain statutory damages for "any infringement of copyright commenced after first publication of

3  the work and before the effective date of its registration, unless such registration is made within

4  three months after the first publication of the work." 17 U.S.C. § 412(2).  Moreover, "[e]very court

5  to consider the issue has held that infringement 'commences' … when the first act in a series of

6  acts constituting continuing infringement occurs." *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528

7  F.3d 696, at 700-01 (9th Cir. 2008) (citation omitted); *see also Marshall v. Babbs*, 2019 WL

8  1557429, at *3-4 (C.D. Cal. Apr. 10, 2019) (concluding plaintiff ineligible for statutory damages

9  when infringements commenced before registration); *Livingston v. Art.com, Inc.*, 2014 WL

10  3404722, at *3–6, *9 (N.D. Cal. Jul. 11, 2014) (Corley, J.) (similar).  The "plaintiff bears the

11  burden of demonstrating its entitlement to statutory damages," by establishing "by what acts and

12  at what time defendant infringed [plaintiff's] copyright." *SimplexGrinnell LP v. Integrated Sys. &*

13  *Power, Inc.*, 642 F. Supp. 2d 167, 196 (S.D.N.Y.) (internal quotations and citation omitted),

14  *modified on reconsideration*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009).  Epidemic cannot meet this

15  burden.

16  █████████████████████████████████████████████████████████████

17  ██████████  Leonard Decl. ¶ 168 & Ex. 11a; *see also* Dkt. 31-4; Dkt. 37 (judicially noticing

18  registration and publication information).  So, for any given Asserted Track, statutory damages are

19  available only if registration was made before the alleged infringement of that track

20  commenced.  17 U.S.C. § 412(2).  But Epidemic admits ████████████████████

21  ███████████████████████████████████████████████████████████████

22  ██████████████████████████████  Ekstrom Tr. 85:12–86:15, 93:25–94:4, 97:13–16,

23  283:1–6; [Epidemic's Resp. to Interrog. No. 15].  For that reason alone, the Court should grant

24  summary judgment with respect to Epidemic's claim of statutory damages.

25  If any more were needed (it is not), Meta's expert Dr. Leonard analyzed the data and

26  concluded that "there are only six Asserted Epidemic Tracks for which there is no indication that

27  the work existed on Meta's platforms before the effective date of registration."  Leonard Decl.

28  ¶ 168 & Ex. 11a).  In other words, for 894 out of the 900 tracks in suit, the evidence demonstrates

1   that registration occurred after the work was allegedly available without a license on Meta's

2   services.  Epidemic cannot obtain statutory damages for any of these works.

3                    **2.  *No Reasonable Jury Could Conclude Meta Was Willful***

4          To the extent statutory damages are available, Epidemic is limited to a maximum award of

5   $30,000 per work because any infringement by Meta was not willful as a matter of law.  *See* 17

6   U.S.C. § 504(c).  A finding of willful infringement requires the plaintiff to show that the defendant

7   "knew that they were infringing the [plaintiff's] copyrights or that they acted with reckless

8   disregard as to whether they were doing so."  *In re Barboza*, 545 F.3d 702, 708 (9th Cir.

9   2008).  Infringement is not willful if the defendant has a "reasonable belief" that its conduct was

10  lawful.  *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012).

11         *First*, for alleged infringement related to Meta's Audio Library, ███████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████    T. Hrivnak Tr. 212:1–12.  Given the notorious complexity of music

14  licensing, it is established industry practice for digital platforms to rely on contractual guarantees

15  like these, particularly when music is licensed at a large scale, as it is for Meta's Audio Library.

16  Marks Decl., Ex. 1 at ¶¶ 52-54, 58; Dkt. 80-4 at ¶ 4.  Moreover, Meta put in place procedures by

17  which Epidemic could have asserted its rights and requested specific content be taken down;

18  Epidemic did not use them.  *See* Arcamona Decl.  Faced with virtually identical facts related to

19  Apple's music library, another judge in this district recently concluded that the fact Apple was

20  provided with a "contractual representations of rights" by licensors and operated a "notice-and-

21  takedown procedure that put[] the onus on an uploader to affirmatively assert rights" was "*fatal* to

22  a finding of willfulness" as a matter of law.  *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869,

23  882 (N.D. Cal. 2022) (emphasis added); *see also Evergreen*, 697 F.3d at 1228-29 (no willfulness

24  where reasonable belief defendant had a license).

25         In fact, the Second Circuit in *Bryant v. Media Right Productions, Inc.*, held that reliance

26  on similar representations and warranties (by one of the distributors originally implicated by

27  Epidemic's claims, the Orchard, before Epidemic dismissed 52 works asserted in the complaint)

28  was *innocent* infringement that cabined statutory damages to $200 per eligible work.  *Bryant*, 603

1  F.3d 135, 139, 143–44 (2d Cir. 2010) (affirming finding that music distributor acted innocently by

2  reasonably relying on provisions of distribution agreement warranting that use of the music in

3  accordance with the agreement would not infringe copyright). So too here.

4      *Second*, for alleged infringement related to UGC, the undisputed facts likewise establish

5  Meta's lack of willfulness.  Meta provided general purpose tools—Original Audio and Reels

6  Remix—that were capable of substantial noninfringing uses.  Meta also provided multiple means

7  for copyright owners to police any alleged infringement.  Arcamona Decl. ¶¶ 11–20.

8  ████████████████████████████████████████████████████████

9  ████████████████████████████  *See* Ex. 101; Ex. 100; Ex. 99; Ex. 104; Ex. 102; Ex. 105; Ex.

10  106; Ex. 103; Ex. 98.  In light of all these facts, no reasonable juror could find Meta infringed

11  "willfully."

12                   **3.  Meta Is Entitled to Summary Judgment on Time-Barred Claims**

13      Epidemic's claims, and accompanying requests for damages, also fail to the extent they are

14  premised on infringements that occurred more than three years before the complaint was filed in

15  this case.  Any claims or requests for damages premised on such infringements are time-barred.  A

16  copyright infringement claim "must be commenced within three years after the claim accrued."  17

17  U.S.C. § 507(b).  Under the Ninth Circuit's "discovery rule," an infringement claim "accrues when

18  the copyright holder knows or reasonably should know that an infringement occurred." *Starz Ent.,*

19  *LLC v. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236, 1237 (9th Cir. 2022).[17]  As

20  explained above, Epidemic has maintained a Rights Manager account since 2017.  That account

21  allows Epidemic to search for and identify potential infringements on Meta's platforms, and

22  Epidemic concedes it monitored its Rights Manager account and received match and conflict

23  notices. *See* Ex. 64, at No. 8; Ex. 31, at Nos. 22, 34.  At a minimum, then, "with due diligence"

24

25

_____

26  [17] The Supreme Court has repeatedly reserved the question whether the Copyright Act permits
    application of the "discovery rule."  *See Warner*, 601 U.S. at 371; *Petrella v. Metro-Goldwyn-*
27  *Mayer, Inc.*, 572 U.S. 663, 670 n.4 (2014).  It does not.  *See Warner*, 601 U.S. at 374-76 (Gorsuch,
    J., joined by Thomas and Alito, JJ., dissenting).  Meta preserves this issue for further review.  Even
28  assuming the discovery rule applies, however, Epidemic's claims for infringements prior to July
    20, 2019, are barred by the statute of limitations.

1    Epidemic "should have discovered" the alleged infringement by 2017 at the latest. *Warner*

2    *Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 369 (2024).

3        The recent decision in *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, 2025

4    WL 2647269 (C.D. Cal. June 25, 2025), is instructive. There, the plaintiff CoStar had access to

5    an automated tool that would have allowed it "to identify alleged copyright infringement through

6    image-matching." *Id.* at *19. Despite "evidence indicat[ing] CoStar knew there was possible

7    infringement of its photos on CREXi.com in late 2019," "there [wa]s no evidence that CoStar used

8    the image-matching technology at its disposal to investigate which images were displayed on

9    CREXi before April 2020." *Id.* The court concluded that a reasonable copyright owner in

10   CoStar's position would have used that technology to investigate infringement, and the discovery

11   rule therefore could not save CoStar from the three year statute of limitations, and any "claims

12   based on instances of infringement that occurred before [the statute of limitations] are time-

13   barred." *Id.* at *20.

14       So too here. Since 2017, Epidemic had a tool—that Meta provided—permitting it to

15   investigate and stop use of its works, but it refused to do so. As a result, the discovery rule offers

16   Epidemic no relief from the statute of limitations, and claims or requests for damages for any

17   infringement that occurred before July 20, 2019—three years prior to when Epidemic filed the

18   complaint in this action, *see* Dkt. 1—are time barred. *See* Leonard Decl. ¶¶ 62 & 95)

19   ███████████████████.

20   **V.    CONCLUSION**

21       For the foregoing reasons, Meta's motion should be granted.

22

23

24

25

26

27

28

1   Dated:  November 20, 2025       **LATHAM & WATKINS LLP**

2

                           By    *Joseph R. Wetzel*

3                                Joseph R. Wetzel (SBN 238008)
                                 *Joe.Wetzel@lw.com*

4                                Brittany N. Lovejoy (SBN 286813)
                                 *Britt.Lovejoy@lw.com*

5                                505 Montgomery Street, Suite 2000
                                San Francisco, California  94111-6538
6                                Telephone:  415.391.0600

7                                Allison L. Stillman (*pro hac vice*)
                                 *Alli.Stillman@lw.com*

8                                1271 Avenue of the Americas
                                New York, New York 10020
9                                Telephone:  212.906.1747

10                             Sarang V. Damle (*pro hac vice*)
                                 *Sy.Damle@lw.com*

11                             Brent T.F. Murphy (*pro hac vice*)
                                 *Brent.Murphy@lw.com*

12                             555 Eleventh Street, NW, Suite 1000
                                Washington, DC 20004
13                               Telephone:  202.637.2200

14                             *Attorneys for Defendant*
                              *Meta Platforms, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO